**GOLDSTEIN TILL & LITE**
Allyn Z. Lite (AL 6774)
Joseph J. DePalma (JD 7697)
Amy M. Riel (AR 1216)
Two Gateway Center
12th Floor
Newark, New Jersey 07102
(201) 623-3000

**POMERANTZ HAUDEK BLOCK
& GROSSMAN**
Stanley M. Grossman, Esq.
D. Brian Hufford, Esq.
Paul O. Paradis, Esq.
100 Park Avenue
New York, NY 10017
(212) 661-1100

Attorneys for Plaintiffs

**FILED**

OCT 27 1995

AT 8:30 ................M
WILLIAM T. WALSH
CLERK

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

---

DAVID CHIN, KEVIN L. SULLIVAN,
MARVIN KIRSCHENBAUM, BRUCE
McCUTCHEON, DEBRA and KEVIN L.
DODGE, HOWARD BARKAN, BESSIE COYNE,
GEORGE HIGGINS, JULIE SZABOS, JIM
COFFEY, SUSAN ROBINS, AL ZEIDLER,
LUSTER DAVIS, FRAN
STRYKOWSKI, JEFF BRADLEY, JERRY
GREEN, TONY SANCHEZ, KENNETH E.
NEALY, CRAIG M. DINSMORE, DAVID P.
YEXLEY, DR. MAURICE BENOIT, JR.,
ED MIKOLOAJCZYK, ABDALLAI HASSAN,
MARTHA and CALVIN M. SINGLETON,
HWARD G. SAUL, SCOTT A. HOLLENBECK,
BERNARD SIMELTON, WILLIAM KNUEVEN,
GARY BERNER, JOHN D. JAMES, MARY
M. GAAR and WENDY DEN, individually
and on behalf of all others
similarly situated,

              Plaintiffs,
      vs.

CHRYSLER CORPORATION,

           Defendant.

Civil Action No. 95-5569 (JCL)

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

---

Plaintiffs, by their undersigned attorneys, for their

complaint, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made by and through their attorneys, which investigation included, among other things, a review of the public documents, consumer complaints filed with public and private auto safety agencies, and news reports concerning Chrysler Corporation ("Chrysler" or the "Company"):

## NATURE OF THE CASE

1.   This action arises from the sale or lease of thousands of vehicles manufactured by Chrysler Corporation from 1990 through 1995 which are equipped with dangerously defective anti-lock brake systems ("ABS").  The Chrysler vehicles equipped with these defective ABS systems are referred to collectively herein as the "Defective Vehicles."  Plaintiffs bring this action on their own behalf under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act ("Magnuson-Moss" or the "Act"), and further bring this action as a class action on behalf of all others similarly situated (the "Class"), under the applicable common law for fraud and for breach of express and implied warranties.

2.   The Defective Vehicles, which include Chrysler's popular and highly profitable line of minivans, were sold or leased pursuant to express and implied warranties.  These warranties assured consumers that such vehicles were free from

2

defects and were properly equipped for the use for which they were intended. In violation of these warranties, the Chrysler vehicles were equipped with defective ABS systems that were prone to failure. These defective ABS systems were manufactured by the Bendix division of the AlliedSignal Corporation and are commonly known as the "Bendix 10 ABS." By equipping its vehicles with the defective Bendix 10 ABS systems, Chrysler has breached its express and implied warranties in violation of federal and state law.

3. At least as early as 1990, when Chrysler began to receive numerous complaints and requests for brake repairs by consumers, the Company knew that the Bendix 10 ABS systems with which it was equipping thousands of its vehicles were defective. Remarkably, rather than honor its warranties, Chrysler has sought to forestall complaints arising from its Defective Vehicles through a deliberate plan of obfuscation and misrepresentations. Rather than honoring the warranties by repairing or replacing the defective Bendix 10 ABS systems, Chrysler has repeatedly denied that they are prone to failure and has affirmatively misled its consumers with respect to the safety of its vehicles.

4. As a result of Chrysler's failure to respond to consumer complaints, owners and lessees of the Defective Vehicles have subsequently complained to various consumer or governmental groups, including the Center for Auto Safety ("CAS") and National Highway Traffic Safety Administration ("NHTSA"). Virtually thousands of such complaints have been received by NHTSA, leading

to its ongoing investigation into the ABS systems in various minivan and other car models manufactured by Chrysler.

5.   Through this action, plaintiffs seek equitable relief from Chrysler's deliberate promotion and sale or lease of a defective product, *i.e.*, vehicles equipped with a defective anti-lock brake system.  Thus, Plaintiffs request that Chrysler be compelled either (i) to offer rescission to the Plaintiffs and members of the Class, by repurchasing their Defective Vehicles for their full cost, or (ii) to recall all Defective Vehicles it manufactured between 1990 and 1995 that were equipped with the Bendix 10 ABS system and retrofit such vehicles by replacing the existing Bendix 10 ABS systems with a non-defective braking system.  In addition, Plaintiffs seek to compel Chrysler to pay restitution of all costs incurred by Plaintiffs and members of the Class in connection with the replacement or repair of the Bendix 10 ABS systems installed in the Defective Vehicles by Chrysler.

### JURISDICTION AND VENUE

6.   This is a civil action for injunctive relief, specific performance and restitution arising under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. § 2301, *et. seq.*, and for damages under the common law.

7.   This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 2310(d)(1)(B) and under the principles of supplemental jurisdiction.  The amount of any individual claim in controversy exceeds $25.00.  The amount of all claims in

4

controversy exceeds $50,000, exclusive of interest and costs.

8.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Certain of the Plaintiffs are New Jersey residents and Chrysler maintains offices in this District, received substantial compensation and profits from sales of Chrysler vehicles in this District, and made representations and breached warranties in this District.  Moreover, AlliedSignal, the manufacturer of the Bendix 10 ABS, has its principal executive offices in this District.  Thus, much of the discovery and many of the potential trial witnesses are located in New Jersey.

**PARTIES**

**Plaintiffs**

9.   Plaintiff David Chin resides at 3 Fawn Court, Jamesburg, New Jersey 08831.  He purchased a 1992 Dodge Caravan on August 31, 1992 from Woodbridge Dodge, Woodbridge, New Jersey. The Vehicle Identification Number is 2B4GH55R1NR516535.

10.   Plaintiff Kevin L. Sullivan resides at 90 Reid Place, Verona, New Jersey 07044.  He purchased a 1991 Dodge Grand Caravan in November 1993.  The Vehicle Identification Number is 1B4GK54R4MX514751.

11.   Plaintiff Marvin Kirschenbaum resides at 22 Lombardi Place, Plainview, New York 11793.  He purchased a 1991 Dodge Caravan LE in March 1991.  The Vehicle Identification Number is 1B4GK54R5MX610646.

12.   Plaintiff Bruce McCutcheon resides at 619 West

5

Lafayette St., Easton, Pennsylvania 18042.  He purchased a 1992 Plymouth Voyager on January 2, 1992 from Rothrock Motor Sale in Allentown, Pennsylvania.  The Vehicle Identification Number is 2P4GH45R5NR508236.

13.   Plaintiffs Debra and Kevin Dodge reside at 527 Westchester Drive, Greensburgh, Pennsylvania 15601.  They purchased a 1991 Dodge Caravan on May 23, 1991 from Kunkle's Service, Inc. in Delmont, Pennsylvania.  The Vehicle Identification Number is 2B4GD55R6MR203085.

14.   Plaintiff Howard Barkan resides at 216 Waverly Road, Southampton, Pennsylvania 18966.  He purchased a 1992 Plymouth Grand Voyager on October 17, 1991 from Lansdale Chrysler-Plymouth in Mongomeryville, Pennsylvania.  The Vehicle Identification Number is 1P4GH54RINX122647.

15.   Plaintiff Bessie Coyne is resides at 5800 Palm Street, Harrisburg, Pennsylvania 17112.  She purchased a 1991 Plymouth Grand Voyager LE on August 1, 1991 from Warner Chrysler Plymouth in Hummelstown, Pennsylvania.  The Vehicle Identification Number is 1P4GH54R3MX653993.

16.   Plaintiff Julie Szabos resides at 1710 Breckenridge, Harrisburg, Pennsylvania 17112.  She has purchased three Dodge Grand Caravans, a 1991, a 1992 and a 1993, the first two of which she traded in after experiencing repeated brake failures.  She purchased her 1993 vehicle from Brenner Dodge in Harrisburg, Pennsylvania.  The Vehicle Identification Number is 1B4GH54R6EX692065.

6

17.   Plaintiff Garry L. Berner resides at 116 Vista Street, Pittsburgh, Pennsylvania 15223-2029.  He purchased a 1993 Plymouth Grand Voyager LE on May 20, 1993 from Krebs Chrysler Plymouth in Glen Shaw, Pennsylvania.  The Vehicle Identification Number is 1P4GH54R5PX520155.

18.   Plaintiff Jim Coffey resides at 393 St. Andrews Lane, Half Moon Bay, California 94019.  He purchased a 1992 Dodge Grand Caravan on July 21, 1992 from Marrietta Dodge in Marrietta, Georgia.  The Vehicle Identification Number is 1B4GH44R0NX294941.

19.   Plaintiff Susan Robins resides at 6928 Burnet Ave., Van Nuys, California 91495.  She purchased a 1992 Plymouth Voyager in January 1992 from Prince Chrysler in Inglewood, California.  The Vehicle Identification Number is 2P4GH45R4NR629324.

20.   Plaintiff Janice Sonski resides at 4854 Placidia Ave., North Hollywood, California 91601.  She leased a 1993 Dodge Caravan LE on October 3, 1993 from Simi Valley Dodge Chrysler Jeep Eagle, in Simi Valley, California.  The Vehicle Identification Number is 2B4GH45R7PR373734.

21.   Plaintiff Al Zeidler resides at 1145 Lea Dr., Novato, California 94945.  He purchased a 1992 Grand Voyager LE in December 1991 from AutoWorld in Petalluma, California.

22.   Plaintiff Luster Davis resides at 2505 E. Division St., Suite F, National City, California 91950.  He purchased a 1993 Chrysler Concorde on September 24, 1993 from Chrysler Overseas Military Sales Corporation in Woodbury, New York.  The

Vehicle Identification Number is 2C3EL56F4PH663314.

23.   Plaintiff Fran Strykowski resides at 242 Orchard Rd., Orlinda, California 94563.  She purchased a 1991 Dodge Caravan on July 14, 1991 from Oakland Dodge in Oakland, California.  The Vehicle Identification Number is 1B4GK54R5MX574733.

24.   Plaintiff Jeff Bradley resides at 1540 Lehigh Street, Boulder, CO 80303.  He purchased a 1992 Plymouth Voyager on May 30, 1992 from Concord Chrysler Plymouth in Concord, Massachusetts.  The Vehicle Identification Number is 2P4GH45R6NR668142.

25.   Plaintiffs Jerry and Vivian Green reside at 10852 Southwest 142 Court, Miami, Florida 33186.  They purchased a 1992 Dodge Caravan in April 1992 from Maroone Dodge in Miami, Florida. The Vehicle Identification No. is 2B4GH45RXNE71757.

26.   Plaintiff Kenneth E. Nealy resides at 1200-E Cornet Ave., Honolulu, Hawaii 96818.  He purchased a 1991 Plymouth Voyager LE on March 3, 1991 from Colorado Chrysler Plymouth in Denver, Colorado.  The Vehicle Identification Number is 2P4GH55R6MR203834.

27.   Plaintiff Craig M. Dinsmore resides at 29 W. 310 Lee Rd., West Chicago, Illinois 60185-2044.  He purchased a 1991 Voyager LE AWD in April 1994 in Waukesha, Wisconsin.  The Vehicle Identification Number is 2P4GP55R1MR317341.

28.   Plaintiff David P. Yexley resides at 1400 E. Sheridan Bridge Lane, Olathe, Kansas 66062.  He leased a 1992

Town & Country on June 1, 1992 from Anne Zaricky's Chrysler Plymouth in Olathe, KS.  The Vehicle Identification Number is 1C4GH54R4NX233533.

29.  Plaintiff Dr. G. Maurice Benoit, Jr. resides at 890 Cross Gates Road, Slidell, Louisiana 70461.  He purchased a 1994 Town & Country in December 1993 from Feinato Chrysler in New Orleans, Louisiana.  The Vehicle Identification Number is 1C4GH54LORX177273.

30.  Plaintiff George Higgins resides at 197 Riverside, Dedman, Masschusetts 02026.  He leased a 1993 Dodge Grand Caravan in November 1992 from Norwood Dodge in Norwood, Massachusetts. The Vehicle Identification Number is 1B4GH44RIPX604873.

31.  Plaintiff Ed Mikolajczyk resides at 13615 Gardenia Path, Apple Valley, Minnesota 55124.  He purchased a 1993 Town & Country in April 1994 from Sunnyside Chrysler Plymouth in Apple Valley, Minnesota.  The Vehicle Identification Number is 1C4GH54R8PX698033.

32.  Plaintiff Abdallai Hassan resides at 2380 Cascade Plaza South, Woodbury, Minnesota 55125.  He purchased a 1992 Dodge Caravan on January 7, 1992 from White Bear Dodge in Woodbury, Minnesota.  The Vehicle Identification Number is 2B4GH45R3NR621037.

33.  Plaintiff Karsten Flagstad resides at 3200 229th Avenue, Bethel, Minnesota 55005.  He purchased a 1991 Chrysler Imperial in November 1993 from Rosedale Chrysler Plymouth in Rosedale, Minnesota.  The Vehicle Identification Number is

9

1C3XY56R0MD184062.

34.  Plaintiffs Martha and Calvin M. Singleton reside at 16301 Fernway Road, Shaker Heights, Ohio 44120.  They purchased a 1991 Plymouth Grand Voyager on March 13, 1991 from Don Jordan Chrysler Plymouth in Beachwood, Ohio.  The Vehicle Identification Number is 1P4GH54R5MX576169.

35.  Plaintiff Howard G. Saul resides at 4138 Bexley Blvd., Cleveland, Ohio 44121-2711.  He purchased a 1990 Dodge Dynasty on May 16, 1990 from Junction Auto Sales in Cleveland, Ohio.  The Vehicle Identification Number is 1B3XC56R3LD868257.

36.  Plaintiff Scott A. Hollenbeck resides at 9515 Orion Court, Burke, Virginia 22015.  He purchased a 1991 Dodge Grand Caravan on January 4, 1991 from Fair Oaks Dodge in Fairfax, Virginia.  The Vehicle Identification Number is 1B4GK54R1MX505909.

37.  Plaintiff Bernard H. Simelton resides at 7310 Lightship Court, Burke, Virginia 22015.  He purchased a 1991 Plymouth Voyager in 1992 from Fair Oaks Dodge in Fairfax, Virginia.  The Vehicle Identification Number is 1P4GH54R7MX542475.

38.  Plaintiff William Knueven resides at 9302 Ludgate Drive, Alexandria, Virginia 22039.  He purchased a 1993 Town & Country in September 1992 from Passport Chrysler in Alexandria, Virginia.  The Vehicle Identification Number is 1C4GH54R5PX519706.

39.  Plaintiff John D. James resides at 1606 Spence

10

St., Green Bay, Wisconsin 54304.  He purchased a 1990 Chrysler Imperial in the Spring of 1991 from Bay City Chrysler Plymouth in Green Bay, Wisconsin.  The Vehicle Identification Number is 1C3XY56R3LD900774.

40.  Plaintiff Mary M. Gaar resides at 4120 North 80th Street, Milwaukee, Wisconsin 53222.  She purchased a 1992 Dodge Dynasty on August 4, 1992 from Stark Falls Chrysler in Menomonee Falls, Wisconsin.  The Vehicle Identification Number is 1B3XC46R2ND860731.

41.  Plaintiff Wendy Den resides at 23701 Elkwood Street, West Hills, California 91304.  She purchased a 1993 Dodge Caravan SV in December 1992 from Valley Dodge In Van Nuys, California.  The Vehicle Identification Number is 2BYGH2536PR143747.

### Express and Implied Warranties Issued to the Plaintiffs

42.  Chrysler sold or leased the Defective Vehicles to Plaintiffs and members of the Class subject to both express and implied warranties.  Pursuant to the express, written warranties, Chrysler presented the Defective Vehicles as being free of defects in materials and workmanship at the time of delivery, providing that authorized Chrysler dealers would make necessary repairs to correct defects in the Defective Vehicles, without charge, over an agreed upon warranty period.  In addition, Chrysler sold or leased the Defective Vehicles to the Plaintiffs and members of the Class under implied warranties of merchantability and fitness for a particular purpose, warranting

11

them as being merchantable and fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by their owners or lessees. Under both the express and implied warranties, Chrysler guaranteed that its Defective Vehicles were equipped with safe and properly functioning braking systems.

43. The anti-lock braking systems in each of the Defective Vehicles owned or leased by the Plaintiffs and members of the Class have repeatedly failed to perform as warranted, leading, in many cases, to the complete loss of braking ability. As a result of defects in the anti-lock braking system Chrysler installed in their Defective Vehicles, the Plaintiffs have been damaged.

**Defendant**

44. Chrysler is a Delaware corporation operating, maintaining offices, and conducting business throughout New Jersey and the United States. Its principal offices are at 12000 Chrysler Drive, Highland Park, Michigan 48288-0001. The Company manufactures, assembles and sells and leases cars and trucks under the brand names Chrysler, Dodge, Plymouth and Eagle, among others. In 1994, Chrysler's domestic retail sales of cars and trucks represented 9.0% of the total industry, with the sale of approximately 812,000 units that year alone. Chrysler sells its new passenger cars and trucks, as well as many of its used automobiles, through dealers, who totalled 4,687 at the end of 1994. The acts upon which this action is based occurred in this

12

District and elsewhere, and Chrysler sold thousands of Defective Vehicles in violation of express and implied warranties in this District and nationwide.

45.   As further discussed in paragraphs 81 through 83 below, in promoting, selling and repairing its Defective Vehicles, Chrysler acts through numerous authorized dealers who act and portray themselves to the public as exclusive Chrysler representatives and agents.  That the dealers act as Chrysler's agents is demonstrated by the fact that (1) the warranties provided by Chrysler for each of the Defective Vehicles expressly direct consumers to take their vehicles to authorized Chrysler dealers for repairs and/or service; (2) Chrysler dictates the nature and terms of the purchase contracts entered into between the authorized dealers and consumers; (3) Chrysler directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning the Defective Vehicles; and (4) Chrysler has entered into agreements and understandings with its authorized dealers pursuant to which it is able to exercise substantial control over the operations of the authorized dealers and their interaction with the public.

46.   Chrysler's control over the actions of its dealers is evidenced by its implementation of the Company's express and implied warranties as they relate to the anti-lock brake systems with which the Defective Vehicles are equipped.  Authorized Chrysler dealers have been informed by Chrysler not to make any repairs on ABS systems without the Company's express permission.

13

Indeed, some dealers have informed their customers that their "hands were tied" with respect to ABS repairs, directing their customers to contact Chrysler directly to discuss any problems they might be having with their braking systems.  Thus, Chrysler -- not its authorized dealers -- exercises complete control over the interpretation and implementation of the express and implied warranties given with the purchase or lease of Chrysler vehicles, particularly as such warranties relate to the ABS.

47.   In addition, Chrysler has insured that it maintains total control over the installation and repair of its ABS systems by controlling and limiting the amount of information available to non-authorized dealers, thereby limiting the ability of anyone other than an authorized dealer with access to information provided by Chrysler to provide necessary repairs to the ABS systems in the Defective Vehicles.

### CLASS ACTION ALLEGATIONS

48.   This action is brought and may properly be maintained as a class action pursuant to the provisions of the Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), 23(b)(2) and 23(b)(3).  Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as representative members of the following proposed Class ("the Class"):

> All persons or entities residing in the United States and Puerto Rico who (1) own or lease a vehicle sold or manufactured by Chrysler which is equipped with a Bendix 10 anti-

14

lock brake system; or (2) have
previously owned or leased such
vehicles as described immediately
above, and have incurred expenses
arising from the repair or
replacement of defective Bendix 10
ABS systems.

Excluded from the Class is any
registered owner who holds a
Chrysler vehicle for salvage, scrap
or for sale of parts.  Excluded
from the Class claims are:  claims
for personal injury, wrongful death
or damage to property other than
repairs to the brakes on the
described vehicles as a result of
the defective brakes.

49.   In this suit, Plaintiffs seek equitable relief,
including injunctive relief, specific performance and restitution
as well as monetary damages, on behalf of all Class members.
Plaintiffs expressly disclaim any intent to seek in this suit any
recovery for personal injuries suffered or which may be suffered
by any Class member.

50.   The proposed Class is so numerous that the
individual joinder of all its members is impracticable.  While
the exact number and identities of Class members are unknown at
this time, and can be ascertained only through appropriate
discovery, Plaintiffs are informed and believe that hundreds of
thousands of Chrysler vehicles have been sold with Bendix 10 ABS
systems.  From 1991 through 1993 alone, Chrysler sold over
200,000 minivans with Bendix 10 ABS systems, and from 1990-1995
it sold an additional 68,000 Chrysler New Yorkers, Fifth Avenues
and Imperials, Eagle Premiers and Dodge Dynasties and Monacos

15

with such systems, many of which were sold in New Jersey.

51.  Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.

52.  Among the questions of fact common to the Class, are the following:

a.  Whether the Defective Vehicles have been sold or leased subject to express and implied warranties;

b.  Whether the Chrysler vehicles have the defect alleged, *i.e.*, an anti-lock brake system that is prone to failure in either the hydraulic assembly or the hydraulic pump, leading, at least in some cases, to complete brake failure and thereby subjecting passengers to risk of injury, and whether Chrysler knew or should have known about this defect;

c.  When Chrysler first became aware of the defective nature of Chrysler vehicles;

d.  Whether Chrysler continued to sell and advertise Chrysler vehicles despite knowledge of their defective and unsafe characteristics, thereby defrauding consumers;

e.  What efforts Defendants took to conceal the defective and unsafe characteristics of Chrysler vehicles from the public;

f.  Whether the advertisements and statements issued by Chrysler concerning Chrysler vehicles are false and/or have a tendency to deceive the public by failing to disclose the

16

defect and/or misleading consumers about the potential existence of defect;

g.     Whether Chrysler notified purchasers of Chrysler vehicles of their dangerous and defective condition.

53.     Among the questions of law common to the class are the following:

a.     Whether, under common law, Chrysler has breached its express warranties and its implied warranties of merchantability and fitness for particular purposes;

b.     Whether the Class is threatened with irreparable harm and has been damaged and, if so, the nature of the equitable relief and/or damages and punitive damages to which each member of the Class is entitled;

c.     Whether any effort by Chrysler to limit the duration of the implied warranties of merchantability and fitness is void as unreasonable and unconscionable;

d.     Whether Chrysler's uniform course of conduct in the advertising, promotion, and sale of the Chrysler vehicles was false or misleading in failing to disclose the latent defect; and

e.     Whether Chrysler has proximately caused injury to Plaintiffs and members of the Class.

54.     Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise out of the purchase by Plaintiffs and members of the Class of Chrysler vehicles equipped with the defective Bendix 10 ABS systems.

17

Plaintiffs and all members of the Class are threatened with harm arising out of Chrysler's common course of conduct as alleged herein.

55. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have no interests antagonistic to those of the other Class members. Plaintiffs have retained counsel experienced in the prosecution of class actions, including consumer class actions involving product liability and vehicle design defects.

56. This class action is appropriate for certification under Rule 23(b)(1) and (2) because:

a. The prosecution of separate actions by individual Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members which would establish incompatible standards of conduct for Chrysler.

b. The prosecution of separate class actions by individual Class Members will create risk of adjudication with respect to the Class which might, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudication, or substantially impair the ability of other Class Members to protect their interests; and/or

c. Chrysler has acted or refused to act in respects generally applicable to the Class, thereby making appropriate final injunctive relief with regard to the members of the Class as a whole.

18

57.   This class action is also appropriate for certification under Rule 23(b)(3) because questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by each individual member are relatively small compared to the expense and burden of prosecuting this complex case against a well-financed, multibillion dollar corporation, this class action is the only way each Class member can redress the harm and damage which Chrysler has caused.

58.   Should individual Class members be required to bring separate actions, courts throughout the United States would be confronted by a multiplicity of lawsuits burdening the court system, while also creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

**FACTUAL ALLEGATIONS**

**Background**

59.   Chrysler is one of the world's largest manufacturers, sellers and lessees of automobiles, trucks and

19

minivans.  While much has been written about Chrysler's return
from the brink of financial ruin, few would dispute that
Chrysler's resurrection is credited to the phenomenal success of
its minivan products -- the Chrysler Town and Country, the
Plymouth Voyager and the Dodge Caravan.

60.  In late 1983, then-Chrysler Chairman Lee Iacocca
announced to a group of business executives "what you're going to
see today is the greatest idea I've been associated with since
the Mustang."  Iacocca then proceeded to show the executives some
of the first minivans to roll off the line at Chrysler's assembly
plant in Windsor, Ontario.

61.  By 1993 -- a decade after Chrysler had originated
the species and four million minivan sales later -- Chrysler
still made almost one out of every two minivans sold, far
exceeding any of its competitors in the market.  Such success
caused Robert Lutz, then- Chrysler's President and Chief
Operating Officer to exclaim, "of all of the vehicles in the
Company's 70 year history, if you had to choose just one that
really set the automotive industry on its ear, this is it: the
minivan!"

62.  Keenly aware that continued success in the minivan
market hinged on Chrysler's ability to equip its minivan line
with the equipment and features most demanded by consumers,
Chrysler responded to consumers' growing concern for safety by
equipping all of its minivans with the Bendix 10 ABS system as
standard equipment, whereas prior to 1993 consumers had been

20

provided with the option of purchasing these vehicles equipped with the Bendix 10 ABS system. In explaining its decision, Chrysler informed consumers that it would "make anti-lock brakes standard equipment in the extended wheelbase versions of Caravan and Voyager, matching a level that already existed in the high-end Town & Country." Safety and reliability became two of the hallmarks of Chrysler's advertising campaigns.

63. Aside from the minivans, Chrysler also equipped a number of its cars with the Bendix 10 ABS systems, including the Chrysler New Yorker, Fifth Avenue and Imperial, the Eagle Premier, and the Dodge Dynasty and Monaco. Thousands of these models, among others, have been sold from 1990 through 1995 containing a Bendix 10 ABS system built by AlliedSignal.

## Chrysler's Breach of Express and Implied Warranties

64. Chrysler sold or leased the above-referenced Defective Vehicles to the Plaintiffs and members of the Class subject to express, written warranties. Pursuant to these express warranties, Chrysler warranted the Defective Vehicles, including, but not limited to, the anti-lock brake system, to be free of defects in materials and workmanship at the time of delivery and provided that repairs and other adjustments will be made by authorized Chrysler dealers, without charge, to correct defects in material or workmanship which occur during a period of time or within an amount of mileage agreed to by the consumer. At the time of the purchase or lease, consumers were required to elect either "The Basic Warranty -- Option 1," which covered all

21

parts of the vehicle for up to 12 months or 12,000 miles, whichever occurred first, or "The Basic Warranty -- Option 2," which extended the warranty to up to 36 months or 36,000 miles.

65.   Chrysler also sold or leased the Defective Vehicles to the Plaintiffs and members of the Class under implied warranties of merchantability and fitness for a particular purpose whereby Chrysler warranted the Defective Vehicles to be merchantable and fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by their owners or lessees for the ordinary purpose for which they were intended, were not otherwise injurious to consumers, and would come with adequate safety warnings.   Under the Magnuson-Moss Act, this implied warranty cannot be disclaimed and, pursuant to these implied warranties, Chrysler was under a duty to design, construct, manufacture, inspect and test the Defective Vehicles so as to render them suitable for the ordinary purpose of their use, including with adequate, safe and reliable braking systems.

66.   The Defective Vehicles manufactured by Chrysler and sold or leased to the Plaintiffs and members of the Class are equipped with defective Bendix 10 ABS systems in which the hydraulic assembly and pump repeatedly fail, leading to the complete loss of or greatly impaired braking ability.   The failure of the Bendix 10 ABS system has led and, without the relief sought in this action, will continue to lead to the complete loss of braking ability in numerous Defective Vehicles.

As such, Chrysler has breached its express and implied warranties
described above.

67.   By refusing to replace the Bendix 10 ABS systems
which are known by Chrysler to be defective, Chrysler is in
breach of its express warranties.   Furthermore, as a result of
the defects in the ABS systems, the Defective Vehicles are unsafe
and unfit for the ordinary purposes for which they are intended
to be used and, as such, Chrysler has breached its implied
warranties of merchantability and fitness for a particular
purpose.

## Evidence of Defective Bendix 10 ABS Systems

68.   Beginning at least in 1990, Chrysler was
confronted with numerous brake failures in its Defective Vehicles
equipped with the Bendix 10 ABS systems, with many owners
reporting a complete loss of braking ability without any warning
in their vehicles.   These brake failures led to many accidents
and injuries.   Moreover, the cost to repair the defective ABS
systems typically ranges from $2,000 to $3,000, with customers
often forced to wait weeks for the parts needed to complete the
work.   Internal Chrysler documents demonstrate that, as early as
November 1992, Chrysler was experiencing soaring warranty claims
relating to the Bendix 10 ABS systems.   This exponential increase
in warranty claims led to a nationwide backorder of parts arising
from the substantial number of repairs required to be made
throughout the country.   Significantly, these documents also
indicate that Chrysler service personnel were "desperate" to

23

identify a way to fix the failing systems.

69. The type of complaints arising from the Bendix 10 ABS systems are legion, as described in the August 6, 1995 issue of the *St.-Louis Post-Dispatch*:

> Drivers have complained . . . about a bewildering variety of problems: Flashing warning lights, odd sounds, rear brake lockup, front brake lockup, stiff brake pedal, soft brake pedal, smoking brakes, loss of power assistance in braking, partial loss of braking, brake pedal going to the floor with little or no braking, and total loss of braking without warning.
>
> Many failures involve fluid leaking from the ABS hydraulic components, expensive to repair but relatively easy to diagnose. But many other ABS failures occur intermittently, and mechanics cannot reproduce them. Intermittent failures should be recorded in the ABS computer chip, but are not, making it difficult or impossible to diagnose the malfunction.
>
> * * * *
>
> ABS is designed so that even if it fails, a vehicle's regular brakes remain operable. But the safeguard is failing with some Chrysler vehicles. When ABS fails, many drivers say regular brakes fail as well. Chrysler denies this, but government records and interviews with drivers confirm it sometimes happens.

70. Significantly, a substantial percentage of these complaints result from the failure of the hydraulic assembly in the ABS. Wolfgang Reinhart, an engineer with NHTSA who has examined many of the complaints, has explained that, under some circumstances during heavy braking, the ABS units may be cycling in and out of operation, quickly depleting the hydraulic pressure in brake lines. Reinhart has further stated: "Such cycling in and out of the ABS mode . . . would cause the brake pedal to drop

repeatedly until the vehicle was stopped, or until the brake pedal reached the end of its stroke.  Once the brake pedal has bottomed out, the brakes would release and act as if they had failed completely."

71.  An additional defect of the Bendix 10 ABS stems from its computer code system which is designed to record ABS failures and thereby permit mechanics to learn what caused the problem and how to repair it.  The Bendix 10 ABS computer code system, however, only records failures that occur for more than 120 consecutive seconds (two minutes).  Thus, in the event of intermittent failures which do not last that long, the computer is completely unable to identify a braking defect.

72.  In March 1994, NHTSA initiated a Preliminary Evaluation into the 1991-1993 Chrysler minivans.  By July 1994, NHTSA had received 837 complaints about the brake systems in the minivans alone, including 26 accidents and 3 injuries.  By June 1995, NHTSA had received an additional 467 complaints while Chrysler reported its receipt of an additional 616 complaints, bringing the total reports of ABS failures on these minivans to 1,920.  By this time the number of reported accidents relating to failed Bendix 10 ABS systems had increased to 53 accidents, with 26 injuries.

73.  Internal Chrysler documents have revealed that the reported failures in the Bendix 10 ABS systems were occurring in a variety of automobiles manufactured by Chrysler in addition to the minivans.  NHTSA announced in June 1995 that it had expanded

25

its investigation into the Bendix 10 ABS systems installed in
approximately 68,000 other Chrysler cars, including the 1990-93
Chrysler New Yorker, Fifth Avenue and Imperial, the Eagle
Premier, and the Dodge Dynasty and Monaco.

74.  In addition to receiving complaints relating to
the Bendix 10 ABS brake systems in the models identified by
NHTSA, the agency has also reported receiving complaints about
ABS problems on model year 1990, 1994 and 1995 Caravans, Voyager
and Town & Country minivans, and model year 1994 New Yorker and
1995 Neon passenger cars.  Because the numbers identified by
NHTSA include only those whose complaints have reached the
Agency, they are vastly understated, as they do not include the
numerous brake failures that have not been reported to the
agency.

### Chrysler's Knowledge Of The Defective Bendix 10 ABS System

75.  As alleged herein, when Chrysler manufactured the
Defective Vehicles and sold or leased them to the Plaintiffs and
members of the Class, Chrysler was aware that these vehicles were
equipped with defective Bendix 10 ABS systems, which rendered
them subject to the possible loss of all braking functions.
Indeed, by at least early 1991, the high number of brake failures
led to substantial concerns at both Chrysler and AlliedSignal,
the manufacturer of the Bendix 10 ABS systems in question.

76.  Numerous complaints had been received by Chrysler
in 1990 and early 1991 concerning the Bendix 10 ABS brake
systems.  In response to a May 28, 1991 letter to then-Chrysler

26

chairman Lee Iacocca complaining about a brake system failure in a 1991 Dodge Caravan, J.I. Corbin, Chrysler's Owner Relations Coordinator, stated in a July 26, 1991 letter that "[b]oth Chrysler and Bendix have assigned several of our product and service engineers to an ABS task team . . . to gather and analyze all pertinent data relative to ABS quality and reliability." Thus, at least by this date, Chrysler was aware of the potential problem with the Bendix 10 ABS system.

77.   This "ABS task team" continued to operate at Chrysler, as it sought to deal with the rising number of complaints.  On November 12, 1992, representatives from Chrysler and AlliedSignal specifically convened to discuss the malfunctioning brake systems.  By that time, Chrysler had already issued two recalls for vehicles equipped with the Bendix 10 ABS -- to replace a defective high pressure hose assembly and an internal sealing system  -- which had proven ineffective in preventing brake failures.  According to minutes of the meeting, the Chrysler representatives referred to "heavy pedal effort during normal braking, float with high hard pedal and lack of de-acceleration" and "also characterized by many people as pedal to the floor."

78.   The Chrysler representatives also indicated that they were "desperate for a field fix," and that they hoped to find a way to repair the ABS systems at the dealerships, rather than having to replace the entire component -- a solution which could save the Company millions of dollars.  As reflected in the

27

minutes, "Chrysler asked what [AlliedSignal] can do to fix these problems."

79.   Remarkably, little resulted from the November 12, 1992 meeting, as Chrysler made no changes in the Bendix 10 ABS systems, failed to recall or retrofit vehicles equipped with the system or otherwise to repair them, and even deliberately failed to notify its consumers of the risks inherent in the defective brakes.   Meanwhile, brake failures continued to rise.

80.   By late 1994, the increase in brake failures had caused a substantial national backorder in the Bendix 10 ABS hydraulic assemblies.   In fact, so many replacements were required that Chrysler was unable to keep up with the demand for these parts.   In a September 12, 1994 memorandum from Rick Cortright, a Senior Staff Supervisor of Chrysler's Customer Center, to all Senior Staff and Senior Staff Supervisors, Chrysler's continuing awareness of the problem was emphasized, when it stated:

> We have been seeing an increase in customer calls related to replacing BENDIX 10 ABS hydraulic assemblies.   Consequently, we have also seen an increase in parts inquiries related to back ordered hydraulic unit[s]   . . .

81.   Rather than admit to its consumers that the Bendix 10 ABS systems were defective, however, Chrysler merely sought to minimize its costs, with Cortright going on to state that, rather than replacing the faulty hydraulic assemblies, "**in many cases the assemblies can be rebuilt!**" (emphasis in original).   Thus, in violation of its express and implied warranties, Chrysler sought

28

to avoid replacements of the defective products by rebuilding them instead.

82.   Moreover, Cortright emphasized Chrysler's desire to control all contact with consumers concerning the defective Bendix 10 ABS systems by ordering that all dealers contact Chrysler directly before implementing any repairs on the brake systems:

> **Please contact all dealers recommending hydraulic component replacements and refer them to the STAR Hotline before they install new assemblies.** STAR will make every effort to ensure a thorough diagnosis occurs prior to the replacement of any hydraulic assemblies in the BENDIX 10 system.
>
> *   *   *   *
>
> **Please be sure to refer the dealer to the STAR Hotline for all customer inquiries related to this issue.** This will help to ensure that no additional customer dissatisfaction results from over repair.

(Emphasis in original.)

83.   The dealers recognized the unusual nature of the extreme steps taken by Chrysler in response to the burgeoning crisis with respect to its Bendix 10 ABS systems. Disturbed by their inability to honor Chrysler's warranties, auto repair executives soon began to complain that Chrysler was making them take unusual steps before delivering replacement anti-lock braking systems. One Chrysler service manager, Rainey Godbey of Glendale Chrysler in Glendale, Missouri, for example, reported that Chrysler was demanding proof that an ABS component was damaged beyond repair before authorizing replacement under

warranty.  Godbey also stated that he thought that Chrysler wanted dealers to repair parts, rather than simply replace them and charge the Company.  Similarly, Mike Meyers, the service manager for Lou Fusz Dodge in Kirkwood, Missouri, stated:  "We have to call the hotline and tell them what's wrong with it," before Chrysler will ship a replacement ABS, resulting in a delay in performing the repair.

84.  By demanding approval of any repairs or other actions prior to permitting any repairs or replacement of the ABS by its dealers, Chrysler was able to control the spread of the complaints among Chrysler consumers and to limit its costs by putting up substantial roadblocks to such consumers when they sought to enforce Chrysler's express and implied warranties.

85.  The exponential growth in the number of Bendix 10 ABS system failures is further revealed by the difficulties many authorized Chrysler dealers are having in obtaining the necessary parts for repairs.  A December 8, 1994 repair invoice issued by one Chrysler dealer for replacement of the ABS hydraulic assembly and pump on a 1992 Plymouth Voyager, for example, highlights the fact that there were "national backorders" for both parts, causing substantial delays in completing needed repairs.  As the invoice stated:  "computer shows low accumulator fault code -- pump takes 80 seconds to build pressure to 500 PSI -- should do it in a few seconds -- ABS pump on nat'l [national] backorder"; "Chrysler pays for hyd.assy. [hydraulic assembly] . . . defection hyd. brake assembly -- nat'l B.O. [national backorder]."

30

Notably, the invoice added that the "van should not be driven due to safety reasons and may also ruin new ABS pump."

86.  Similar evidence can be gleaned from many of the authorized Chrysler dealers confronted with frustrated consumers seeking to repair their defective brake systems:

- o  one dealer told an owner of a 1993 Plymouth Voyager LE with a failed ABS system that "he was aware that other vans had had hydraulic brake problems";

- o  another dealer told an owner of a 1993 Dodge Caravan with defective brakes that there were five other cars in shop with same problem;

- o  in July 1995, the owner of a 1993 Town & Country with failed brakes was told by the dealer that Chrysler had had "many Bendix 10 ABS problems" and that it had "placed extraordinary emphasis on this problem within the last month;

- o  in April 1995, when an owner of a 1992 Chrysler Town and Country had to have substantial brake repairs, he was informed by the dealer that it had a Chrysler's New Yorker with the same problem; after the dealer took three weeks to repair the vehicle because of a delay in getting parts, Chrysler' Customer Center confirmed to the owner that the delay was caused by the fact that the brake parts were failing so often that they could not be kept in stock; and

- o  on July 16, 1995, Steve Cancilia, operations manager with Dodge World in Florissant, Missouri, was quoted as stating that "[s]ometimes you have to wait 30 days" to get anti-lock braking system parts from Chrysler.

87.  Adding significantly to the problems arising from the defective Bendix 10 ABS systems is Chrysler's refusal to make information available to the public with respect to needed repairs.  Generally, car manufacturers provide details concerning their engines, and means to repair them, to the public and, in

31

particular, to independent mechanics who may need to work on
Chrysler vehicles.  Chrysler, however, fails to provide such
information.  As a result, when independent mechanics are
presented with defective brakes in the Chrysler vehicles, they
are unable to perform the necessary work.  Indeed, Chrysler has
even required other mechanics to pay for its assistance prior to
providing any information on the ABS, in sharp contrast with the
norm in the industry.

88.  In the June 12, 1995 press release, the Center for
Auto Safety called on Chrysler "to set up an emergency task force
to find a fix for its Bendix anti-lock brake failure and do a
recall," emphasizing that "Chrysler owners drive at risk of brake
failure without warning where only fate determines whether they
have a fatal accident."  Not surprisingly, the CAS's call has
been completely ignored by Chrysler and the Company continues to
breach its express and implied warranties -- choosing instead to
risk the lives of millions of consumers who have unwittingly
entrusted themselves and their families to a potentially deadly
defective brake system.

**Chrysler's Fraud In The Promotion And Sale Of The Defective
Vehicles And Its Fraudulent Concealment Of The Defective ABS
System**

89.  While Chrysler knew at least by early 1991 that
the Bendix 10 ABS system was defective and prone to failure, it
nevertheless repeatedly promoted and advertised the Defective
Vehicles equipped with this ABS system as safe and reliable.
Indeed, the purported safety of the Chrysler vehicles was one of

32

the primary reasons for many of the Plaintiffs and the members of the Class to purchase or lease the Defective Vehicles in the first instance.

90.   Moreover, while the number of brake failures, and resultant complaints from consumers, has skyrocketed, Chrysler continues to deny the existence of the Bendix 10 ABS system defect.  Instead, it claims that Chrysler products equipped with the Bendix 10 ABS system are safe, thereby encouraging more consumers to purchase vehicles with this life-threatening defect.

91.   Rather than admitting the defects in the Bendix 10 ABS it has used in so many of its vehicles, Chrysler has affirmatively and aggressively misled its consumers concerning the problem.  Chrysler, for example, has established a Minivan Hotline (1-800-MINIVAN) as a result of the many difficulties it has had with the Defective Vehicles and, in an effort to control the knowledge of its consumers, has disseminated scripts to its employees receiving the calls.  One such script spells out responses to questions about the NHTSA investigation into the minivan ABS systems.  In response to the question "what is the failure being investigated," Chrysler has told its employees to state:

> There is no single repeating complaints, and **we have no reason to believe there is a technical defect in the system.**  But we do believe that many owners do not fully understand the operation of their ABS braking system and its capabilities.

(Emphasis added.)

92.   Thus, Chrysler has expressly denied knowledge of a

33

defect in the Bendix 10 ABS despite knowing that a defect does in fact exist, and has deliberately and falsely attempted to place blame on the drivers themselves.

93. The script also misstates the reason for the NHTSA investigation. In responding to why NHTSA began its investigation, Chrysler advises its employees to state merely that "NHTSA received some owner reports regarding performance of the ABS brake failure," omitting the material fact that numerous complaints of complete brake failure had been received leading to many accidents and even injury.

94. Moreover, Chrysler is misleading consumers concerning the type of investigation being conducted by NHTSA. Downplaying the fact that NHTSA had proceeded from a Preliminary Evaluation to an Engineering Analysis of the Chrysler brake systems, Chrysler states:

> NHTSA procedures requires that any investigation in the first level (Preliminary Evaluation) must be investigated, acted on or closed within 120 days. If there is still more information required, or if all the data has not been reviewed, then it must be moved into the next level. This is apparently what happened in this case.

Far from being a formality, however, NHTSA deliberately chose to upgrade its "Preliminary Investigation" to an "Engineering Analysis" in July 1995 after learning that Chrysler was continuing to receive numerous complaints from consumers concerning continuing Bendix 10 ABS system failures.

95. In addition, Chrysler continues to mislead its

consumers into believing that the Bendix 10 ABS system is safe.
First, it points to two recalls that Chrysler had in early 1992,
relating to a high pressure hose in the brake assembly and the
internal sealing from brake fluid.   It then falsely suggests that
these recalls solved all of the problems, stating, in response to
whether a safety problem exists:

> Chrysler's assessment is that this issue presents
> no unreasonable safety risk.   Our evaluation is
> that most of the reports are related to the prior
> 1991 model year recalls.   **We are not aware of any
> other defect conditions.**

(Emphasis added.)   In fact, many -- if not most -- of the
complaints had nothing to do with the issues raised in the
earlier recalls, with numerous complaints relating to subsequent
models or those unaffected by the recall notice and based on
defects which the recalls did not solve.

96.   Finally, Chrysler suggests in its Hotline script
that the problem is gone by emphasizing that there are "no"
current problems with the Chrysler minivan ABS systems and that
Chrysler is no longer using AlliedSignal's Bendix system.   Yet,
hundreds of thousands of its vehicles with the Bendix 10 ABS
continue to be operated (and sold) throughout the country, all
with a defective brake system that could lead to complete brake
failure -- and numerous casualties.

97.   Such disinformation campaign tactics are not new
to Chrysler.   Earlier this year, the Company fired the head
engineer assigned to Chrysler's minivan safety leadership team
when it suspected that he had leaked information concerning

35

allegations that Company employees had manipulated minivan crash tests, hid results from government officials and failed to correct obvious minivan defects. Afraid of the devastating impact that public disclosure of such information would have upon the sale of its minivans, Chrysler sought to silence this engineer by seeking and obtaining a gag order against him.

98.    In an effort to stem the rising tide of consumer complaints concerning the Bendix 10 ABS systems, without acknowledging its complicity in the sale of defective products, Chrysler has also begun to negotiate secretly with individual consumers on a case-by-case basis. At no time did Chrysler notify any potential purchases or lessees, or current consumers, that the brake systems were potentially defective, and when brake repairs were required on particular vehicles and the consumer did not complain or object to the cost, Chrysler would charge the consumer for the entire cost. On the other hand, if the consumer strenuously objected, and particularly if the consumer obtained evidence of the NHTSA investigation or otherwise learned of the high number of brake failures, Chrysler has attempted to resolve the dispute with the consumer by agreeing to limit the consumer's out-of-pocket costs to $600 or otherwise to share in the repair costs. At certain times, Chrysler has even agreed to pay the full cost of the repair or agreed to buy back the vehicle equipped with the defective product. In entering into these separate agreements with certain consumers, Chrysler often required the consumers to enter into confidentiality agreements

whereby they were precluded from disclosing the nature or type of
settlements they were provided.  In effect, Chrysler has issued a
"secret warranty" whereby it agreed to honor its warranties only
when forced to do so, while aggressively attempting to cover up
its sale of defective brake systems from the majority of the
unknowing consumers who purchased the Defective Vehicles.  In
recognition of the defective nature of the Bendix 10 ABS,
Chrysler has now replaced it with an alternative anti-lock
braking system for all of its 1996 models.

99.  At the time Chrysler vehicles equipped with the
defective Bendix 10 ABS system were sold to Plaintiffs, Chrysler
knew or negligently disregarded that these Defective Vehicles had
and continue to have a dangerous, latent, safety-related defect,
as alleged herein.

100. Because information concerning the ABS systems in
the Chrysler vehicles is non-public information over which
Chrysler had exclusive control, and because Chrysler knew that
this information was not available to Plaintiffs, Chrysler was
under a duty to disclose information regarding the defect to
Plaintiffs.

101. Chrysler refrained from disclosing the defect to
the Plaintiffs and thereby misled them into believing that the
Chrysler vehicles were and are safe and free of defect.  Chrysler
has been aware since at least 1991 that Chrysler vehicles
containing the Bendix 10 ABS system were and are defective and
that failure to disclose the defect would and did constitute a

37

breach of both Chrysler's express and implied warranties.

102. Plaintiffs possessed limited, if any, knowledge of the complex operating systems of their Chrysler vehicles and of the possibility that a concealed latent defect was present in their vehicles, and reasonably relied upon Chrysler's express and implied guarantees of quality, fitness, dependability, and safety.  In reliance upon such guarantees, Plaintiffs purchased defective Chrysler vehicles, and consequently the occupants of their Defective Vehicles are exposed to risk of injury.  Had Chrysler disclosed the true defective nature of the Defective Vehicles, Plaintiffs would have been aware of the defect and would not have purchased or leased such Defective Vehicles, or would have acted to prevent exposure to the risks and damages they suffered.  The total amount of damages suffered by Plaintiffs as a result of Chrysler's unlawful and fraudulent conduct has not yet been fully ascertained at this time and will be proven at trial.

### ESTOPPEL FROM PLEADINGS AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

103. Chrysler is estopped from relying on any statutes of limitation by virtue of its acts of fraudulent concealment.  Since at least 1991, Chrysler has actively concealed the defective Bendix 10 ABS system with which so many of its vehicles are equipped and the extraordinarily high number of brake failures experienced by owners of the Defective Vehicles.  In doing so, Chrysler has systematically denied the existence of any tendency of the Bendix

38

10 ABS system to fail and has falsely asserted that the primary problem is a misunderstanding by consumers with respect to the use and function of anti-lock brakes.

104. As a result of Chrysler's fraudulent concealment, Plaintiffs had no knowledge that Chrysler was engaged in the wrongdoing alleged herein until at least May 1994, when NHTSA initiated its Preliminary Examination into the ABS systems of the Chrysler minivans. Prior to that time, Plaintiffs had exercised due diligence by inquiring of Chrysler and its authorized dealers as to whether the ABS failures reflected a systematic problem, but they were repeatedly misled by assurances that such was not the case. Moreover, various Plaintiffs sought counsel from non-authorized dealers, but their efforts proved fruitless given that the ABS system was designed so that only Chrysler authorized dealers had sufficient information to diagnose and repair ABS failures.

105. Because of Chrysler's nondisclosure of the defective brake systems in its Defective Vehicles, Plaintiffs could not reasonably have discovered, before May 1994, the defect or any of the wrongdoing. Given Chrysler's failure to disclose this non-public information about the defective nature of the Bendix 10 ABS systems, over which Chrysler knew it had exclusive control, and because Plaintiffs could not reasonably have known that the Chrysler vehicles were thereby defective, Chrysler is estopped from relying on any statutes of limitations that might otherwise be applicable to the claims asserted herein.

106. In addition, Plaintiffs have met the requirements of any applicable statutes of limitations because the statutes could not have commenced running before the May 1994 commencement of the NHTSA investigation, which constituted the earliest time at which Plaintiffs could reasonably have discovered or suspected the existence of the defect or of Chrysler's wrongdoing.

### FIRST CLAIM OF RELIEF

### [Violation Of The Magnuson-Moss Act, 15 U.S.C. § 2310(d)(1)]

107. Plaintiffs reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 106 above, and further allege against Defendant Chrysler as follows:

108. Plaintiffs purchased the Chrysler Defective Vehicles under a written warranty wherein Chrysler warranted the Defective Vehicles, including, but not limited to, the anti-lock brake system, to be free of defects in materials and workmanship at the time of delivery.

109. In addition to its written warranty, Chrysler also sold Chrysler Defective Vehicles to Plaintiffs under an implied warranty of merchantability wherein Chrysler warranted the Defective Vehicles to be fit for the ordinary purposes for which they are used, including the guarantee that they were in a safe and non-defective condition to be used as minivans or other automobiles, were not otherwise injurious to consumers, and would come with adequate safety warnings. Under the Magnuson-Moss Act, this implied warranty cannot be disclaimed. Any purported limitation of the duration of this implied warranty contained in

40

the written warranties given by Chrysler is unreasonable and unconscionable and thereby void, because Chrysler knew the defect existed and might not be discovered, if at all, until the Chrysler Defective Vehicles had been driven for a period of time longer than the period of the written warranty, and Chrysler withheld information about the defect from purchasers of such Defective Vehicles.   Moreover, due to unequal bargaining power and lack of effective warranty competition among dominant firms in the automobile manufacturing industry, Plaintiffs had no meaningful alterative to accepting Chrysler's attempted limitation of the duration of the implied warranty.

110. When Chrysler manufactured the Chrysler Defective Vehicles and sold them through its dealers to Plaintiffs, Chrysler knew that the Bendix 10 ABS systems used in such Defective Vehicles were defective, rendering them subject to the possible loss of all braking functions and subjecting passengers to risk of injury. This defective ABS system was, and is, a safety-related defect known to Chrysler at the time Plaintiffs purchased Chrysler Defective Vehicles.   Equipping the Defective Vehicles with the Bendix 10 ABS systems therefore constitutes a breach of Chrysler's express warranties.

111. Furthermore, the likelihood that, as a result of the defects in the Bendix 10 ABS systems, the brakes could, and will, fail made the Chrysler Defective Vehicles unsafe and unfit for the ordinary purposes of such vehicles when sold.   Equipping the Defective Vehicles with the Bendix 10 ABS systems therefore

constitutes a breach of the implied warranty of merchantability.

112. Chrysler has been aware of the defect in the Bendix 10 ABS systems since at least 1990, when it began to receive complaints from consumers.  Nevertheless, it has continued to promote and sell Defective Vehicles containing the Bendix 10 ABS without any notice of the increased likelihood of brake failure, while at the same time advertising its Defective Vehicles as being safe and reliable.  Moreover, Chrysler has refused to honor its warranties and to compensate fully many of the Plaintiffs, notwithstanding their brake failures and subsequent complaints, and it has publicly declared that there is no defect in the Bendix 10 ABS.  As such, Chrysler has clearly had more than a reasonable opportunity to cure the defect, but has knowingly failed to do so.

113. Because of Chrysler's breaches of the written and implied warranties covering the Chrysler Defective Vehicles, such vehicles are unsafe and should be recalled and/or retrofitted and restitution should be made to Plaintiffs.

### SECOND CLAIM FOR RELIEF

#### [Equitable (Injunctive and Declaratory) Relief]

114. Plaintiffs, on behalf of themselves and all other members of the proposed Class, reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 113 above, and further allege against Defendant Chrysler as follows:

115. Plaintiffs and the Class are without adequate remedy at law, rendering injunctive and other equitable relief appropriate in that:

42

a.   Damages cannot adequately compensate Plaintiffs for the injuries suffered; and

b.   If the conduct complained of is not enjoined, a multiplicity of suits will result, because Chrysler's conduct is continuing and on-going.

116. Plaintiffs, the Class and the public will suffer irreparable harm if Chrysler is not ordered to repair properly all Chrysler Defective Vehicles containing Bendix 10 ABS systems immediately and to cease and desist its fraudulent and dangerous advertising, marketing, and sale of Chrysler vehicles which contain the defective Bendix systems.

### THIRD CLAIM FOR RELIEF

### [Fraud and Deceit]

117. Plaintiffs, on behalf of themselves and all other members of the proposed Class, reallege each and every allegation contained in paragraphs 1 through 116 above, and further allege against Defendant Chrysler as follows:

118. In its express and implied warranties and in its advertising and promotion of the Defective Vehicles, Chrysler represented that they were safe and free from dangerous defects.

119. Chrysler's representations and advertisements for the Defective Vehicles, as well as general representations and advertisements regarding the quality of the Defective Vehicles, were misleading or likely to mislead because they misrepresented the quality and conditions of these vehicles and concealed or actively misrepresented the fact that the Defective Vehicles were

43

equipped with a latent and hidden defect, *i.e.*, the defective Bendix 10 ABS systems which were prone to failure, thereby subjecting occupants of the Defective Vehicles to risk of injury. Chrysler was and is in a superior position to know the true facts of the hidden defect based on, among other things, its internal investigation by a task force established to evaluate the defective Bendix 10 ABS systems, and knew or should have known of the potential danger to consumers, and owed a duty to disclose the fact of the concealed danger to Plaintiffs and the Class. Chrysler's material misrepresentations and omissions resulted in increased sales of the Defective Vehicles.

120. Chrysler's representations regarding the qualities and characteristics of the Defective Vehicles were made with knowledge of common and statutory laws prohibiting false and misleading statements and advertisements, as well as the reasonable expectations of consumers, including Plaintiffs and the Class, that they would not be exposed to the dangers posed by the Defective Vehicles. Such representations were made with the intent to defraud and induce reliance by Plaintiffs and the Class, and in fact did so, as evidenced by the purchase of the Defective Vehicles by Plaintiffs and the Class.

121. Plaintiffs and the Class, unaware of the falsity of Chrysler's representations and/or concealment and suppression of material facts, purchased the Defective Vehicles in reasonable reliance upon Chrysler's representations that the vehicles were safe and free from hidden defects. Had Plaintiffs and the Class

44

known of the suppressed and concealed facts as alleged herein, they would not have purchased the Defective Vehicles or paid the prices they paid.

122. As a direct and proximate result of Chrysler's misrepresentations and/or concealment of material facts as detailed above, Plaintiffs and the Class have suffered damages in an amount to be proven at trial, and the occupants of their Defective Vehicles are at risk of injury.

123. In misrepresenting expressly and by implication that Plaintiffs and the Class purchased dependable and safe vehicles, Chrysler acted with oppression, fraud, and/or malice.

124. Accordingly, Plaintiffs and the Class are entitled to punitive and exemplary damages.

### FOURTH CLAIM FOR RELIEF

### [Breach of Express Warranty]

125. Plaintiffs, on behalf of themselves and all other members of the proposed Class, reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 124, above, and further allege against Defendant Chrysler as follows:

126. For each Defective Vehicle, Chrysler issued an express written warranty which covered the vehicle, including, but not limited to, the anti-lock brakes, to be free of defects in materials and workmanship at the time of delivery.

127. As alleged above, Chrysler breached its warranties by offering for sale, and selling as safe, Defective Vehicles that were by design and construction latently unsafe, and thereby

subjecting occupants of the Defective Vehicles purchased by Plaintiffs and members of the Class to the risk of injury.

128. Chrysler's breach of its express warranties proximately caused Plaintiffs and the members of the Class to suffer damages in an amount to be proven at trial.

### FIFTH CLAIM FOR RELIEF

### [Breach of Implied Warranty]

129. Plaintiffs, on behalf of themselves and all other members of the proposed Class, reallege, as if fully set forth, each and every allegation contained in paragraphs 1 through 128 above, and further allege against Defendant Chrysler as follows:

130. Defendant Chrysler impliedly warranted that its Defective Vehicles, which it designed, manufactured, and sold or leased to Plaintiffs and members of the Class, were merchantable and fit and safe for their ordinary use, not otherwise injurious to consumers, and would come with adequate safety warnings. Any purported limitation of the duration of these implied warranties contained in the written warranties given by Defendant Chrysler is unreasonable and unconscionable and thereby void, because Defendant Chrysler knew the defect existed and might not be discovered, if at all, until the Defective Vehicles had been driven for a period of time longer than the period of the written warranty, and Chrysler withheld information about the defect from purchasers of the Defective Vehicles. Moreover, due to unequal bargaining power and lack of effective warranty competition among dominant firms in the automobile manufacturing industry, Plaintiffs and members of the

Class had no meaningful alternative to accepting Chrysler's attempted limitation of the duration of the implied warranty.

131. Because Defective Vehicles are equipped with the Bendix 10 ABS system which are prone to failure, leading, among other things, to the complete loss of braking power and subjecting occupants of the vehicles to risk of injury, the Defective Vehicles purchased or leased and used by Plaintiffs and members of the Class were unsafe, unmerchantable, and unfit for use when sold, and threaten injury to the occupants of the Defective Vehicles purchased by Plaintiffs and the members of the Class. Therefore, Chrysler breached the implied warranty of merchantability in the sale of the Defective Vehicles to Plaintiffs and members of the Class in that they were not fit for their ordinary purposes.

132. As a direct and proximate result of Chrysler's breach of the implied warranty of merchantability, Plaintiffs and members of the Class suffered damages in an amount to be proven at trial.

WHEREFORE, plaintiffs demand judgment:

(1)  Declaring that this action may properly proceed as a class action;

(2)  Granting Plaintiffs and the members of the Class a mandatory injunction requiring Chrysler to (i) comply with the Act; (ii) comply with the terms of the written warranty given in connection with the manufacture, sale and repair of the Defective Vehicles; (iii) comply with its implied warranty given in connection with the manufacture and sale of the Defective Vehicles;

(iv) eliminate any time, mileage and damage limitations that may have been provided in connection with the implied or written warranty; (v) offer rescission to the Plaintiffs and the members of the Class by returning the full costs paid for the Defective Vehicles in exchange for a return of the Defective Vehicles, or inspect and repair the Defective Vehicles without charge so as to render them suitable for the ordinary purposes for which they are used; (vi) reimburse Plaintiffs and  members of the Class for all costs they incurred in connection with the replacement or repair of the Bendix 10 ABS systems installed in the Defective Vehicles by Chrysler; (vii) provide notice to all Chrysler consumers (a) that the Defective Vehicles are defective, (b) that the Defective Vehicles require special maintenance and repair, (c) of the written and implied warranties, (d) that time, mileage and damage limitations given in connection with the implied or written warranties are removed, and (e) that Chrysler will provide rescission for a return of the Defective Vehicles or will inspect and repair the Defective Vehicles free of charge;

(2)   Awarding restitution in an amount to be determined at trial;

(3)   Awarding Plaintiffs and the Class punitive or exemplary damages in an amount to be determined at trial;

(4)   Awarding the reasonable costs and disbursements of this action, including fees for plaintiffs' counsel and experts; and

48

(5)   Granting such other and further relief as to this court may seem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues triable.

**GOLDSTEIN TILL & LITE**
Attorneys for Plaintiffs

By: _____
Allyn Z. Lite
Joseph J. DePalma
Amy M. Riel

**POMERANTZ HAUDEK BLOCK
    & GROSSMAN**
Stanley M. Grossman, Esq.
D. Brian Hufford, Esq.
Paul O. Paradis, Esq.
100 Park Avenue
New York, NY 10017
(212) 661-1100

**LAW OFFICES OF JAMES V. BASHIAN**
500 5th Avenue
Suite 2800
New York, New York 10110
(212) 921-4110

Attorneys for Plaintiffs