GOLDSTEIN TILL & LITE
Allyn Z. Lite (AL 6774)
Joseph J. DePalma (JD 7697)
Amy M. Riel (AR 1216)
Two Gateway Center
12th Floor
Newark, New Jersey 07102
(201) 623-3000

POMERANTZ HAUDEK BLOCK & GROSSMAN
Stanley M. Grossman, Esq.
D. Brian Hufford, Esq.
100 Park Avenue, 26th Floor
New York, New York 10017
(212) 661-1100

LAW OFFICES OF JAMES V. BASHIAN
James V. Bashian, Esq.
500 Fifth Avenue, Suite 2800
New York, New York 10110
(212) 921-4110

**FILED**

JUN 27 1996

AT 8:30 12:55 P M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID CHIN, DR. DOUGLAS W. ALDERMAN, PETER & LYNNE ANDRADE, HOWARD PARKAN, RONALD R. BARRICK, GARRY L. BERNER, JEFF BRADLEY, FRANK WALLACE BROMBERG, CAROLYN A. BUTLER, CHRIS CLARKSON, JIM COFFEY, CYNTHIA COOPER, BESSIE COYNE, BRYCE CUSTODIO, CRAIG M. DINSMORE, DEBRA K. AND L. KEVIN DODGE, SGT. CHRISTOPHER B. DYE, KAREN ELLIOTT, KAREN FALLIS, KIMBERLY S. FISH, KARSTEN FLAGSTAD, STEVE FOLEY, WILLIAM FOWLER, J.V. FRANCK, MARY M. GAAR, THOMAS E. GARDNER, ROGER GAUTHIER, DAVE GOLDBERG, RAYMOND C. GOMEZ, BENJAMIN M. GOSSWILLER, MARK GOZA, J.E. GRAVENMIER, JOHN GRAZIANO, JERRY AND VIVIAN GREEN, JEAN E. GRIMM, HYMAN HASS, ABDALLAI HASSAN, JAMES B. HASTY, JEAN PALMER HECK, DOUG HEINS, ANTHONY A. AND BRENDA L. HELM, GILBERT HELWIG, CAREY E. HIDAKA, GEORGE HIGGINS, SCOTT A. HOLLENBECK, STEVE HOLLOWAY, RON HOMMELSON, NAN HUTCHINS, CHARLES JABBONSKY, JOHN D. JAMES, GEORGE R. JONES, ROBERT JONES, DANIEL G. KAGAN, JAMES E. AND CHARLES KELLEY, THOMAS F. KINDER, LLOYD J. KING, MARVIN KIRSCHENBAUM, WILLIAM KNUEVEN, DR. LORA AND DR. THOMAS KRAVEC, MICHELLE LESSE, RAYMOND C. AND ROSEANNE D. MCCARTY, BRUCE MCCUTCHEON, MIKE MCINERNEY, C. STUART MCPHERSON, AAA REALTY, INC., ED MIKOLAJCZYK, WILLENE MITCHELL, NANCY MOLLHAGEN, WALTER H. MOORER, JR., KENNETH E. NEALY, LEONARD NELSON, KENNETH H. NORRIS, KHALEEL NURIDEEN, | Civ. Action No. 95-5569 (JCL)<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

OLIVER, CYNTHIA OLSEN, MAUREEN O'NEIL, DAVID C. POLICH, SUSAN L. POMEROY, DAVID PRICE, NORMAN REVOLINSKI, ROBERT T. REYES, SUSAN ROBINS, HOWARD G. SAUL, KATHY SCHOFIELD, WALTER SEMCHYSHYN, FRED AND NANCY SHIMIZU, BERNARD H. SIMELTON, LOREINE SIMOPOULOS, MARTHA AND CALVIN M. SINGLETON, BERNIE K. SLOANE, JANICE SONSKI, ERIC AND DEBBIE STOPPA, SHEILA T. STRAUB, FRAN STRYKOWSKI, KEVIN L. SULLIVAN, JULIE SZABOS, CHRIS TERES, PETER F. VON SAVOYE, TAMMY L. WALKER, ERNEST C. WALSH, PAUL NELSON WARE, TED WINDHAM. DAVID P. YEXLEY and AL ZEIDLER,

Plaintiffs,

v.

CHRYSLER CORPORATION,

Defendant.

Plaintiffs, by their undersigned attorneys, for their complaint, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation made by and through their attorneys, which investigation included, among other things, a review of the public documents, consumer complaints filed with public and private auto safety agencies, news reports concerning Chrysler Corporation ("Chrysler" or the "Company"), and manuals and Technical Service Bulletins ("TSB") prepared and disseminated by the Company.

## NATURE OF THE CASE

1.     This action arises from the sale or lease of thousands of vehicles manufactured by Chrysler which are equipped with dangerously defective anti-lock brake systems ("ABS"). These defective ABS systems were manufactured by the Bendix division of the AlliedSignal Corporation and are commonly known as the "Bendix 9" or the "Bendix 10" systems. The Bendix 9 and 10 ABS systems are largely interchangeable and suffer from virtually identical defects. Unless otherwise stated, the use of the term "Bendix" shall refer

to both the Bendix 9 and the Bendix 10 systems.  The Chrysler vehicles equipped with the defective Bendix ABS systems are referred to collectively herein as the "Defective Vehicles." By equipping its vehicles with the defective Bendix ABS systems, Chrysler has breached its express and implied warranties in violation of federal and state law.  Plaintiffs bring this action on their own behalf, and on behalf of all those similarly situated (the "Class" as hereinafter defined), under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act ("Magnuson-Moss" or the "Act") and under applicable common law for fraud and for breach of express and implied warranties.

2.    The Defective Vehicles, which include, among other models, the 1991 through 1993 model years for Chrysler's popular and highly profitable line of minivans, were sold or leased pursuant to express and implied warranties.  These warranties assured consumers that such vehicles were free from defects and were properly equipped for the use for which they were intended.  At the time the Defective Vehicles were sold by Chrysler through its authorized agents, they were patently defective, in violation of express and implied warranties.  In particular, the Bendix ABS systems with which the Defective Vehicles were equipped by Chrysler suffered from a leak in the master cylinder seal which caused a continuous bleeding of pressure, leading to an eventual failure of the ABS pump and a loss of power assisted braking.

3.    Many of the Defective Vehicles manifested the effects of the defective ABS systems while still under the terms of the express written warranties, with numerous customers complaining to Chrysler by early 1992 that, among other things, their brake pedal failed to return to its full upright position, thereby causing the brake light to remain on. This problem was caused, *inter alia*, by the inadequate pressure resulting from the leak in the master cylinder seal.  Rather than acknowledging the defect and replacing the system

3

under warranty, however, Chrysler sought merely to mask the symptoms. Thus, Chrysler disseminated a TSB in mid-1992 which authorized its dealers to use a "brake pedal return spring" to force the pedal up mechanically so as to cause the brake light to go out and lead the consumer to believe that the problem had been solved. Yet, it had not. The leak in the master cylinder continued, causing the ABS pumps in many of the vehicles to run continuously until eventually they failed, leading to a total loss of all power assisted braking. By this time, however, the written warranty had often expired.

4. Even though the problem with the brake pedal had originated while the vehicle was under warranty, Chrysler would deny any relationship between the two events and would force the consumer to pay for the repair. Chrysler thereby effectively defrauded many of its consumers by pushing the eventual failure of the ABS system beyond the written warranty period even though the defect had initially caused noticeable symptoms while under warranty.

5. In addition to the difficulties with the brake lights, many other consumers alleged brake failures or other problems arising from the Bendix ABS while their vehicles were under written warranties. Because of a related defective design in the diagnostic computer of the ABS system, dealers were often unable to diagnose the problem and thus claimed that no problem existed, even though Chrysler knew that the problems cited by the consumers were caused by the patent defect in the ABS system. Then, when the eventual failure of the ABS pump occurred, leading to a loss of all power assisted braking, Chrysler again failed to assume responsibility for the repair if it occurred outside the warranty period.

6. To the extent the ABS system did fail outright during the written warranty period, Chrysler also defrauded its consumers by simply replacing it with another

4

new *or rebuilt* Bendix ABS which suffered from the same defect. Thus, many consumers had their ABS repaired only to fail again while outside the warranty period. At no time were the consumers warned by Chrysler that the Bendix ABS system suffered from a patent defect.

7.    Chrysler has long had knowledge of the defect in the Bendix ABS, having been confronted with numerous brake failures beginning in 1990. Internal Chrysler documents demonstrate that, as early as November 1992, Chrysler was experiencing soaring warranty claims relating to the Bendix ABS systems. This exponential increase in warranty claims led to a nationwide backorder of parts arising from the substantial number of repairs required to be made throughout the country. Significantly, these documents also indicate that Chrysler service personnel were "desperate" to identify a way to fix the failing systems, a fact Chrysler never disclosed to its consumers.

8.    Chrysler's effort to push the ABS failures beyond the warranty often succeeded, with many of the failures occurring only after the written warranties had expired. When this has occurred, Chrysler has dealt with its customers on a case-by-case basis as a tactic designed to avoid responsibility for its sale of defective ABS systems. When the ABS system failed outside the written warranty, Chrysler would initially charge the complete replacement cost to the consumer, which often totalled as much as $3,000 or more. If, however, the consumer complained, the dealer was instructed to refer him to a Chrysler 800 number, where a Chrysler representative was trained to attempt to alleviate any concerns. If the consumer continued to complain, then Chrysler would authorize a progressive series of compromises in the form of secret warranties, offering to pay for a portion of the bill. At no time did Chrysler disclose that the failure of the ABS system resulted from a known defect. The amount of damages sustained by consumers therefore depends on the extent to which they had the time and resources to complain vigorously to Chrysler.

9.    Through this action, plaintiffs seek equitable relief from Chrysler's deliberate promotion and sale or lease of a defective product, *i.e.*, vehicles equipped with a defective anti-lock brake system.  Thus, plaintiffs request that Chrysler be compelled either (i) to offer rescission to the plaintiffs and members of the Class, by repurchasing their Defective Vehicles for their full cost, or (ii) to recall and retrofit all Defective Vehicles that were equipped with the Bendix ABS system and retrofit such vehicles by replacing the existing Bendix ABS systems with a non-defective braking system.  In addition, plaintiffs seek to compel Chrysler to pay compensatory damages for their lost bargain in acquiring or leasing vehicles that had less value than had been represented to them as a result of the defective braking system and for the subsequent diminished value of the vehicles, restitution of all costs incurred by plaintiffs and members of the Class in connection with the purchase, replacement or repair of the Bendix ABS systems installed in the Defective Vehicles by Chrysler, and punitive damages.

## JURISDICTION AND VENUE

10.    This is a civil action for injunctive relief, specific performance and restitution arising under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. § 2301, *et. seq.*, and under common law.

11.    This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 2310(d)(1)(B) and under the doctrine of supplemental jurisdiction.  The amount of any individual claim in controversy exceeds $25.00; the amount of all claims in controversy exceeds $50,000, exclusive of interest and costs; and the number of named plaintiffs exceed 100.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). Certain of the plaintiffs are New Jersey residents and Chrysler maintains offices in this

6

District, received substantial compensation and profits from sales of Chrysler vehicles in this District, and made representations and breached warranties in this District. Moreover, AlliedSignal, the manufacturer of the Bendix ABS, has its principal executive offices located in this District. Thus, much of the discovery and many of the potential trial witnesses are located in New Jersey.

<u>PARTIES</u>

<u>Plaintiffs</u>

13. Each of the following named plaintiffs have owned or leased vehicles from Chrysler, through its authorized agents, which were equipped with either the Bendix 9 or the Bendix 10 ABS system. At the time they purchased or leased such vehicles, the ABS systems were defective, causing the vehicles to be in an unsafe condition. As a result of defects in the ABS systems installed by Chrysler in their Defective Vehicles, the plaintiffs have been damaged in an amount to be determined at trial.

14. Plaintiff David Chin resides at 3 Fawn Court, Jamesburg, New Jersey 08831. He purchased a 1992 Dodge Caravan on August 31, 1992 from Woodbridge Dodge, Woodbridge, New Jersey. The Vehicle Identification Number is 2B4GH55R1NR516535.

15. Plaintiff Dr. Douglas W. Alderman resides at 13009 Bankfoot Court in Herndon, VA 22071. He purchased a 1993 Dodge Grand Caravan LE. The Vehicle Identification Number is 1B4GH54R8PX552678.

16. Plaintiffs Peter & Lynne Andrade reside at 9 Harris Ave. in Warren, RI 02885. They purchased a 1989 Jeep Cherokee. The Vehicle Identification Number is 1J4FJ78L4KL519403.

17. Plaintiff Howard Barkan resides at 216 Waverly Road, Southampton, Pennsylvania 18966. He purchased a 1992 Plymouth Grand Voyager on October 17, 1991

7

from Lansdale Chrysler-Plymouth in Montgomeryville, Pennsylvania. The Vehicle Identification Number is 1P4GH54RINX122647.

18. Plaintiff Ronald R. Barrick resides at 7108 Blue Star Highway in Coloma, MI 49038-9313. He purchased a 1993 Town & Country in August 1993 from Schroeder Motors in Benton Harbor, MI. The Vehicle Identification Number is 1C4GH54R3PX763919.

19. Plaintiff Garry L. Berner resides at 116 Vista Street, Pittsburgh, Pennsylvania 15223-2029. He purchased a 1993 Plymouth Grand Voyager LE on May 20, 1993 from Krebs Chrysler Plymouth in Glen Shaw, Pennsylvania. The Vehicle Identification Number is 1P4GH54R5PX520155.

20. Plaintiff Jeff Bradley resides at 1540 Lehigh Street, Boulder, CO 80303. He purchased a 1992 Plymouth Voyager on May 30, 1992 from Concord Chrysler Plymouth in Concord, Massachusetts. The Vehicle Identification Number is 2P4GH45R6NR668142.

21. Plaintiff Frank Wallace Bromberg resides at 4301 Wilderness Road Birmingham, AL 35213. He purchased a 1992 Dodge Caravan on October 12, 1994 from Hoover Toyota in Birmingham, AL. The Vehicle Identification Number is 1B4GH54R9NX254945.

22. Plaintiff Carolyn A. Butler resides at P.O. Box 183 in Duvall, WA 98019. She purchased a 1989 Jeep Cherokee in July 1989 from Little Jess Chrysler in Quincy, IL. The Vehicle Identification Number is 1J4FJ58L5KL620986.

23. Plaintiff Chris Clarkson resides at 5830 19th St. N., Arlington, VA 22205. He purchased a 1992 Dodge Dynasty in June 1994 from Wheels Incorporated following the expiration of a lease on the vehicle. Wheels Incorporated had purchased the

8

vehicle in May 1992 from Ourisman Dodge in Alexandria, VA. The Vehicle Identification Number is 1B3XC46R4ND853618.

24.    Plaintiff Jim Coffey resides at 393 St. Andrews Lane, Half Moon Bay, California 94019. He purchased a 1992 Dodge Grand Caravan on July 21, 1992 from Marrietta Dodge in Marrietta, Georgia. The Vehicle Identification Number is 1B4GH44R0NX294941.

25.    Plaintiff Cynthia Cooper resides at 10 Bay Street Landing. Apt. 7D, in Staten, Island, NY 10301. She purchased a 1990 Jeep Cherokee on August 7, 1993 from McCafferty Ford/Jeep Sales. The Vehicle Identification Number is 1J4FJ58L5LL124247.

26.    Plaintiff Bessie Coyne is resides at 5800 Palm Street, Harrisburg, Pennsylvania 17112. She purchased a 1991 Plymouth Grand Voyager LE on August 1, 1991 from Warner Chrysler Plymouth in Hummelstown, Pennsylvania. The Vehicle Identification Number is 1P4GH54R3MX653993.

27.    Plaintiff Bryce Custodio resides at 563 Freemark Lane, Oakley, CA 94561. She purchased a 1991 Dodge Caravan on January 21, 1994. The Vehicle Identification Number is 2B4GK45R9MR207468.

28.    Plaintiff Craig M. Dinsmore resides at 29 W. 310 Lee Rd., West Chicago, Illinois 60185-2044. He purchased a 1991 Voyager LE AWD in April 1994 in Waukesha, Wisconsin. The Vehicle Identification Number is 2P4GP55R1MR317341.

29.    Plaintiffs Debra K. and L. Kevin Dodge reside at 527 Westchester Drive, Greensburgh, Pennsylvania 15601. They purchased a 1991 Dodge Caravan on May 23, 1991 from Kunkle's Service, Inc. in Delmont, Pennsylvania. The Vehicle Identification Number is 2B4GD55R6MR203085.

30.    Plaintiff Sgt. Christopher B. Dye resides at Co. B 733d Military

9

Intelligence BN, Bx 348, in Schofield Bks HI 96857. He purchased a 1991 Jeep Cherokee from Oahu Chrysler on September 26, 1994. The Vehicle Identification Number is 1J4FJ7854ML526.

31.    Plaintiff Karen Elliott resides at 1387 Highland Court in Milpitas, CA 95035. She purchased a 1989 Jeep Cherokee on April 4, 1994. It had originally been purchased from Jeep Capital Expressway in San Jose, CA. The Vehicle Identification Number is 1J4FJ58LIKL640443.

32.    Plaintiff Karen Fallis resides at 91 Reed Avenue, Roslyn, NY 11576. She purchased a 1993 Grand Voyager LE on December 8, 1992 from Island Chrysler Plymouth in Mineola, NY. The Vehicle Identification Number is 1P4GH54RXPX541437.

33.    Plaintiff Kimberly S. Fish resides at 3613 Bounty Circle, Springfield, IL 62707. She purchased a 1992 Dodge Caravan in 1992 from Royal Parkway Dodge in Springfield, IL. The Vehicle Identification Number is 1B4GH54R5NX231520.

34.    Plaintiff Karsten Flagstad resides at 3200 229th Avenue, Bethel, Minnesota 55005. He purchased a 1991 Chrysler Imperial in November 1993 from Rosedale Chrysler Plymouth in Rosedale, Minnesota. The Vehicle Identification Number is 1C3XY56R0MD184062.

35.    Plaintiff Steve Foley resides at 11034 N. 74th St., Scottsdale, AZ 85260-6404. He purchased a 1993 Chrysler Town & Country. The Vehicle Identification Number is 1C4GH54R8PX724937.

36.    Plaintiff William Fowler resides at 3532 Chowning Ct., Columbus, OH 43220. He purchased a 1991 Dodge Dynasty on October 15, 1994 from New Richmond Auto Sales in New Richmond, OH. The Vehicle Identification Number is 1B3XC56R7MD181560.

10

37.    Plaintiff J.V. Franck resides at 3810 Palo Alto Dr. in Lafayette, CA 94549. He purchased a 1990 Jeep Cherokee in 1989 from Oakland Volvo/Barber Jeep/Eagle in Vallejo, CA. The Vehicle Identification Number is 1J4FJ78L9LL141158.

38.    Plaintiff Mary M. Gaar resides at 4120 North 80th Street, Milwaukee, Wisconsin 53222. She purchased a 1992 Dodge Dynasty on August 4, 1992 from Stark Falls Chrysler in Menomonee Falls, Wisconsin. The Vehicle Identification Number is 1B3XC46R2ND860731.

39.    Plaintiff Thomas E. Gardner resides at 14469 Manuella Rd., Los Altos, CA 94022. He purchased a 1993 Chrysler Town & Country on February 27, 1993 from Normandin Chrysler in San Jose, CA. The Vehicle Identification Number is 1C4GK54RXPX635548.

40.    Plaintiff Roger Gauthier resides at 36108 Suffolk, Clinton Twp., MI 48035. He purchased a 1992 Dodge Dynasty LE on April 1, 1992 from Mt. Clemens Dodge in Mt. Clemens, MI. The Vehicle Identification Number is 1B3XC56R5ND801291.

41.    Plaintiff Raymond C. Gomez resides at 139 E. Dawn Dr. Tempe, AZ 85284. He purchased and 1991 Grand Voyager on June 12, 1991 from Bell Road Chrysler Plymouth in Phoenix, AZ. The Vehicle Identification Number is 1P4GH54ROMX634284.

42.    Plaintiff Dave Goldberg resides at 6637 Rosemoor Street, Pittsburgh, Pennsylvania 15217. He purchased a 1992 New Yorker Salon on March 18, 1992 from Monroeville Chrysler-Plymouth. The Vehicle Identification Number is 1C3XC66ROND801840.

43.    Plaintiff Benjamin M. Gosswiller resides at 3525 W. Campo Bello Dr., Glendale, AR 85308. He purchased a 1991 Chrysler Town & Country on February 16, 1992 from Mission Chrysler-Plymouth in West Covina, CA. The Vehicle Identification Number is

11

1C4GY54R6MX529592.

44.    Plaintiff Mark Goza resides at 2494 Palmer Circle, Fairfield, CA 94533.  He purchased a 1993 Grand Caravan on May 25, 1993 from Swift Dodge in Sacramental, CA.  The Vehicle Identification Number is 1B4GH54R5PX668095.

45.    Plaintiff John Graziano resides at 2 Mindy Lane, Westbury, NY 11590.  He purchased a 1992 Plymouth Voyager.

46.    Plaintiff J.E. Gravenmier resides at 833 Beaumont Road, Charleston, WV 25314.  He purchased a 1993 Plymouth Grand Voyager LE in June 1993 from Capital Chrysler-Plymouth in South Charleston, WV.  The Vehicle Identification Number is 1P4GH54R3PX772079.

47.    Plaintiffs Jerry and Vivian Green reside at 10852 Southwest 142 Court, Miami, Florida 33186.  They purchased a 1992 Dodge Caravan in April 1992 from Maroone Dodge in Miami, Florida.  The Vehicle Identification No. is 2B4GH45RXNE71757.

48.    Plaintiff Jean E. Grimm resides at 1233 E. Baker Dr., Tempe, AZ 85282.  She purchased a 1991 Plymouth Voyager on July 6, 1991 from Pitre in Scottsdale, AZ.  The Vehicle Identification Number is 2P4GH55R1MR219097.

49.    Plaintiff Hyman Hass resides at 11 Skyview Drive, Stamford, CT 06902.  He purchased a 1991 Plymouth Voyager.

50.    Plaintiff Abdallai Hassan resides at 2380 Cascade Plaza South, Woodbury, Minnesota 55125.  He purchased a 1992 Dodge Caravan on January 7, 1992 rom White Bear Dodge in Woodbury, Minnesota.  The Vehicle Identification Number is 2B4GH45R3NR621037.

51.    Plaintiff James B. Hasty resides at 25192 Wandering Lane, Lake Forest, CA 92630.  He purchased a 1991 Plymouth Voyager on June 5, 1991 from Parkview

AutoWorld in Buena Park, CA.  The Vehicle Identification Number is 1P4GH54ROMX581201.

52.    Plaintiff Jean Palmer Heck resides at 1955 Mulsanne Drive, Zionsville, IN 46077-9077.  She purchased a 1991 Dodge Caravan in Sept/Oct 1990 from Palmer Dodge in Indianapolis, IN.  The Vehicle Identification Number is 2B4GK55RSMR125632.

53.    Plaintiff Doug Heins resides at 212 Prospect, Howell, MI 48843.  He purchased a 1992 Dodge Grand Caravan on July 31, 1992 from John Colone Chrysler, Plymouth Dodge in Pickney, MI.  The Vehicle Identification Number is 1B4GH44R6NX334746.

54.    Plaintiffs Anthony A. and Brenda L. Helm reside at 3950A Ashland, St. Louis, MO 63107.  They purchased a 1991 Dodge Dynasty on April 16, 1994 from Mallory Buick in St. Louis, MO.  The Vehicle Identification Number is 1B3XC46R3MD285411.

55.    Plaintiff Gilbert Helwig resides at 2006-55 Ontario Rd. Niles, MI 49120.  He purchased a 1991 Plymouth Grand Voyager in September 1991 from Rafferty Motor Mall in Niles, MI.  The Vehicle Identification Number is 1P4GH54R8MX651396.

56.    Plaintiff Carey Hidaka resides at 2230 Dewes Street in Glenview, IL 60025.  He purchased a 1993 Plymouth Voyager on July 19, 1993 from Schaumburg Chrysler-Plymouth in Schaumburg, IL.  The Vehicle Identification Number is 1P4GH44R8PX771116.

57.    Plaintiff George Higgins resides at 197 Riverside, Dedman, Masschusetts 02026.  He leased a 1993 Dodge Grand Caravan in November 1992 from Norwood Dodge in Norwood, Massachusetts.  The Vehicle Identification Number is 1B4GH44RIPX604873.

13

58.    Plaintiff Scott A. Hollenbeck resides at 9515 Orion Court, Burke, Virginia 22015. He purchased a 1991 Dodge Grand Caravan on January 4, 1991 from Fair Oaks Dodge in Fairfax, Virginia. The Vehicle Identification Number is 1B4GK54R1MX505909.

59.    Plaintiff Steve Holloway resides at 2020 West Ash Avenue in Fullerton, California 92833. He purchased a 1989 Jeep Cherokee on August 19, 1989 from Huntington Beach Jeep, Huntington Beach, California. The Vehicle Identification Number is 1J4FJ58L3KL610571.

60.    Plaintiff Ron Hommelson resides at 350 Westbrook, O'Fallon, MO 63366. He purchased a 1991 Dodge Caravan LE in 1992 from St. Ann Dodge in St. Ann, MO. The Vehicle Identification Number is 1B4GK54R2MX569733.

61.    Plaintiff Nan Hutchins resides at 57 Running Brook Lane, New Canaan, CN 06840. She purchased a 1992 Plymouth Grand Voyager on October 16, 1991 from Mill River Motors in Stamford, CT. The Vehicle Identification Number is 1F4GH54RINX142722.

62.    Plaintiff Charles Jabbonsky resides at 1 Bates Lane, Shoreham, N.Y., 11786. He purchased a 1993 Plymouth Voyager SE on April 13, 1993 from Port Jeff Chrysler-Plymouth-Jeep-Eagle in Port Jefferson Station, NY. The Vehicle Identification Number is 2P4GH45R4PR317474.

63.    Plaintiff John D. James resides at 1606 Spence St., Green Bay, Wisconsin 54304. He purchased a 1990 Chrysler Imperial in the Spring of 1991 from Bay City Chrysler Plymouth in Green Bay, Wisconsin. The Vehicle Identification Number is 1C3XY56R3LD900774.

64.    Plaintiff George R. Jones resides at 15110 S.E. 138th PL, Renton, WA

98059. He purchased a 1992 Chrysler Town & Country in April 1992 from Bellevue Chrysler, Bellevue, WA. The Vehicle Identification Number is 1C4GH54R4NX235903.

65.    Plaintiff Robert Jones resides at 5903 Mt. Eagle Drive, Apt. 715, Alexandria, VA 22303. He purchased a 1991 Dodge Caravan on December 9, 1992 from Ourisman Dodge in Alexandria, VA. The Vehicle Identification Number is 1B4GH54R1PX600070.

66.    Plaintiff Daniel G. Kagan resides at 8 Todd Brook Road, Freeport, ME 04032. He purchased a 1992 Dodge Grand Caravan ES in November 1994 from Michael Liberty of Gray, Maine who purchased it new in Jolly John Auto Center in Saco, ME. The Vehicle Identification Number is 1B4GK54R1NX232228.

67.    Plaintiff Charles Kelley resides at 1099 Fairbank Street in Great Falls, VA 22066. He purchased a 1993 Dodge Caravan in May 1993 from Templeton Dodge in Vienna, VA. The Vehicle Identification Number is 1B4GH44R2PX618393.

68.    Plaintiff Thomas F. Kinder resides at 9434 Galecrest Drive, Cincinnati, OH 45231. He purchased a 1992 Plymouth Voyager LE on March 18, 1994 from PHH Fleet America in Baltimore, MD. The Vehicle Identification Number is 294GH55R4NR719269.

69.    Plaintiff Lloyd J. King resides at 3810 Annapolis Road, Baltimore, MD 21227. He purchased a 1991 Chrysler Fifth Avenue in 1992 from Tate Dodge in Glen Burnie, MD. The Vehicle Identification Number is 1C3XY66R5MD182989.

70.    Plaintiff Marvin Kirschenbaum resides at 22 Lombardi Place, Plainview, New York 11793. He purchased a 1991 Dodge Caravan LE in March 1991. The Vehicle Identification Number is 1B4GK54R5MX610646.

71.    Plaintiff William Knueven resides at 9302 Ludgate Drive, Alexandria,

15

Virginia 22039.  He purchased a 1993 Chrysler Town & Country in September 1992 from Passport Chrysler in Alexandria, Virginia.  The Vehicle Identification Number is 1C4GH54R5PX519706.

72.    Plaintiffs Dr. Lora and Dr. Thomas Kravec reside a 1282 McCoy Road, Columbus, OH 43220.  They purchased a 1991 Plymouth Grand Voyager on October 10, 1990 from Beyers Plymouth in Columbus, OH.  The Vehicle Identification Number is 1P4GH44R2MX508258.

73.    Plaintiff Michelle Lesse resides at 70 E. Highland Ave. in Sierra Madre, CA 91024.  She purchased a 1989 Jeep Cherokee Wagoneer on March 30, 1989 from Huntington Jeep/Eagle in Huntington Beach, CA.  The Vehicle Identification Number is 1J4FN78LOKL554699.

74.    Plaintiffs Raymond C. and Roseanne D. McCarty reside at 368 Tuckerton Rd. in Tabercacle, NJ 08088.  They purchased a 1991 Jeep Cherokee in September 1990 from Johnny's Chrysler-Plymouth in Ohlyn, NJ.  The Vehicle Identification Number is 1J4FJ58SXML517749.

75.    Plaintiff C. Stuart McPherson resides at 560 San Antonio Rd., No. 104, Palo Alto, CA 94306.  He purchased a 1993 Dodge Caravan on September 30, 1992 from Jim Olick Dodge in Tucson, AZ.  The Vehicle Identification Number is 2B4GH55R4NR603636.

76.    Plaintiff AAA Realty, Inc. is located at 560 San Antonio Road, Suite 104, Palo Alto, CA 94306.  It purchased a 1992 Dodge Caravan ES on December 11, 1991 from Oakland Dodge in Oakland, CA.  The Vehicle Identification Number is 2B4GH55R4NR603636.

77.    Plaintiff Bruce McCutcheon resides at 619 West Lafayette St., Easton,

Pennsylvania 18042. He purchased a 1992 Plymouth Voyager on January 2, 1992 from Rothrock Motor Sale in Allentown, Pennsylvania. The Vehicle Identification Number is 2P4GH45R5NR508236.

78.    Plaintiff Mike McInerney resides at 204 Bloomfield Lane, Greer, SC 29650-3807. He purchased a 1992 Plymouth Grand Voyager on June 21, 1992 from Arnett Motors, Inc. in Anderson, South Carolina. The Vehicle Identification Number is 1P4GH44R9NX230556.

79.    Plaintiff Ed Mikolajczyk resides at 13615 Gardenia Path, Apple Valley, Minnesota 55124. He purchased a 1993 Chrysler Town & Country in April 1994 from Sunnyside Chrysler Plymouth in Apple Valley, Minnesota. The Vehicle Identification Number is 1C4GH54R8PX698033.

80.    Plaintiff Willene Mitchell resides at 2656 E. 124, Cleveland, Ohio 44120. She purchased a 1992 Plymouth Voyager on December 20, 1994 from Axelrod Chrysler in Parma, Ohio. The Vehicle Identification Number is 2P4GH2538NR640245.

81.    Plaintiff Nancy Mollhagen resides at 22301 60th Ave. in Mattawan, MI 49071. She purchased a 1991 Plymouth Voyager in January 1991 from Maple Hill Chrysler Plymouth in Kalamazoo, MI. The Vehicle Identification Number is 2P4GH55ROMR224095.

82.    Plaintiff Walter H. Moorer, Jr. resides at 4946 McDonald Ave. West Columbia, SC 29172. He purchased a 1991 Dynasty LE on February 14, 1995 from Goodwin & Barton Motors in Gayce, SC. The Vehicle Identification Number is 1B3XC56R4MD155076.

83.    Plaintiff Kenneth E. Nealy resides at 1200-E Cornet Ave., Honolulu, Hawaii 96818. He purchased a 1991 Plymouth Voyager LE on March 3, 1991 from Colorado Chrysler Plymouth in Denver, Colorado. The Vehicle Identification Number is

2P4GH55R6MR203834.

84.    Plaintiff Leonard Nelson resides at 3832 41st Ave., NE, Seattle, WA 98105.  He purchased a 1992 Grand Voyager on December 26, 1991 from Puget Sound Chrysler-Plymouth in Renton, WA.  The Vehicle Identification Number is 1P4GH44R4NX163462.

85.    Plaintiff Kenneth H. Norris resides at 22951-B Nadine Circle Torrance, CA 90505.  He purchased a 1992 New Yorker on January 8, 1993 from South Bay Chrysler in Torrance, CA.  The Vehicle Identification Number is 1C3XC66R8ND856729.

86.    Plaintiff Khaleel Nurideen resides at 183 Beekman Lane, Neshanic Station, NJ 08553.  He leased a 1991 Dodge Caravan from Flemington Chrysler/Plymouth in Flemington, NJ.  The Vehicle Identification Number is 1B4GK44R9MX566287.

87.    Plaintiff Ernest T. Oddo resides at 1910 Suva Circle in Costa Mesa, CA 92626.  He purchased a 1993 Dodge Caravan on October 22, 1992 from Herb Friedlander Dodge in Garden Grove, CA.  The Vehicle Identification Number is 2B4GH55R4PR128105.

88.    Plaintiffs Tony and Barbara Oliver reside at 27570 Berkshire Hills Pl., Valencia, CA 91355.  They purchased a 1992 Grand Voyager LE.  The Vehicle Identification Number is 1P4GH54R9NX240770.

89.    Plaintiff Maureen O'Neil resides at 2454 Earl Ave., Long Beach, CA 90806.  She purchased a 1992 Plymouth Voyager on October 23, 1991 from Gould Chrysler-Plymouth in Long Beach, CA.  The Vehicle Identification Number is 2P4GH2531NR520951.

90.    Plaintiff Cynthia Olsen resides at 4344 Glenelbyn Dr. in Los Angeles, CA 90065.  She purchased a 1989 Jeep Cherokee on November 13, 1991 from Glendale Jeep/Eagle in Glendale, CA.  The Vehicle Identification Number is 1J4FJ78S2ML595177.

18

91.    Plaintiff David C. Polich resides at 31872 Joshua Dr. #18-M, Trabuco Canyon, CA 92679-3109. He purchased a 1993 Dodge Caravan LE in September 1993 from Tuttle-Click Dodge in Irvine, CA. The Vehicle Identification Number is 2B4GH55R2PR255953.

92.    Plaintiff Susan L. Pomeroy resides at 159 Hillcrest Ave. in Summit, NJ. She purchased a 1992 Plymouth Grand Voyager.

93.    Plaintiff David Price resides at 115 Ridgecrest Rd., Graniteville, SC 29829. He purchased a 1992 Dodge Caravan ES on May 18, 1992 from Jim Cogdill Dodge in Knoxville, TN. The Vehicle Identification Number is 2B4GH55RXNR649892.

94.    Plaintiff Norman Revolinski resides at 4283 Dicky Lane in Madison, WI 53704. He purchased a 1991 Dodge Dynasty in May 1993. The Vehicle Identification Number is 1B3XC56R9MD188512.

95.    Plaintiff Robert T. Reyes resides at 8529 W. Charleston Ave., Peoria, AZ 85382. He purchased a 1992 Chrysler Town & Country on April 28, 1993 from Moore Chrysler-Plymouth in Peoria, AZ. The Vehicle Identification Number is 1C4GH54R5PX641885.

96.    Plaintiff Susan Robins resides at 6928 Burnet Ave., Van Nuyes, California 91495. She purchased a 1992 Plymouth Voyager in January 1992 from Prince Chrysler in Inglewood, California. The Vehicle Identification Number is 2P4GH45R4NR629324.

97.    Plaintiff Howard G. Saul resides at 4138 Bexley Blvd., Cleveland, Ohio 44121-2711. He purchased a 1990 Dodge Dynasty on May 16, 1990 from Junction Auto Sales in Cleveland, Ohio. The Vehicle Identification Number is 1B3XC56R3LD868257.

19

98.     Plaintiff Kathy Schofield resides at 9814 Taylor Street, Blaine, MN 55434.  She purchased a 1991 Plymouth Voyager.

99.     Plaintiff Walter Semchyshyn resides at 49 Somerset Ave., Bridgewater, NJ 08807-2023.  He purchased a 1991 Plymouth Voyager on April 3, 1991 from Flemington Chrysler-Plymouth-Dodge in Flemington, NJ.  The Vehicle Identification Number is 1P4GH54R5MX576205.

100.    Plaintiffs Fred and Nancy Shimizu reside at 102 Lewis Drive, Upper Nyack, NY.  They  purchased a 1991 Grand Voyager SE on April 1, 1991 from Teterboro Chrysler in Teterboro, NJ.  The Vehicle Identification Number is 1P4GH44R9MX583765.

101.    Plaintiff Bernard H. Simelton resides at 7310 Lightship Court, Burke, Virginia 22015.  He purchased a 1991 Plymouth Voyager in 1992 from Fair Oaks Dodge in Fairfax, Virginia.  The Vehicle Identification Number is 1P4GH54R7MX542475.

102.    Plaintiff Loreine Simopoulos resides at 6030 Hoffman Lane in Fair Oaks, CA 95628.  She purchased a 1990 Jeep Cherokee Laredo on September 22, 1989 from Autowest Jeep in Roseville, CA.  The Vehicle Identification Number is 1J4FJ58L9KL608999.

103.    Plaintiffs Martha and Calvin M. Singleton reside at 16301 Fernway Road, Shaker Heights, Ohio 44120.  They purchased a 1991 Plymouth Grand Voyager on March 13, 1991 from Don Jordan Chrysler Plymouth in Beachwood, Ohio.  The Vehicle Identification Number is 1P4GH54R5MX576169.

104.    Plaintiff Bernie K. Sloane resides at P.O. Box 93, Spring Valley, CA 91976.  He purchased a 1990 Chrysler Imperial.  The Vehicle Identification Number is 1C3XY56R5LD799463.

105.    Plaintiff Janice Sonski resides at 4854 Placidia Ave., North Hollywood,

20

California 91601. She leased a 1993 Dodge Caravan LE on October 3, 1993 from Simi Valley Dodge Chrysler Jeep Eagle, in Simi Valley, California.

106. Plaintiffs Eric and Debbie Stoppa reside at 12411 N. 67th Street, Scottsdale, AZ 85254. They purchased a 1993 Grand Caravan. The Vehicle Identification Number is 1P4GH54R6PX531726.

107. Plaintiff Sheila T. Straub resides at 167 Franklin Avenue, Maplewood, NJ. She purchased a new 1991 Dodge Caravan. The Vehicle Identification Number is 2B4GK2536MR256613.

108. Plaintiff Fran Strykowski resides at 242 Orchard Rd., Orlinda, California 94563. She purchased a 1991 Dodge Caravan on July 14, 1991 from Oakland Dodge in Oakland, California. The Vehicle Identification Number is 1B4GK54R5MX574733.

109. Kevin L. Sullivan resides at 90 Reid Place, Verona, New Jersey 07044. He purchased a 1991 Dodge Grand Caravan in November 1993. The Vehicle Identification Number is 1B4GK54R4MX514751.

110. Plaintiff Julie Szabos resides at 1710 Breckenridge, Harrisburg, Pennsylvania 17112. She has purchased three Dodge Grand Caravans, a 1991, a 1992 and a 1993, the first two of which she traded in after experiencing repeated brake failures. She purchased her 1993 vehicle from Brenner Dodge in Harrisburg, Pennsylvania. The Vehicle Identification Number is 1B4GH54R6EX692065.

111. Plaintiff Chris Teres resides at 2942 Legation St., N.W. in Washington, D.C. 20015. He purchased a 1992 Dodge Caravan on December 31, 1992 from Herb Gordon Dodge in Silver Spring, MD. The Vehicle Identification Number is 1B4GH44R6PX609129.

21

112.    Plaintiff Peter F. von Savoye, II resides at 3153 Normington Drive, Sacramento, CA 95833-1248.  He purchased a 1992 Dodge Grand Caravan SE in June 1992 from Autowest Dodge in Roseville, CA.  The Vehicle Identification Number is 1B4GK44R7NX149106.

113.    Plaintiff Tammy L. Walker resides at 163 Lowmaster Dr. in Carrolltown, PA 15722-7910.  She purchased a 1993 Dodge Grand Caravan LE.  The Vehicle Identification Number is 1B4GK44R0PX592507.

114.    Plaintiff Ernest C. Walsh resides at 2257 Red Top Rd., Wilkesboro, N.C. 28697.  He purchased a 1991 Chrysler Imperial on July 7, 1994 from Emma Beahill in Winston Salem, NC.  The Vehicle Identification Number is 1CXY56R2MD282481.

115.    Plaintiff Paul Nelson Ware resides at 1090 Barker Road SW, Rome, GA 30165-9261.  He purchased a 1990 Jeep Cherokee Laredo on January 30, 1990 from Jasper Jeep in Jasper, GA.  The Vehicle Identification Number is 1J4FJ58L2LL200975.

116.    Plaintiff Ted Windham resides at 21561 Calle Otono in Lake Forest, CA 92630.  He purchased a 1990 Jeep Cherokee in November 1993.  The Vehicle Identification Number is 1J4FJ78L3LL110777.

117.    Plaintiff David P. Yexley resides at 1400 E. Sheridan Bridge Lane, Olathe, Kansas 66062.  He leased a 1992 Chrysler Town & Country on June 1, 1992 from Anne Zaricky's Chrysler Plymouth in Olathe, KS.  The Vehicle Identification Number is 1C4GH54R4NX233533.

118.    Plaintiff Al Zeidler resides at 1145 Lea Dr., Novato, California 94945.  He purchased a 1992 Grand Voyager LE in December 1991 from AutoWorld in Petalluma, California.  The Vehicle Identification Number is 1B4GK54R8NX181309.

**Defendant**

119.  Chrysler is a Delaware corporation operating, maintaining offices, and conducting business throughout New Jersey and the United States.  Its principal offices are at 12000 Chrysler Drive, Highland Park, Michigan 48288-0001.  The Company manufactures, assembles and sells and leases cars and trucks under the brand names Chrysler, Dodge, Plymouth and Eagle, among others. In 1994, Chrysler's domestic retail sales of cars and trucks represented 9.0% of the total industry, with the sale of approximately 812,000 units that year alone.  Chrysler sells its new passenger cars and trucks, as well as many of its used automobiles, through dealers, who totalled 4,687 at the end of 1994.  The acts upon which this action is based occurred in this District and elsewhere, and Chrysler sold thousands of Defective Vehicles in violation of express and implied warranties in this District and nationwide.

120.  As further discussed below, in promoting, selling and repairing its Defective Vehicles, Chrysler acts through numerous authorized dealers who act and portray themselves to the public as exclusive Chrysler representatives and agents.  That the dealers act as Chrysler's agents is demonstrated by the fact that (1) the warranties provided by Chrysler for each of the Defective Vehicles expressly direct consumers to take their vehicles to authorized Chrysler dealers for repairs and/or service; (2) Chrysler dictates the nature and terms of the purchase contracts entered into between the authorized dealers and consumers; (3) Chrysler directs its authorized dealers as to the manner in which they can respond to complaints and inquiries concerning the Defective Vehicles, particularly as they relate to the defective Bendix systems; and (4) Chrysler has entered into agreements and understandings with its authorized dealers pursuant to which it is able to exercise substantial control over the operations of the authorized dealers and their interaction with the public.

23

121.   Chrysler's control over the actions of its dealers is evidenced by its implementation of the Company's express and implied warranties as they relate to the anti-lock brake systems with which the Defective Vehicles are equipped.  Authorized Chrysler dealers have been informed by Chrysler not to make any repairs on ABS systems without the Company's express permission.  Indeed, some dealers have informed their customers that their "hands were tied" with respect to ABS repairs, directing their customers to contact Chrysler directly to discuss any problems they might be having with their braking systems.  Thus, Chrysler -- not its authorized dealers -- exercises complete control over the interpretation and implementation of the express and implied warranties given with the purchase or lease of Chrysler vehicles, particularly as such warranties relate to the ABS.

122.   In addition, Chrysler has insured that it maintains total control over the installation and repair of its ABS systems by controlling and restricting the amount of information available to non-authorized dealers, thereby limiting the ability of anyone other than an authorized dealer with access to information provided by Chrysler to provide necessary repairs to the ABS systems in the Defective Vehicles.

## CLASS ACTION ALLEGATIONS

123.   This action is brought and may properly be maintained as a class action pursuant to the provisions of the Federal Rules of Civil Procedure 23(a)(1)-(4) and 23(b)(1), 23(b)(2) and 23(b)(3).  Plaintiffs bring this action, on behalf of themselves and others similarly situated, as representative members of the following proposed Class:

> All persons or entities residing in the United
> States and Puerto Rico who (1) own or lease a
> vehicle sold or manufactured by Chrysler which is
> equipped with a Bendix 9 or 10 anti-lock brake
> system; or (2) have previously owned or leased
> such Defective Vehicles and have incurred
> expenses arising from the repair or replacement of

24

defective Bendix 9 or 10 ABS systems.

> Excluded from the Class are any registered owner
> who holds a Chrysler vehicle for salvage, scrap
> or for sale of parts.  Excluded from the Class
> claims are:  claims for personal injury, wrongful
> death or damage to property other than repairs to
> the brakes as a result of the defective brakes.

124.   In this suit, plaintiffs seek equitable relief, including injunctive relief, specific performance and restitution, on behalf of all Class members.  Plaintiffs expressly disclaim any intent to seek in this suit any recovery for personal injuries suffered or which may be suffered by any Class member.

**Numerosity of the Class, Fed. R. Civ. P. 23(a)(1).**

125.   The proposed Class is so numerous that the individual joinder of all its members is impracticable under the standard of Fed. R. Civ. P. 23(a)(1).  While the exact number and identities of Class members are unknown at this time, and can be ascertained only through appropriate discovery, plaintiffs are informed and believe that hundreds of thousands of Chrysler vehicles have been sold with Bendix ABS systems.  From 1991 through 1993 alone, Chrysler sold over 200,000 minivans with Bendix 10 ABS systems, and from 1990-1993 it sold an additional 68,000 New Yorker Salons or Fifth Avenues, Imperials, Premiers, Dynasties and Monacos with such systems, many of which were sold in New Jersey.  In addition, thousands more of the Jeep Cherokees were sold from 1989 through 1991 equipped with the defective Bendix 9 ABS systems.

**Existence and Predominance of Common Questions of Law and Fact,**
**Fed. R. Civ. P. 23(a) and 23(b)(3)**

126.   Questions of law and fact of common and general interest to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the Class.

127.    Among the questions of fact common to the Class, are the following:

a.    Whether the Defective Vehicles have been sold or leased subject to express and implied warranties;

b.    Whether the Chrysler vehicles have the defect alleged, *i.e.*, an anti-lock brake system that is prone to failure in either the hydraulic assembly or the hydraulic pump, leading, at least in some cases, to complete brake failure and thereby subjecting passengers to risk of injury, and whether Chrysler knew or should have known about this defect;

c.    When Chrysler first became aware of the defective nature of Chrysler vehicles;

d.    Whether Chrysler continued to sell and advertise Chrysler vehicles despite knowledge of their defective and unsafe characteristics, thereby defrauding consumers;

e.    What efforts Defendants took to conceal the defective and unsafe characteristics of Chrysler vehicles from the public;

f.    Whether the advertisements and statements issued by Chrysler concerning Chrysler vehicles are false and/or have a tendency to deceive the public by failing to disclose the defect and/or misleading consumers about the potential existence of a defect; and

g.    Whether Chrysler notified purchasers of Chrysler vehicles of their dangerous and defective condition.

128.    Among the questions of law common to the class are the following:

a.    Whether, under common law, Chrysler has breached its express warranties and its implied warranties of merchantability and fitness;

26

b.    Whether the Class is threatened with irreparable harm and has been damaged and, if so, the nature of the equitable relief and/or damages and punitive damages to which each member of the Class is entitled;

c.    Whether any effort by Chrysler to limit the duration of the implied warranties of merchantability and fitness is void as unreasonable and unconscionable;

d.    Whether Chrysler's uniform course of conduct in the advertising, promotion, and sale of the Chrysler vehicles was false or misleading in failing to disclose the defect; and

e.    Whether Chrysler has proximately caused injury to plaintiffs and members of the Class.

**Typicality of Claims, Fed. R. Civ. P. 23(a)(3)**

129.    Plaintiffs' claims are typical of the claims of the members of the Class, as all such claims arise out of the purchase or lease by plaintiffs and members of the Class of Chrysler vehicles equipped with the defective Bendix ABS systems.  Plaintiffs and all members of the Class are threatened with harm arising out of Chrysler's common course of conduct as alleged herein.

**Adequate Representation, Fed. R. Civ. P. 23(a)(4)**

130.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have no interests antagonistic to those of the Class members. Plaintiffs have retained counsel experienced in the prosecution of class actions, including consumer class actions involving product liability, mass tort and vehicle design defects.

## Mandatory Class Certification Under Rule 23(b)(1) and (2)

131.    This class action is appropriate for certification under Rule 23(b)(1) and (2) because:

a.    The prosecution of separate actions by individual Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members which would establish incompatible standards of conduct for Chrysler.

b.    The prosecution of separate class actions by individual Class Members will create of risk of adjudication with respect to the Class which might, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudication, or substantially impair the ability of other Class Members to protect their interests; and/or

c.    Chrysler has acted or refused to act in respects generally applicable to the Class, thereby making appropriate final injunctive relief with regard to the members of the Class as a whole.

## Superiority, Fed. R. Civ. P. 23(b)(3)

132.    This class action is also appropriate for certification under Rule 23(b)(3) because questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable.  Furthermore, as the damages suffered by each individual member are relatively small compared to the expense and burden of prosecuting this complex case against a well-financed, multibillion dollar corporation, this class action is the only way each Class member can redress the harm and damage which Chrysler has caused.

133.    Should individual Class members be required to bring separate actions, courts throughout the United States would be confronted by a multiplicity of lawsuits burdening the court system and the litigations while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## FACTUAL ALLEGATIONS

### Background

134.    Chrysler is one of the world's largest manufacturers, sellers and lessors of automobiles, trucks and minivans. While much has been written about Chrysler's return from the brink of financial ruin, few would dispute that Chrysler's resurrection is credited to the phenomenal success of its minivan products -- the Chrysler Town & Country, the Plymouth Voyager and the Dodge Caravan.

135.    In late 1983, then-Chrysler Chairman Lee Iacocca was holding court with a group of business executives when he announced, "what you're going to see today is the greatest idea I've been associated with since the Mustang." Iacocca then proceeded to show the executives some of the first minivans to roll off the line at Chrysler's assembly plant in Windsor, Ontario.

136.    By 1993 -- a decade after Chrysler had originated the species and four million minivan sales later -- Chrysler still made almost one out of every two minivans sold, far exceeding any of its competitors in the market. Such success caused Robert Lutz, then-Chrysler's President and Chief Operating Officer to exclaim, "of all of the vehicles in the Company's 70 year history, if you had to choose just one that really set the automotive

29

industry on its ear, this is it: the minivan!"

137.    Keenly aware that continued success in the minivan market hinged on Chrysler's ability to equip its minivan line with the equipment and features most demanded by consumers, Chrysler responded to consumers' growing concern for safety by offering the Bendix 10 ABS system as an option for its 1991 and 1992 Dodge Caravan and Plymouth Voyagers, and as standard equipment for the Chrysler Town & Country. In response to a consumer's complaint letter in 1991, for example, Chrysler's Owners Relations Coordinator wrote on July 26, 1991:

> Your Caravan is equipped with a Bendix Antilock 10 Brake System (ABS), which is a new extra-cost option on all 1991 Chrysler minivan models. Chrysler, widely recognized as an industry leader and innovator in automotive safety (we offered the first U.S. production automobile 4-wheel ABS package in the 1971 Imperial), and Bendix, the leading current U.S. supplier of passenger care ABS equipment, designed this system to provide Chrysler minivan owners with an additional safety advantage.

138.    In 1993, the Bendix 10 ABS became standard equipment for all three versions of the minivan. In explaining its decision, Chrysler informed consumers that it would "make anti-lock brakes standard equipment in the extended wheelbase versions of Caravan and Voyager, matching a level that already existed in the high-end Town & Country." Safety and reliability became two of the hallmarks of Chrysler's advertising campaigns. Aside from the minivans, Chrysler also equipped thousands of its sedans manufactured between 1990 and 1993 with the Bendix 10, while equipping the 1989 to 1991 Jeep Cherokees with the comparable Bendix 9 ABS system.

### Chrysler's Breach of Express and Implied Warranties

139.    Chrysler sold or leased the above-referenced Defective Vehicles to the plaintiffs and members of the Class subject to express, written warranties. Pursuant to these

express warranties, Chrysler warranted the Defective Vehicles, including, but not limited to, the anti-lock brake system, to be free of defects in materials and workmanship at the time of delivery and provided that repairs and other adjustments will be made by authorized Chrysler dealers, without charge, to correct defects in material or workmanship which occur during a period of time or within an amount of mileage agreed to by the consumer. At the time of the purchase or lease, consumers were required to elect either "The Basic Warranty -- Option 1," which covered all parts of the vehicle for up to 12 months or 12,000 miles, whichever occurred first, or "The Basic Warranty -- Option 2," which extended the warranty to up to 36 months or 36,000 miles. In addition, Chrysler offered a 7-year or 70,000 "powertrain" warranty. Unlike other manufacturers, however, Chrysler excluded the ABS from this warranty, knowing that the ABS system suffered from a patent defect.

140.    Chrysler also sold or leased the Defective Vehicles to the plaintiffs and members of the Class under implied warranties of merchantability and fitness for a particular purpose whereby Chrysler warranted the Defective Vehicles to be merchantable and fit for the ordinary purposes for which they were intended to be used, including the guarantee that they were in a safe and non-defective condition for use by their owners or lessees for the ordinary purpose for which they were intended, were not otherwise injurious to consumers, and would come with adequate safety warnings. Under the Magnuson-Moss Act, this implied warranty cannot be disclaimed and, pursuant to these implied warranties, Chrysler was under a duty to design, construct, manufacture, inspect and test the Defective Vehicles so as to render them suitable for the ordinary purpose of their use, including with adequate, safe and reliable braking systems.

141.    Chrysler has breached the express written warranties for each of the Defective Vehicles as a result of the patent defects in the Bendix ABS systems with which

31

they were equipped. Moreover, Chrysler breached its express warranties by (i) intentionally masking the symptoms caused by the defects in order to push the eventual complete failure of the system outside the written warranty period; (ii) denying any problem with the ABS system when the particular problem caused by the defect could not be duplicated by the dealer, even though Chrysler knew the problem was caused by a known defect; or (iii) repairing the failed ABS system under warranty with a new or rebuilt system that contained the same defect, which would eventually lead to another failure after the written warranty had expired.

142. Furthermore, as a result of the defects in the ABS systems, the Defective Vehicles are unsafe and unfit for the ordinary purposes for which they are intended to be used and, as such, Chrysler has breached its implied warranties of merchantability and fitness for a particular purpose.

143. The Defective Vehicles manufactured by Chrysler and sold or leased to the plaintiffs and members of the Class are equipped with defective Bendix ABS systems in which the hydraulic assembly and pump repeatedly fail, leading to the complete loss of or greatly impaired braking ability. To date, there have been over 2,000 complaints by consumers received by Chrysler, consumer advocacy groups or governmental agencies concerning defects in the Bendix ABS, with at least 60 accidents reported, leading to 30 injuries. Chrysler has also reportedly bought back at least 35 minivans from owners because of ABS failures. These reports are undoubtedly understated by a material amount, as they exclude numerous Bendix ABS failures or accidents which have not been reported or properly attributed to the defective braking system. The failure of the Bendix ABS system has led and, without the relief sought in this action, will continue to lead to the loss of braking ability in numerous Defective Vehicles. As such, Chrysler has breached its express

32

and implied warranties described above.

**Description Of The Bendix ABS System**

144.    The Bendix ABS system is designed to prevent wheel locking tendencies during braking conditions. As explained herein, the system is supposed to track the movement of each wheel to identify when it appears to be locking-up. In such a situation, the system is to automatically provide for rapid modulation of the pressure being applied to the brake. In other words, the ABS system should effectively pump the brakes on behalf of the driver.

145.    The following is a list of the major system components in both the Bendix 9 and 10 ABS systems.

a.    The Hydraulic Assembly provides the function of an integral master cylinder and hydraulic booster assembly, and contains the wheel circuit valves used for brake pressure modulation.

b.    Attached to the Hydraulic Assembly is the Hydraulic Bladder Accumulator which stores pressurized brake for hydraulic assist during both power-assisted and anti-lock braking.

c.    A Wheel Speed Sensor is located at each wheel to transmit wheel speed information to the Controller Anti-Lock Brake ("CAB").

d.    The CAB is a small control computer that receives wheel speed information, controls anti-lock operation and monitors system operation.

e.    The Pump/Motor Assembly, or "ABS Pump," is an electrically driven pump. It takes low pressure brake fluid from the hydraulic assembly reservoir and pressurizes it for storage in the accumulators.

146.    When the CAB notes that the wheels are locking during a brake

33

application, it is designed to cause the system to enter into the anti-lock mode. This should result in hydraulic pressure being modulated in each of the four wheel circuits to prevent any wheel from locking. Each wheel has a set of electrical solenoid valves and a hydraulic line to provide the modulation, with the system designed to build, hold or reduce pressure at each wheel, as necessary. In effect, the computer is supposed to direct pressure to each of the wheels so as to pump the brakes rapidly without direct intervention by the driver. As a result, even when the driver is slamming on the brakes during an emergency, which might otherwise lead to the wheels locking up, the ABS system should ensure that the brakes are being pumped so as to avoid such a lock-up of the wheels.

147.    An important feature of the Bendix ABS, particularly considering the defects alleged herein, is that it is an "integrated" system, in that it does not have a conventional vacuum booster and master cylinder to provide normal braking, but relies on the ABS Pump. In other words, the Bendix ABS uses its Pump to provide both power-assisted braking and to provide a source of high pressure hydraulic fluid during anti-lock braking. Thus, if the ABS system loses its ability to provide adequate pressure to the braking system, the vehicle will lose both its anti-lock braking capability as well as power assist.

148.    The Bendix 9 system derives its name from the fact that it uses three isolation valves, three build valves and three decay valves for a total of nine solenoid valves. One isolation valve is used for each of the front wheels, while one isolation valve is used for both of the rear wheels. In contrast, the Bendix 10 uses an additional isolation valve so that there is one for each of the rear wheel circuits, and thus has ten solenoid valves, leading to its name. Although there are certain other minor differences between the Bendix 9 and the Bendix 10 systems, they are identical with respect to the primary system components and the

34

defects contained therein upon which this action is based.

149.    The similarities between the Bendix 9 and Bendix 10 is demonstrated by the fact that Chrysler has issued one Service & Diagnostic Procedures Manual for both the Bendix 9 and the Bendix 10.  This manual, entitled *Bendix Antilock 9 & 10*, purports to contain "all service and diagnostic information for both systems."  In addition, in August 1995, Chrysler issued a "Master Tech" reference book to its mechanics, entitled "ABS Symptom Diagnosis--Bendix Antilock 9 and 10 Systems."  Master Tech is a publication by Chrysler which focuses on specific problem areas Chrysler mechanics may be confronting.  According to this issue of Master Tech, it was written "to take a look at antilock brake system diagnosis and repair -- specifically for the Bendix Antilock 9 and 10 systems."

## The Defects In The Bendix ABS Systems

150.    The primary defect in both the Bendix 9 and 10 ABS systems is a leak in the seals in the boost section of the Master Cylinder piston.  The ABS pump drives the piston in order to pressurize the brake fluid so as store pressure in the Accumulators and to permit pressure to be applied through the system to each wheel, acting to provide the necessary braking power.  There are two rings, known as "O-rings," in the plunger assembly through which the piston moves to push the brake fluid.  The rings, however, are not providing an adequate seal, thereby permitting the pressure to bypass the piston.  When this leak occurs, reserve pressure continuously bleeds off, causing the ABS pump to continue to run in an effort to sustain the necessary pressure.  The inability of the pump to sustain the necessary pressure as a result of the leak in the master cylinder seal prevents the ABS system from effectively providing either the anti-lock braking ability or, more importantly, power-assisted braking.  Eventually, if a repair is not made in time, the continuous running of the pump causes it to burn out, resulting in a loss of both the anti-lock braking as well as power

35

assist. As reported in the December 8, 1994 handwritten notes of a Chrysler dealer which repaired the failed Bendix ABS system on a 1992 Plymouth Voyager:

> Hydraulic assembly internal leak. Will cause pump to run almost continuously. Accelerated pump failure and loss of brake assist will result. Could become dangerous to drive.

151. Significantly, the leak in the piston seal prevents the ABS Pump from building up enough pressure to shut itself off. However, until it is too late, the Pump is often able to build up enough pressure to shut off the warning light which notifies the driver that there may be an ABS problem. Thus, the Pump continues to run until it fails without warning to the driver.

152. An additional problem arises from the fact that the Hydraulic Bladder Accumulator is unable to store sufficient pressure to meet the ongoing braking needs of the Defective Vehicles. The Accumulator is a softball shaped container which has a rubber bladder seal in the middle. On the top is nitrogen and in the bottom is brake fluid. The nitrogen is pre-charged so that, with no brake fluid in the system, the nitrogen gas applies approximately 1,000 psi to one side of the diaphragm. Under normal operation, the ABS Pump charges the Accumulator to an operating pressure of between 1600 psi to 2,000 psi. As the pressurized brake fluid enters the Accumulator, pushing against the diaphragm, the nitrogen gas is compressed and the pressure increases, with the Accumulator "storing" the pressure for future use. The Accumulator in the Bendix ABS, however, is unable to sustain its nitrogen pre-charge. Thus, while the Accumulator stores up pressure, upon application of the brakes it rapidly depletes, causing the ABS Pump to run continuously in order to build back up the pressure. The next application again causes the rapid pressure depletion, requiring the Pump to continue working to build it back up. Thus, pressure is being lost both through the seals in the master cylinder and in the Accumulators which are designed to

36

store the pressure. The result is often a loss of both power-assisted and ABS braking ability.

153. The loss of power-assisted braking is particularly crucial, especially when it occurs without warning. When the brakes suddenly lose the power assist it will have the feel of a complete loss of braking power, with the driver suddenly having to place a tremendous amount of unanticipated pressure on the brake in order to slow down the vehicle. When this occurs with the vehicle in motion and the driver attempting to slow it down, its places the driver, passengers and other vehicles in serious danger.

154. Chrysler was aware of the problem associated with tying the ABS system to power assist as well as the anti-lock braking function as early as 1991. In an April 15, 1991 letter from an owner of a 1991 Dodge Caravan to T.R. Cunningham, a Chrysler Executive Vice President, for example, the consumer complained about the fact that the failure of the ABS system also had a significantly adverse impact on the vehicle's overall braking capacity:

> Once the front (ABS controlled) brakes failed and in spite of strong pressure on the brake pedal, rear wheel braking (if any) was totally ineffective. Even when we [including the consumer and a Dodge dealer representative] were anticipating a brake failure, neither of us could stop the vehicle safely. . . .
>
> * * * *
>
> . . . I must repeat my earlier statement that the overall design of the Chrysler two wheel ABS system in the 1991 Dodge Minivan is potentially dangerous as the vehicle can not be stopped safely in the event of an ABS failure. I presume the same applies in the other Chrysler products with the same ABS design.

155. Ironically, the same concern was raised by another Chrysler consumer over four years later. In an April 24, 1995 letter to the Center for Auto Safety, a consumer advocacy group, an owner of a 1989 Jeep Cherokee explained the problems that he had been having with his Bendix ABS system, including eight major repairs on the system starting

37

shortly after acquiring the vehicle. The author stressed that he had also written Chrysler to detail his complaints.

156. In this instance, the consumer was well educated with respect to the ABS problems, as he was an aeronautical engineer who had worked for over a decade in hydraulic systems on jet airplanes. As he explained:

> The problem with the ABS system is internal leakage, either in the servovalve or in the accumulator. This causes the pump to run continuously, rather than just for a few seconds. I am sure the pump is not built for continuous duty. The system, as it exists in this model Jeep, is an integrated system, meaning that it acts on the braking system directly. If the pump fails, there are no brakes in this car! If the ABS system functions normally, the accumulator is fully charged and the brakes can be applied once or twice to stop the car. However, if the ABS has an internal leakage, the accumulator never gets charged and no braking power is available.

> \* \* \* \*

> I expect to see some fatal accidents occurring in the next few years, caused by failed brakes.

157. Chrysler even acknowledged the problem in its owner's manuals, albeit with typical understatement. Thus, the 1992 Plymouth Voyager owner's manual states:

> BRAKE SYSTEM. In the event power assist is lost for any reason (for example, repeated brake applications with the motor off), the brakes will still function. The effort required to brake the vehicle will be *substantially increased* over that required with the power system operating. (Emphasis added.)

158. What Chrysler does not disclose, of course, is that the loss of the ABS system will also cause a loss of power assist, with the resulting "substantial increase" in the effort needed to stop the vehicle. Indeed, the reference to "repeated brake applications with the motor off" is the process by which Chrysler mechanics can depressurize the Accumulator prior to performing necessary tests on the ABS system.

159. A related defect arises from the inability of the Bendix ABS system to

record the problem arising from the loss of brake pressure. As described herein, the Accumulator stores pressurized brake fluid for use in hydraulic assisted braking. The Dual Function Pressure ("DFP") Switch is used to monitor the pressure inside the Accumulator. It contains two sets of switch contacts: the warning pressure switch and the ABS Pump switch. The warning pressure switch is closed under normal system pressure (1000 psi or higher), but when Accumulator pressure drops below 1000 psi, the warning pressure switch opens, causing the CAB to record the pressure decline. The pressure decline reported by the DFP Switch, however, is only recorded by the CAB after the switch is open for *two minutes continuously* and the vehicle speed exceeds 3 mph. With respect to the Master Cylinder Seal leak, or the inadequate Accumulator storage, the defect may result at a particular time when braking power is needed and then, shortly thereafter, the pressure may build up enough so as not to be recorded as a failure. Thus, when a customer complains about loss of braking power and a mechanic examines the CAB to determine what defect codes were reported, there will be no record of intermittent failures in which the Accumulator pressure fell below 1000 psi but was able to increase within the two minute time limit. The consumer will then be told that there is nothing apparently wrong with the vehicle, when, in fact, they may have suffered -- and continue to suffer -- from intermittent loss of power-assisted and ABS braking ability.

**Chrysler's Knowledge Of The Defective Bendix ABS System**

160. As alleged herein, when Chrysler manufactured the Defective Vehicles and sold or leased them to the plaintiffs and members of the Class, Chrysler was aware that these vehicles were equipped with defective Bendix ABS systems, which rendered them subject to the possible loss of all braking functions. Indeed, by at least early 1991, the high number of brake failures led to substantial concerns at both Chrysler and AlliedSignal, the

manufacturer of the Bendix ABS systems in question.

### The Bendix ABS Task Force

161.   Numerous complaints had been received by Chrysler in 1990 and early 1991 concerning the Bendix ABS brake systems.  In response to a consumer complaint letter to then-Chrysler chairman Lee Iacocca concerning a brake system failure in a 1991 Dodge Caravan, J.I. Corbin, Chrysler's Owner Relations Coordinator, stated in a July 26, 1991 letter that "[b]oth Chrysler and Bendix have assigned several of our product and service engineers to an ABS task team . . . to gather and analyze all pertinent data relative to ABS quality and reliability."  Thus, at least by this date, Chrysler was aware of the potential problem with the Bendix ABS system.

162.   This "ABS task team" continued to operate at Chrysler, as it sought to deal with the rising number of complaints.  On November 10, 1992, 10 representatives from Chrysler and AlliedSignal specifically convened to discuss the malfunctioning brake systems.  By that time, Chrysler had already issued two recalls for vehicles equipped with the Bendix ABS -- to replace a defective high pressure hose assembly and an internal sealing system in the ABS Pump -- which had proven ineffective in preventing brake failures.

163.   According to minutes of the November 10, 1992 meeting, Roger Haikio of Chrysler reported that, as a result of a meeting with field personnel, Chrysler had "identified two major issues" with respect to the Bendix ABS "for which the field people (in his words) 'are desperate for a field fix'."  This two issues included "'[h]eavy pedal effort' during normal braking," and "'[f]loat' with high hard pedal and lack of decel (premature isolation on bumps)."  Haikio further explained that the "float" condition was characterized by many consumers as "pedal to the floor."  These conditions resulted, in all likelihood, from the combination of the Master Cylinder Seal leak and the loss of pressure in the

Accumulators.

164.    After identifying the problems it was having with the Bendix ABS, Chrysler then asked AlliedSignal "what we can do to fix these problems." Following further discussions, Chrysler asked AlliedSignal to "provide two boosters, one high band unit and one low band unit to Chrysler for evaluation of the pedal feel issue," and requested what AlliedSignal could do "to reduce float."

165.    The minutes also reported that Chrysler asked why 30-40% of the "assembly plant returns," which represented 53 of the 135 such returns, were labeled "No Trouble Found." This failure to diagnose the problem with these vehicles may well have resulted from the specification in the Chrysler system that the CAB only record failures that last for at least two minutes.

## The Brake Pedal Return Spring

166.    While Chrysler was trying desperately to solve the problem in 1992, a fact it has yet to publicly admit, it had already designed ways to treat the underlying symptoms, without disclosing that the system was defective. On July 13, 1992, 1992, Chrysler issued TSB 05-08-92 to its dealers directed to a problem noted in the 1990-1992 Dodge Dynasty, Chrysler Imperial, New Yorker Salon and New Yorker Fifth Avenue and the 1991-1992 Dodge Caravan, Plymouth Voyager and Chrysler Town & Country. The TSB noted the following "symptom/condition":

> Some vehicles equipped with Bendix ABS may exhibit a condition
> where the brake pedal may not return to its fully released position. As
> a result, the rear stop lamps remain illuminated when the brake pedal
> has been released or the speed control may be inoperative.

The TSB then described how to install a "brake pedal return spring" to assist in pushing the brake pedal to its fully released position so as to keep the rear stop lamps from illuminating.

Shortly thereafter, on August 10, 1992, this TSB was superseded by a TSB 05-08-92 Rev. A, which modified the artwork portraying the spring in the TSB, but otherwise described the same process for installing the pedal return spring.

167.    Upon information and belief, the cause of the problem reported in TSB 05-08-92 was the loss of pressure resulting from the leak in the Master Cylinder Seal and/or the failure of the Accumulator to hold the necessary pressure. As a result, when the brake was applied, there was insufficient pressure to push it back to it fully released position. Chrysler did not attempt to treat the cause of the problem, however. Rather, it recommended that the dealer install an extra spring under the brake to push it back into place even when there was insufficient pressure in the system.

168.    Because the use of the return spring treated the symptom, not the cause, it did not resolve the underlying problem with loss of pressure. As a result, drivers of the vehicles with the spring were misled into believing the problem was resolved when, in fact, the ABS system was performing with inadequate pressure and the ABS Pump in all likelihood was running continuously in an effort to build up the pressure. Eventually, the ABS Pump would fail, leading to a loss of power assist as well as anti-lock braking capacity.

169.    An additional result from this procedure is that many vehicles were "repaired" with the return spring while still under warranty, which then put off final resolution of the defect until after the warranty had expired. Then, when the ABS Pump failed and the owner brought the vehicle in for a repair of the same condition that led to the installation of the return spring in the first instance, Chrysler would contend that a new problem had developed, which was outside the warranty period. Through this process, Chrysler effectively defrauded numerous consumers by forcing their necessary repairs on their Bendix ABS systems outside the express warranty period offered by Chrysler.

42

## The Hydraulic Piston Assembly Kit

170. While Chrysler repeatedly used the return spring in an effort to mask the defect in the Bendix ABS, it failed to disclose to its consumers that it was, in fact, using a two level attack to deal with the problem. It would (i) have the spring package installed in an effort to treat the symptom, and, if that failed, it would (ii) replace the hydraulic piston assembly. This was specifically announced by Chrysler to its dealers -- but not its consumers -- on October 19, 1992, with the issuance of a follow-up TSB, 05-13-92, to address circumstances involving the same vehicles in which the brake pedal return spring did not appear to solve the problem. The TSB specifically states that its recommended procedures "should be performed only after Technical Service Bulletin 05-08-92 has been completed, and did not eliminate this condition." The fact that Chrysler perceived a need to do the more drastic remedy demonstrates that it knew full well that the ultimate cause of the problem was not solved by the return spring, which, at best, only delayed the ultimate failure of the ABS system.

171. TSB 05-13-92 identified a "piston assembly kit" and described how to replace the master cylinder piston assembly, the source for the leak in the Master Cylinder Seal. Moreover, attached to TSB 05-13-92 was an advance notice of TSB 05-14-92, which Chrysler was in the process of disseminating for 1990-1992 vehicles equipped with the Bendix 10 ABS. TSB 05-14-92 described various brake repairs and tests, including, significantly, the use of Internal Leak Test Fixture #6685. As explained in the TSB: "If an internal leak is suspected in the ABS circuit, a test fixture has been developed to assist in the diagnostics. This fixture will assist in determining if there is an internal leak, and if the leak is within the hydraulic unit or the pump motor assembly." TSB 04-14-92 was subsequently superseded by TSB 05-24-94, issued on November 18, 1994, which added an additional

43

section to describe the process for replacing the piston assemblies in the master cylinder, the same repair described initially in TSB 05-13-92.

172.  Chrysler therefore knew as early as 1992 that a loss of pressure from its master cylinder was causing substantial problems with braking systems on vehicles equipped with the Bendix ABS, and it specifically disseminated a special tool for diagnosing internal leaks which caused the problems and a piston assembly kit to repair them. Yet, Chrysler never disclosed what it knew to its consumers, who were paying thousands of dollars for repairs and suffering from the dangerous loss of braking power. Instead, it deliberately misled them into believing that their brake systems were safe.

173.  Chrysler's use of its two step approach to the failure of its ABS system is demonstrated by the experience of one owner of a 1993 Plymouth Voyager who brought his vehicle to a Chrysler dealer on December 15, 1994, complaining that the brake light was staying on because of the failure of the brake pedal to return to its full upright position. The dealer responded to the problem by installing the return spring as prescribed in TSB 08-05-92. Shortly thereafter, however, on March 16, 1995, the owner suffered a complete ABS failure and a loss of braking power. This time, pursuant to TSB 08-13-92, the dealer used the piston assembly kit to replace the piston assembly, and also replaced the ABS pump which had failed in the interim. Thus, Chrysler first merely covered up the symptom of the ABS defect through the installation of the return spring, letting the consumer continue to drive the vehicle without warning him that the defect would eventually cause the ABS Pump to fail, with a concomitant loss of braking power. Then, only after the complete ABS failure occurred, did Chrysler repair the actual problem -- the defective piston assembly.

174.  The consumers travails did not end there, however. The brakes failed again on May 24, 1995, but this time no error codes were recorded on the diagnostic

44

computer, due to the two minute requirement explained above. Because the dealer could not duplicate the problem, no repair was performed. Remarkably, after the owner complained vociferously to Chrysler concerning the ongoing brake problems, Gena Edwards, Chrysler's Executive Administrator, responded on June 8, 1995 with the following assurances:

> Please be assured that our dealerships have training, equipment and access to technical information to adequately diagnosis [sic] problems with vehicles. We have reviewed your particular situation with the dealership, and after much testing, they have been unable to duplicate or diagnosis [sic] your complaint.
>
> Based on their analysis, it is felt that your vehicle is operating as engineered and designed *and is considered safe to drive at this time.* If in the future a problem occurs, please contact your dealer's service manager or this office, and we will be happy to assist you wherever possible. (Emphasis added.)

175.    Unwilling to accept these statements at face value, the consumer forwarded to Ms. Edwards a copy of a newspaper article which disclosed that numerous other Chrysler customers had experienced substantial problems with their ABS systems. In response, Ms. Edwards wrote back on October 17, 1995, asserting that "there has been no clear pattern of problems with the [Bendix] ABS." She then added:

> In an attempt to alleviate some of the financial burden to our customers, Chrysler Corporation has significantly lowered the replacement cost [for the ABS]. Also note that the ABS components under discussion are no longer used on Chrysler products.

Thus, not only did Chrysler refuse to warn its consumers about the defective product, it deliberately misled them by denying any "clear pattern of problems" with the Bendix ABS systems, a patently false claim.

<h3 style="text-align:center">The Cortright Memorandum</h3>

176.    Chrysler's knowledge of the defect in the Bendix ABS well before the October 17, 1995 assurances of Ms. Edwards is demonstrated by a September 12, 1994

memorandum from Rick Cortright, a Senior Staff Supervisor of Chrysler's Customer Center, to all Senior Staff and Senior Staff Supervisors, which indicated that the increase in brake failures had caused a substantial national backorder in the Bendix ABS hydraulic assemblies, making it difficult for Chrysler to keep up with the demand for parts. The memorandum stated:

> We have been seeing an increase in customer calls related to replacing BENDIX 10 ABS hydraulic assemblies. Consequently, we have also seen an increase in parts inquiries related to back ordered hydraulic unit[s]    . . .

177.    Rather than admit to its consumers that the Bendix ABS systems were defective, however, Chrysler merely sought to minimize its costs, with Cortright going on to state that, rather than replacing the faulty hydraulic assemblies, "**in many cases the assemblies can be rebuilt!**" (emphasis in original). Thus, in violation of its express and implied warranties, Chrysler sought to avoid replacements of the defective products by rebuilding them instead.

178.    Moreover, Cortright emphasized Chrysler's desire to control all contact with consumers concerning the defective Bendix ABS systems by ordering that all dealers contact Chrysler directly before implementing any repairs on the brake systems:

> **Please contact all dealers recommending hydraulic component replacements and refer them to the STAR Hotline before they install new assemblies.** STAR will make every effort to ensure a thorough diagnosis occurs prior to the replacement of any hydraulic assemblies in the BENDIX 10 system.
>
> * * * *
>
> **Please be sure to refer the dealer to the STAR Hotline for all customer inquiries related to this issue.** This will help to ensure that no additional customer dissatisfaction results from over repair.

(Emphasis in original.)

46

179.    Additionally, the memorandum indicates that by September 1994, at least, Chrysler was already aware that a leak in the Master Cylinder Seal was the primary cause of the problems, stating:

> For your information, there are two primary steps necessary for proper diagnosis of a hydraulic problem.
>
> 1)    The dealer must use the 1993 Bendix 10 diagnostic manual [which has] an updated hydraulic test (#22). This test requires the [use of] isolation tool #6685.
>
> 2)    If test #22 finds internal leakage within the hydraulic unit assembly, the dealer should perform **TSB 05-13-92**. This provides instructions for rebuilding the actuator piston assemblies. **(This TSB applies to 1990-1992 vehicles only. 1993 vehicles that appear in need of this TSB will need authorization.)** Dealers should be instructed to disregard TSB 05-13-92's reference to TSB 05-08-92.

This latter sentence suggests that Chrysler now recognized that the brake pedal return spring was a useless attempt to cover up the defect, which no longer should be used. Instead, the dealer was told to immediately replace the piston assemblies, although the customers were not informed of the fact that this was caused by a defect in the system which numerous consumers had experienced. It is also significant that Chrysler would not even permit its dealers to implement the repairs described in TSB 05-13-92 for 1993 vehicles without express authorization from the Company, evidencing further efforts by Chrysler to control all aspects of the Bendix ABS problem.

180.    The Cortright memorandum makes clear that Chrysler knew that the internal leakage in the piston assemblies, of which the Company was already aware in 1992, was the primary cause for the increase in customer calls concerning the Bendix ABS and the resulting national backorder in the hydraulic units. Notably, the Chrysler dealer which replaced the piston assembly and the ABS pump in the 1993 Voyager following the failure of the return spring to solve the problem, as described above, received authorization from

Chrysler to do so pursuant to the STAR Hotline advocated by Cortright. Thus, Chrysler itself -- and not just its dealers -- was fully aware of the extent of the problem.

### August 1995 Master Tech

181. While the Cortright memorandum suggests Chrysler's awareness of leaks in the Master Cylinder seal, any further doubt about Chrysler's knowledge of the problem is erased by its publication in August 1995 of its Master Tech, a manual periodically distributed by Chrysler to update its mechanics on significant problems they may encounter. Summarizing the information provided in the manual, the Master Tech stated:

> This month we've focused on the Bendix Antilock 9 and Antilock 10 ABS systems. We've looked at the Service and Diagnostic Procedures Manual which you should refer to whenever diagnosis and repair of these systems are required. We've also looked at a typical problem with the Antilock 9 and Antilock 10 systems, covering both the diagnosis and repair.

182. The manual identified the vehicles equipped with the Bendix 9 as the 1989 to 1991 Jeep Cherokees and those equipped with the Bendix 10 as the 1990 to 1993 Dodge Dynasty, New Yorker Salon, Chrysler Imperial and New Yorker Fifth Avenue, the 1991 to 1993 Dodge Caravan, Plymouth Voyager and Chrysler Town & Country, and the 1991 to 1992 Premier and Monaco.

183. Significantly, the "typical" Bendix ABS problem which the Master Tech was designed to address was the "master cylinder seal leak." In the manual, Chrysler described how to diagnosis the leak in both the Bendix 9 and 10 ABS systems, stating:

> With [a master cylinder seal leak], the yellow ABS warning lamp and the red BRAKE warning lamp will be illuminated. In addition, the pump/motor will run continuously, or in a few cases, will cycle on and off frequently. A low accumulator fault will also be set.

It then proceeded to detail how to address and repair the problem for both systems.

184. The Master Tech states that the "preferred method" of repairing the

48

master cylinder seal leak in the Bendix ABS is to replace the master cylinder piston assembly. It adds that "[r]eplacment of the piston assemblies is basically the same for both" the Bendix 9 and the Bendix 10 ABS systems. In addition, the Master Tech notes that the Service and Diagnostic Procedures Manual permits a replacement of the entire hydraulic assembly as well, but adds:

> However, [the hydraulic assembly] should only be replaced as a last resort, if a piston assembly rebuilt kit is not available. Authorization through the STAR Center is required to replace the hydraulic assembly. To contact the STAR Center, dial 1-800-850-STAR.

185. The repair summarized in the August 1995 Master Tech to treat the leak in the Master Cylinder Seal is virtually identical to that described by Chrysler in TSB 05-13-92, issued *in October 1992*. The Master Tech also called for the performance of "Test #22," known as the Hydraulic Pressure Performance Test, the *same* test identified in the Cortright memorandum to use in order to identify an internal leak in the hydraulic assembly. Moreover, the test involved the use of the Internal Leak Test Fixture #6685, the *identical* tool referenced in both the October 1992 TSB and the September 1994 Cortright memorandum. As the Master Tech explained:

> Now we must install the internal leakage test fixture, which is special tool number 6685. This special tool is designed to isolate the hydraulic assembly from the pump/motor to determine if an internal leak is present, and if the leak is in the hydraulic assembly or the pump/motor.

Thus, it is apparent that the problem leading to the failure of the brake pedal to return to its fully released position in numerous Chrysler vehicles equipped with the Bendix ABS, first formally acknowledged by Chrysler in 1992, is the same problem that Chrysler now concedes was caused by the leak in the Master Cylinder Seal.

### Chrysler's Admission

186.    On December 5, 1995, Chrysler finally admitted that it was evaluating the problems with the piston seal in the master cylinder which could cause of loss of pressure in the system.  Chrysler's spokesperson Lindsay Brooke boldly declared to the Bloomberg Business News, however, that "[t]his is not a safety issue," despite the numerous ABS failures and the many resulting accidents.

187.    In a subsequent article in the *Detroit Free Press*, Brooke again conceded that "[r]ight now, it appears that the piston seal in the hydraulic unit is the leading candidate" for the cause of the numerous problems encountered in the Bendix ABS systems, although adding that "we're not sure because we haven't finished our tests."  In making this statement, Brooke did not reveal that several months before Chrysler had already issued a Master Tech specifically identifying how to repair the piston seal, and that steps had been taken to provide necessary repairs to the identical problem as far back as 1992.  Chrysler also downplayed the significance of the problem, with Randy Edwards, its manager for vehicle safety and emission compliance, stressing that "[n]o recall is in the works and no service action is in the works."

188.    The *Detroit Free Press* article added:

> Chrysler conceded that many dealers replaced entire antilock brake systems when improved diagnostic techniques have led the automaker to decide that a simpler fix may have solved the problem.

> "There has been so much misdiagnosis by dealers that we have been helping them," Edwards said.  "Instead of replacing the entire ABS unit we've minimized the cost and time of repairs with a piston kit" that repairs leaky seals.

Through these representations, Chrysler suggests that it had just developed the improved diagnostic techniques and that the misdiagnosis by the dealers was something over which it

had no control.  However, Chrysler failed to disclose that the "piston kit" had been made available by Chrysler as early as October 1992 and that the diagnostic techniques for identifying the leak in the piston seals were available shortly thereafter.  Moreover, at least since September 1994, Chrysler had assumed complete control over the process by which the Bendix ABS systems were repaired.  Yet, after that date, numerous individuals continued to be charged thousands of dollars for complete replacement of the entire ABS system to remedy a known, but undisclosed, defect in the Bendix ABS.

### The Shortage Of Parts

189.    As highlighted in the Cortright memorandum, the Bendix ABS problem was becoming critical for Chrysler as a result of the exponential growth in the number of Bendix ABS system failures, leading to difficulties in obtaining parts.  This conclusion is supported by a number of other sources as well.  A December 8, 1994 repair invoice issued by one Chrysler dealer for replacement of the ABS hydraulic assembly and pump on a 1992 Plymouth Voyager owned by one of the named plaintiffs, for example, highlights the fact that there were "national backorders" for both parts, causing substantial delays in completing needed repairs.  As the invoice stated:  "computer shows low accumulator fault code -- pump takes 80 seconds to build pressure to 500 PSI -- should do it in a few seconds -- ABS pump on nat'l [national] backorder"; "Chrysler pays for hyd.assy. [hydraulic assembly] . . . defection hyd. brake assembly -- nat'l B.O. [national backorder]."  The invoice added that the "van should not be driven due to safety reasons and may also ruin new ABS pump."

190.    Notably, this invoice clearly reflects a results of the defects in the Bendix ABS alleged herein, given the reflection of the "low accumulator fault code," which is identified in the August 1995 Master Tech as being a symptom of the Master Cylinder Seal leak.

191.    Similar evidence of the broad extent of the Bendix ABS failures can be gleaned from many of the authorized Chrysler dealers confronted with frustrated consumers seeking to repair their defective brake systems:

o      one dealer told an owner of a 1993 Plymouth Voyager LE with a failed ABS system that "he was aware that other vans had had hydraulic brake problems";

o      another dealer told an owner of a 1993 Dodge Caravan with defective brakes that there were five other cars in shop with same problem;

o      in July 1995, the owner of a 1993 Chrysler Town & Country with failed brakes was told by the dealer that Chrysler had had "many Bendix 10 ABS problems" and that it had "placed extraordinary emphasis on this problem within the last month";

o      in April 1995, when an owner of a 1992 Chrysler Town & Country had to have substantial brake repairs, he was informed by the dealer that it had a Chrysler New Yorker with the same problem; after the dealer took three weeks to repair the vehicle because of a delay in getting parts, Chrysler' Customer Center confirmed to the owner that the delay was caused by the fact that the brake parts were failing so often that they could not be kept in stock; and

o      on July 16, 1995, Steve Cancilia, operations manager with Dodge World in Florissant, Missouri, was quoted as stating that "[s]ometimes you have to wait 30 days" to get anti-lock braking system parts from Chrysler.

**Chrysler Drops The Bendix ABS**

192.    Despite the concerns expressed at Chrysler at least since 1992, Chrysler failed to recall or retrofit vehicles equipped with the Bendix ABS system or otherwise to repair them, and deliberately failed to notify its consumers of the risks inherent in the defective brakes.  Meanwhile, brake failures continued to rise.  Because of the failures, however, Chrysler elected to use a different Bendix system for 1994 and 1995 models, resorting to a Bendix ABX-4.  This Bendix version is what is known as an "add-on" system rather than the integrated system represented by the Bendix 9 and 10 ABS.  As an add-on

52

system, a conventional vacuum booster and master cylinder is installed for normal power-assisted braking so that the ABS Pump is only used when anti-lock braking is required. Chrysler therefore sought to avoid the problem it was encountering with the Bendix 9 and 10 ABS in which power-assisted braking was loss during a failure of the ABS Pump or Accumulator. For all of its 1996 models, Chrysler gave up on Bendix altogether, using instead a Teves ABS system manufactured by ITT Corporation. At no time has Chrysler publicly disclosed its reasons for dropping its use of the Bendix ABS systems.

193. The problems with Bendix were even significant enough to force AlliedSignal to leave the business altogether. On October 27, 1995, AlliedSignal announced that it would be cutting 3,100 jobs in its auto-parts division -- 8.4% of the unit's workforce -- as part of its effort to completely withdraw from the anti-lock brake business. Upon information and belief, plaintiffs contend that AlliedSignal is withdrawing from the business at least in part because of the substantial difficulties which were arising from the Bendix ABS systems installed in the Defective Vehicles.

**Chrysler's Effort At Damage Control**

194. Upon recognizing the tremendous problem it faced with its defective brake systems, Chrysler resorted to a complicated effort at damage control, rather than relying on full disclosure to its consumers. As noted in the Cortright memorandum, and reiterated in the Master Tech, Chrysler took the unusual step of requiring its dealers to obtain approval from Chrysler prior to performing any substantive repairs on the Bendix ABS systems.

195. The dealers recognized the unusual nature of the extreme steps taken by Chrysler in response to the burgeoning crisis with respect to its Bendix ABS systems. Disturbed by their inability to honor Chrysler's warranties, auto repair executives soon began

to complain that Chrysler was making them take unusual steps before delivering replacement anti-lock braking systems. One Chrysler service manager, Rainey Godbey of Glendale Chrysler in Glendale, Missouri, for example, reported that Chrysler was demanding proof that an ABS component was damaged beyond repair before authorizing replacement under warranty. Godbey also stated that he thought that Chrysler wanted dealers to repair parts, rather than simply replace them and charge the Company. Similarly, Mike Meyers, the service manager for Lou Fusz Dodge in Kirkwood, Missouri, stated: "We have to call the hotline and tell them what's wrong with it," before Chrysler will ship a replacement ABS, resulting in a delay in performing the repair.

196. By demanding approval of any repairs or other actions prior to permitting any repairs or replacement of the ABS by its dealers, Chrysler was able to control the spread of the complaints among Chrysler consumers and to limit its costs by putting up substantial roadblocks to such consumers when they sought to enforce Chrysler's express and implied warranties.

197. Chrysler's actions to maintain total control over repairs of the Bendix ABS also has caused increased danger to its consumers. Because the dealer must contact Chrysler's STAR hotline Bendix team and review the diagnosis before performing any repairs, Chrysler has assumed the right to control which repairs are performed. The problem occurs, however, because Chrysler insists on fixing one problem at a time, even if the mechanic suspects that the vehicle is suffering both from a leak in the Master Cylinder Seal and a failure in the Accumulator to store adequate pressure. In such a situation, Chrysler will often permit the mechanic to repair the seal, but will not authorize a replacement of the Accumulator. As a result, even though the system will now be able to hold pressure, because the leak in the pistons has been repaired, it will not be able to store the pressure in

the Accumulator, requiring the Pump to continue to run after a minimum number of brake applications.

198.    Adding significantly to the problems arising from the defective Bendix ABS systems is Chrysler's refusal to make information available to the public with respect to needed repairs.  Generally, car manufacturers provide details concerning their engines, and means to repair them, to the public and, in particular, to independent mechanics who may need to work on Chrysler vehicles.  Chrysler, however, fails to provide such information. As a result, when independent mechanics are presented with defective brakes in the Chrysler vehicles, they are unable to perform the necessary work.  Indeed, Chrysler has even required other mechanics to pay for its assistance prior to providing any information on the ABS, in sharp contrast with the norm in the industry.

**Chrysler's Fraud In The Promotion And Sale Of The Defective Vehicles And Its Fraudulent Concealment Of The Defective ABS System**

199.    While Chrysler knew at least by early 1991 that the Bendix ABS system was defective and prone to failure, it nevertheless repeatedly promoted and advertised the Defective Vehicles equipped with this ABS system as safe and reliable.  Indeed, the purported safety of the Chrysler vehicles was one of the primary reasons for many of the plaintiffs and the members of the Class to purchase or lease the Defective Vehicles in the first instance.

200.    Moreover, while the number of brake failures, and resultant complaints from consumers, has skyrocketed, Chrysler continues to deny the existence of the Bendix ABS system defect.  Instead, it claims that Chrysler products equipped with the Bendix ABS system are safe, thereby encouraging more consumers to purchase vehicles with this life-threatening defect.

201.    Rather than admitting the defects in the Bendix ABS it has used in so many of its vehicles, Chrysler has affirmatively and aggressively misled its consumers concerning the problem.  Chrysler, for example, has established a Minivan Hotline (1-800-MINIVAN) as a result of the many difficulties it has had with the Defective Vehicles and, in an effort to control the knowledge of its consumers, has disseminated scripts to its employees receiving the calls.  One such script spells out responses to questions about the problems in the ABS systems, suggesting that Chrysler employees state:

> There is no single repeating complaint, and **we have no reason to believe there is a technical defect in the system**.  But we do believe that many owners do not fully understand the operation of their ABS braking system and its capabilities.

(Emphasis added.)

202.    Thus, Chrysler has expressly denied knowledge of a defect in the Bendix ABS despite knowing that a defect does in fact exist, and it has deliberately and falsely attempted to place blame on the drivers themselves.

203.    In addition, Chrysler continues to mislead its consumers into believing that the Bendix ABS system is safe.  First, it points to two recalls that Chrysler had in early 1992, relating to a high pressure hose in the brake assembly and the internal sealing from brake fluid.  It then falsely suggests that these recalls solved all of the problems, stating, in response to whether a safety problem exists:

> Chrysler's assessment is that this issue presents no unreasonable safety risk.  Our evaluation is that most of the reports are related to the prior 1991 model year recalls.  **We are not aware of any other defect conditions.**

(Emphasis added.)  In fact, many -- if not most -- of the complaints had nothing to do with the issues raised in the earlier recalls, with numerous complaints relating to subsequent models or those unaffected by the recall notice and based on defects which the recalls did not

solve.

204. Finally, Chrysler suggests in its Hotline script that the problem is gone by emphasizing that there are "no" current problems with the Chrysler minivan ABS systems and that Chrysler is no longer using AlliedSignal's Bendix system. Yet, hundreds of thousands of its vehicles with the Bendix ABS continue to be operated (and sold) throughout the country, all with a defective brake system that could lead to complete brake failure -- and numerous casualties.

205. Such disinformation campaign tactics are not new to Chrysler. In 1995, the Company fired the head engineer assigned to Chrysler's minivan safety leadership team when it suspected that he had leaked information concerning allegations that Company employees had manipulated minivan crash tests, hidden results from government officials and failed to correct obvious minivan defects. Afraid of the devastating impact that public disclosure of such information would have upon the sale of its minivans, Chrysler sought to silence this engineer by seeking and obtaining a gag order against him.

206. In an effort to stem the rising tide of consumer complaints concerning the Bendix ABS systems, without acknowledging its complicity in the sale of defective products, Chrysler has also begun to negotiate secretly with individual consumers on a case-by-case basis. At no time did Chrysler notify any potential purchases or lessees, or current consumers, that the brake systems were potentially defective, and when brake repairs were required on particular vehicles and the consumer did not complain or object to the cost, Chrysler would charge the consumer for the entire cost. On the other hand, if the consumer strenuously objected, and particularly if the consumer obtained evidence of the high number of brake failures, Chrysler has attempted to resolve the dispute with the consumer by agreeing to limit the consumer's out-of-pocket costs to $600 or otherwise to share in the

repair costs. At certain times, Chrysler has even agreed to pay the full cost of the repair or agreed to buy back the vehicle equipped with the defective product. In entering into these separate agreements with certain consumers, Chrysler often required the consumers to enter into confidentiality agreements whereby they were precluded from disclosing the nature or type of settlements they were provided. In effect, Chrysler has issued a "secret warranty" whereby it agreed to honor its warranties only when forced to do so, while aggressively attempting to cover up its sale of defective brake systems from the majority of the unknowing consumers who purchased the Defective Vehicles.

207.    At the time Chrysler vehicles equipped with the defective Bendix ABS system were sold to plaintiffs, Chrysler knew or negligently disregarded that these Defective Vehicles had and continue to have a dangerous, safety-related defect, as alleged herein.

208.    Because information concerning the ABS systems in the Chrysler vehicles is non-public information over which Chrysler had exclusive control, and because Chrysler knew that this information was not available to plaintiffs, Chrysler was under a duty to disclose information regarding the defect to plaintiffs.

209.    Chrysler refrained from disclosing the defect to the plaintiffs and thereby misled them into believing that the Chrysler vehicles were and are safe and free of defect. Chrysler has been aware since at least 1991 that Chrysler vehicles containing the Bendix ABS system were and are defective and that failure to disclose the defect would and did constitute a breach of both Chrysler's express and implied warranties.

210.    Plaintiffs and members of the Class possessed limited, if any, knowledge of the complex operating systems of their Chrysler vehicles and of the possibility that a concealed defect was present in their vehicles, and reasonably relied upon Chrysler's express and implied guarantees of quality, fitness, dependability, and safety. In reliance

upon such guarantees, plaintiffs purchased defective Chrysler vehicles, and consequently the occupants of their Defective Vehicles are exposed to risk of injury. Had Chrysler disclosed the true defective nature of Chrysler Defective Vehicles, plaintiffs would have been aware of the defect and would not have purchased or leased such Defective Vehicles, or would have acted to prevent exposure to the risks and damages they suffered. The total amount of damages suffered by plaintiffs as a result of Chrysler's unlawful and fraudulent conduct has not yet been fully ascertained at this time and will be proven at trial.

211.    In a June 12, 1995 press release, the Center for Auto Safety called on Chrysler "to set up an emergency task force to find a fix for its Bendix anti-lock brake failure and do a recall," emphasizing that "Chrysler owners drive at risk of brake failure without warning where only fate determines whether they have a fatal accident." Not surprisingly, the Center's call has been completely ignored by Chrysler and the Company continues to breach its express and implied warranties -- choosing instead to risk the lives of millions of consumers who have unwittingly entrusted themselves and their families to a potentially deadly defective brake system. The evidence is sufficient for the Court to compel Chrysler to remedy its defective product now, before even more damage and injuries occur.

212.    Plaintiffs seek equitable relief and punitive damages. Plaintiffs expressly disclaim any intent to seek any recovery for personal injuries in this suit.

## FIRST CLAIM OF RELIEF

### [Violation Of The Magnuson-Moss Act, 15 U.S.C. § 2310(d)(1)]

213.    Plaintiffs, on behalf of themselves and all other members of the Class, reallege, as if fully set forth, each and every allegation contained above, and further allege against Defendant Chrysler as follows:

214.    Plaintiffs and members of the Class purchased the Chrysler Defective Vehicles under a written warranty wherein Chrysler warranted the Defective Vehicles, including, but not limited to, the anti-lock brake system, to be free of defects in materials and workmanship at the time of delivery.

215.    In addition to its written warranty, Chrysler also sold Chrysler Defective Vehicles to plaintiffs and members of the Class under an implied warranty of merchantability wherein Chrysler warranted the Defective Vehicles to be fit for the ordinary purposes for which they are used, including the guarantee that they were in a safe and non-defective condition to be used as minivans or other automobiles, were not otherwise injurious to consumers, and would come with adequate safety warnings.  Under the Magnuson-Moss Act, this implied warranty cannot be disclaimed.  Any purported limitation of the duration of this implied warranty contained in the written warranties given by Chrysler is unreasonable and unconscionable and thereby void, because Chrysler knew the defect existed and might not be discovered, if at all, until the Chrysler Defective Vehicles had been driven for a period of time longer than the period of the written warranty, and Chrysler withheld information about the defect from purchasers of such Defective Vehicles.  Moreover, due to unequal bargaining power and lack of effective warranty competition among dominant firms in the automobile manufacturing industry, plaintiffs and members of the Class had no meaningful alternative to accepting Chrysler's attempted limitation of the duration of the

implied warranty.

216.   When Chrysler manufactured the Chrysler Defective Vehicles and sold them through its dealers to plaintiffs and members of the Class, Chrysler knew that the Bendix ABS systems used in such Defective Vehicles were defective, rendering them subject to the possible loss of all braking functions and subjecting passengers to risk of injury. This defective ABS system was, and is, a safety-related defect known to Chrysler at the time plaintiffs purchased Chrysler Defective Vehicles. Equipping the Defective Vehicles with the Bendix ABS systems therefore constitutes a breach of Chrysler's express warranties.

217.   Furthermore, the likelihood that, as a result of the defects in the Bendix ABS systems, the brakes could, and will, fail made the Chrysler Defective Vehicles unsafe and unfit for the ordinary purposes of such vehicles when sold. Equipping the Defective Vehicles with the Bendix ABS systems therefore constitutes a breach of the implied warranty of merchantability.

218.   Chrysler has been aware of the defect in the Bendix ABS systems since at least 1991, when it began to receive complaints from consumers. Nevertheless, it has continued to promote and sell Defective Vehicles containing the Bendix ABS without any notice of the increased likelihood of brake failure, while at the same time advertising its Defective Vehicles as being safe and reliable. Moreover, Chrysler has refused to honor its warranties and to compensate fully many of the plaintiffs and members of the Class, notwithstanding their brake failures and subsequent complaints, and it has publicly declared that there is no defect in the Bendix ABS. As such, Chrysler has clearly had more than a reasonable opportunity to cure the defect, but has knowingly failed to do so.

219.   Because of Chrysler's breaches of the written and implied warranties covering the Chrysler Defective Vehicles, such vehicles are unsafe and should be recalled

61

and/or retrofitted and restitution should be made to plaintiffs and members of the Class.

## SECOND CLAIM FOR RELIEF

### [Equitable (Injunctive and Declaratory) Relief]

220.   Plaintiffs, on behalf of themselves and all other members of the proposed Class, reallege, as if fully set forth, each and every allegation contained above, and further allege against Defendant Chrysler as follows:

221.   Plaintiffs and members of the Class are without an adequate remedy at law, rendering injunctive and other equitable relief appropriate in that:

a.   Damages cannot adequately compensate plaintiffs and members of the Class for the injuries suffered; and

b.   If the conduct complained of is not enjoined, a multiplicity of suits will result, because Chrysler's conduct is continuing and on-going.

222.   Plaintiffs, the members of the Class and the public will suffer irreparable harm if Chrysler is not ordered to repair properly all Chrysler Defective Vehicles containing Bendix ABS systems immediately and to cease and desist its fraudulent and dangerous advertising, marketing, and sale of Chrysler vehicles which contain the defective Bendix systems.

## THIRD CLAIM FOR RELIEF

### [Fraud and Deceit]

223.   Plaintiffs, on behalf of themselves and all other members of the proposed Class, reallege each and every allegation contained above, and further allege against Defendant Chrysler as follows:

224.   In its express and implied warranties and in its advertising and promotion of the Defective Vehicles, Chrysler represented that they were safe and free from

dangerous defects.

225. Chrysler's representations and advertisements for the Defective Vehicles, as well as general representations and advertisements regarding the quality of the Defective Vehicles, were misleading or likely to mislead because they misrepresented the quality and conditions of these vehicles and concealed or actively misrepresented the fact that the Defective Vehicles were equipped with a hidden defect, *i.e.*, the defective Bendix ABS systems which were prone to failure, thereby subjecting occupants of the Defective Vehicles to risk of injury. Chrysler was and is in a superior position to know the true facts of the hidden defect based on, among other things, its internal investigation by a task force established to evaluate the defective Bendix ABS systems, and knew or should have known of the potential danger to consumers, and owed a duty to disclose the fact of the concealed danger to plaintiffs. Chrysler's material misrepresentations and omissions resulted in increased sales of the Defective Vehicles.

226. Chrysler's representations regarding the qualities and characteristics of the Defective Vehicles were made with knowledge of common and statutory laws prohibiting false and misleading statements and advertisements, as well as the reasonable expectations of consumers, including plaintiffs and members of the Class, that they would not be exposed to the dangers posed by the Defective Vehicles. Such representations were made with the intent to defraud and induce reliance by plaintiffs, and in fact did so, as evidenced by the purchase of the Defective Vehicles by plaintiffs and members of the Class.

227. Plaintiffs and members of the Class, unaware of the falsity of Chrysler's representations and/or concealment and suppression of material facts, purchased the Defective Vehicles in reasonable reliance upon Chrysler's representations that the vehicles were safe and free from hidden defects. Had plaintiffs and members of the Class

63

known of the suppressed and concealed facts as alleged herein, they would not have purchased the Defective Vehicles or paid the prices they paid.

228.    As a direct and proximate result of Chrysler's misrepresentations and/or concealment of material facts as detailed above, plaintiffs and members of the Class have suffered damages in an amount to be proven at trial, and the occupants of their Defective Vehicles are at risk of injury.

229.    In misrepresenting expressly and by implication that plaintiffs and members of the Class had purchased or leased dependable and safe vehicles, Chrysler acted with oppression, fraud, and/or malice.

230.    Accordingly, plaintiffs and members of the Class are entitled to punitive and exemplary damages.

## FOURTH CLAIM FOR RELIEF

### [Breach of Express Warranty]

231.    Plaintiffs, on behalf of themselves and all other members of the proposed Class, reallege, as if fully set forth, each and every allegation contained above, and further allege against Defendant Chrysler as follows:

232.    For each Defective Vehicle, Chrysler issued an express written warranty which covered the vehicle, including, but not limited to, the anti-lock brakes, to be free of defects in materials and workmanship at the time of delivery.

233.    As alleged above, Chrysler breached its warranties by offering for sale, and selling as safe, Defective Vehicles that were by design and construction unsafe, and thereby subjecting occupants of the Defective Vehicles purchased by plaintiffs and members of the Class to the risk of injury.

234.    Chrysler's breach of its express warranties proximately caused plaintiffs

64

and the members of the Class to suffer damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### [Breach of Implied Warranty]

235.    Plaintiffs, on behalf of themselves and all other members of the proposed Class, reallege, as if fully set forth, each and every allegation contained above, and further allege against Defendant Chrysler as follows:

236.    Defendant Chrysler impliedly warranted that its Defective Vehicles, which it designed, manufactured, and sold or leased to plaintiffs and members of the Class, were merchantable and fit and safe for their ordinary use, not otherwise injurious to consumers, and would come with adequate safety warnings.  Any purported limitation of the duration of these implied warranties contained in the written warranties given by Defendant Chrysler is unreasonable and unconscionable and thereby void, because Defendant Chrysler knew the defect existed and might not be discovered, if at all, until the Defective Vehicles had been driven for a period of time longer than the period of the written warranty, and Chrysler withheld information about the defect from purchasers of the Defective Vehicles. Moreover, due to unequal bargaining power and lack of effective warranty competition among dominant firms in the automobile manufacturing industry, plaintiffs and members of the Class had no meaningful alternative to accepting Chrysler's attempted limitation of the duration of the implied warranty.

237.    Because Defective Vehicles are equipped with the defective Bendix ABS, leading to, among other things, the complete loss of braking power and subjecting occupants of the vehicles to risk of injury, the Defective Vehicles purchased or leased and used by plaintiffs and members of the Class were unsafe, unmerchantable, and unfit for use when sold, and threaten injury to the occupants of the Defective Vehicles purchased or leased

65



by plaintiffs and the members of the Class. Therefore, Chrysler breached the implied warranty of merchantability in the sale of the Defective Vehicles to plaintiffs and members of the Class in that they were not fit for the ordinary purposes for which they were purchased or leased.

238. As a direct and proximate result of Chrysler's breach of the implied warranty of merchantability, plaintiffs and members of the Class suffered damages in an amount to be proven at trial.

WHEREFORE, plaintiffs demand judgment:

(A) Determining that this action is a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and designating the named plaintiffs or any number of them as proper Class representatives, and their counsel as counsel for the Class;

(B) Granting plaintiffs and members of the Class a mandatory injunction requiring Chrysler to (i) comply with the Magnuson-Moss Act; (ii) comply with the terms of the written warranty given in connection with the manufacture, sale, lease and repair of the Defective Vehicles; (iii) comply with its implied warranty given in connection with the manufacture, sale and lease of the Defective Vehicles; (iv) eliminate any time, mileage and damage limitations that may have been provided in connection with the implied or written warranty; (v) offer rescission to the plaintiffs and members of the Class by returning the full costs paid for the Defective Vehicles in exchange for a return of the Defective Vehicles, or inspect and repair the Defective Vehicles without charge so as to render them suitable for the ordinary purposes for which they are used; (vi) reimburse plaintiffs and members of the Class for all costs they incurred in connection with the purchase, replacement or repair of the Bendix ABS systems installed in the Defective Vehicles by Chrysler; (vii) pay plaintiffs and

66

members of the Class compensatory damages for their lost bargain in acquiring or leasing vehicles that had less value than had been represented to them as a result of the defective Bendix ABS and for the subsequent diminished value of the vehicles; and (viii) provide notice to all Chrysler consumers (a) that the Defective Vehicles are defective, (b) that the Defective Vehicles require special maintenance and repair, (c) of the written and implied warranties, (d) that time, mileage and damage limitations given in connection with the implied or written warranties are removed, and (e) that Chrysler will provide rescission for a return of the Defective Vehicles or will inspect and repair the Defective Vehicles free of charge;

(C)    Awarding to plaintiffs and members of the Class restitution in an amount to be determined at trial;

(D)    Awarding to plaintiffs and members of the Class compensatory, punitive or exemplary damages in an amount to be determined at trial;

(E)    Awarding to plaintiffs and members of the Class the costs and disbursements incurred in connection with this action, including reasonable fees for plaintiffs' counsel and experts; and

239.        (F)    Granting such other and further relief as to this court

may seem just and proper.

Dated:        June 27, 1996

GOLDSTEIN TILL & LITE

By:_____
Allyn Z. Lite, Esq.
Joseph J. DePalma, Esq.
Amy M. Riel, Esq.
Two Gateway Center
12th Floor
Newark, New Jersey 07102
(201) 623-3000


POMERANTZ HAUDEK BLOCK
& GROSSMAN
Stanley M. Grossman, Esq.
D. Brian Hufford, Esq.
100 Park Avenue
New York, NY 10017
(212) 661-1100

LAW OFFICES OF JAMES V. BASHIAN
James V. Bashian, Esq.
500 Fifth Avenue, Suite 2800
New York, New York 10110
(212) 921-4110

Attorneys for Plaintiffs
