## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____ :

DAVID CHIN, et al.               :

          :

      Plaintiffs,       :      CIVIL ACTION NO.: 95-5569 (JCL)

          :

      vs.            :      **OPINION**

          :

DAIMLERCHRYSLER          :

CORPORATION             :

          :

      Defendant.       :

_____ :

## LIFLAND, District Judge

This matter is before the Court on Plaintiffs' motion for attorneys' fees under California Code of Civil Procedure § 1021.5. The question presented is whether Plaintiffs' class-action lawsuit was a material factor motivating Defendant DaimlerChrysler Corporation's ("Chrysler") voluntary decision to recall vehicles installed with defective anti-lock braking systems ("ABS"). For the reasons set forth below, the Court concludes that Plaintiffs' suit was a catalyst for Chrysler's remedial action, and thus, Plaintiffs are entitled to attorneys' fees under section 1021.5.

## I.      Factual and Procedural Background

1

On October 27, 1995, Plaintiffs filed a class-action complaint claiming that Chrysler manufactured and sold vehicles from 1990 to 1993 equipped with the allegedly defective Bendix 10 ABS.  (Compl. ¶ 2.)  The Complaint asserted a claim under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, and common law claims for fraud and deceit, and breach of express and implied warranties.

At the time Plaintiffs filed suit, the Bendix 10 was the subject of a National Highway Traffic Safety Administration ("NHTSA") investigation, commenced in March 1994, under its authority pursuant to the National Traffic and Motor Vehicle Safety Act ("Safety Act"), 49 U.S.C. § 30101, et seq.[1]  Prompted by consumer complaints about vehicles with the Bendix 10 ABS, the two-year NHTSA investigation sought to determine whether the Bendix 10 had a safety-related defect requiring a recall.  On April 15, 1996, Chrysler voluntarily recalled its vehicles installed with the Bendix 10 ABS, ending NHTSA's investigation.

On March 3, 1996, approximately one month prior to Chrysler's Bendix 10 recall announcement, Plaintiffs amended their Complaint to extend their defect allegations to Chrysler vehicles equipped with the Bendix 9 ABS, which Plaintiffs

---

[1] Under the Safety Act, if NHTSA discovers that a vehicle contains a "defect related to motor vehicle safety," it can order the automaker to issue a "'recall,' providing both notice of the safety-related defect or noncompliance and a free remedy to owners, purchasers, and dealers of the vehicle."  Ctr. For Auto Safety & Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin., 452 F.3d 798, 800 (D.C. Cir. 2006) (citing 49 U.S.C. §§ 30118-30120)).

2

claimed was "largely interchangeable [with the Bendix 10] and suffer[ed] from virtually identical defects."  (Amended Class Action Compl. ("Amend. Compl.") ¶ 1.)  Three months later in June 1996, Chrysler executives met in the first in a series of meetings that summer, to discuss, and later initiate, extending the terms of the Bendix 10 recall to vehicles with the Bendix 9 ABS.  On September 6, 1996, NHTSA first informed the automaker that it would begin to investigate consumer complaints regarding the Bendix 9.  About three weeks later, Chrysler officials voted to approve the Bendix 9 recall, and soon thereafter notified NHTSA, ending its Bendix 9 investigation.

The Court denied a Chrysler motion to dismiss Plaintiffs' Complaint in its entirety on March 7, 1997.  Chin v. Chrysler, No. 95-5569, slip op. at 1 (D.N.J. Mar. 7, 1997).  A month later, in April 1997, Chrysler formally announced the Bendix 9 ABS recall to the public, and notified its dealers and consumers.

For nearly all intents and purposes, Plaintiffs' class-action came to an end on September 11, 1998, when the Court denied Plaintiffs' motion for class certification.  See Chin v. Chrysler Corp., 182 F.R.D. 448, 451, 465 (D.N.J. Sept. 11, 1998).  The Court found, in part, that Plaintiffs failed to demonstrate that "'questions of law . . . common to the members of the class predominate over any questions affecting only individual members . . . .'"  Id. at 451, 465 (quoting Rule

23(b)(3)). Looking to New Jersey's choice-of-law rules, the Court found that it

would be necessary to apply the law of each Plaintiff's home state to determine

whether Chrysler was liable. Id. at 457. Because hundreds of thousands of

potential class-members existed, hailing from every state in the Union, the District

of Columbia, and Puerto Rico, it would be necessary to apply 52 sets of laws if a

nationwide class were certified. Id. at 451, 457. In light of the substantive

variations existing from state to state in Plaintiffs' common law causes of action,

the Court found that a "predominance of common legal issues as required by Rule

23(b)(3)" did not exist. Id. at 461.

Despite this setback, and despite that Chrysler's recalls were voluntary,

Plaintiffs moved on January 29, 1999 under the fee-shifting provisions of the

Magnuson-Moss Act, 15 U.S.C. § 2310(d)(2), for a ruling that they were entitled to

attorneys' fees as the party that "finally prevail[ed]" in the action.[2] Using the so-

called "catalyst theory," Plaintiffs claimed they "finally prevail[ed]" because their

suit was the catalyst behind Chrysler's decision to order the recalls, and thus, their

suit achieved the relief they sought despite not receiving a formal judgment in their

favor. On December 14, 1999, the Court held that the catalyst theory could be

_____

[2] While making the motion, Plaintiffs' admitted they intended to move for a
voluntary dismissal of the action with prejudice under Rule 41(a)(2), in light of the
Court's denial of class certification. The Plaintiffs so moved on September 9,
1999, and the Court granted the motion on November 30, 1999.

used under the Magnuson-Moss Act's fee shifting provision, and granted Plaintiffs' motion to conduct discovery into whether, and to what extent, their suit caused Chrysler to recall vehicles with the Bendix 9 and 10 ABS.  Chin v. Chrysler, No. 95-5569, slip op. at 17, 20 (D.N.J. Dec. 14, 1999).

However, three months after Plaintiffs completed discovery, on May 29, 2001, the Supreme Court of the United States decided in Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health and Human Res., 532 U.S. 598, 610 (2001), that "the 'catalyst theory' is not a permissible basis for the award of attorney's fees under the [Fair Housing Amendments Act of 1988] and the [Americans With Disabilities Act of 1990]."  In light of Buckhannon, Chrysler filed a motion for reconsideration of the Court's December 14, 1999 order. Plaintiffs counterargued that Buckhannon was inapposite.  Alternatively, they cross-moved for attorneys' fees under the fee-shifting provision of California Code of Civil Procedure § 1021.5, for their assertion of state law causes of action on behalf of the 25 named Plaintiffs who are citizens of California.

The Court granted Chrysler's motion for reconsideration on August 14, 2003, holding that Buckhannon precluded using the catalyst theory under the Magnuson-Moss Act.  Chin v. DaimlerChrysler Corp., No. 95-5569, slip op. at 8 (D.N.J. Aug. 14, 2003).  As for Plaintiffs' cross-motion, the Court found that while

California courts permit parties to use the catalyst theory to meet section 1021.5's "successful party" requirement, it was unclear whether they would continue to do so after Buckhannon. Id. at 15-16. Noting that the identical question of law had recently been certified to the Supreme Court of California by the Ninth Circuit, id. at 18 (citing Tipton-Whittingham v. City of Los Angeles, 316 F.3d 1058, 1060 (9th Cir. 2003)), the Court deferred judgment on the question, pending the California Supreme Court's resolution of the issue, id. at 19.

On December 2, 2004, in the companion cases of Tipton-Whittingham v. City of Los Angeles, 34 Cal. 4th 604, 608 (2004), and Graham v. DaimlerChrysler Corp., 34 Cal. 4th 553, 560-61 (2004), the California Supreme Court ruled that attorney's fees are recoverable using a catalyst theory under section 1021.5, and, in Graham, mapped out a three-part test for determining whether a party qualifies.

Plaintiffs now argue that they satisfy Graham's three-part test and therefore should be awarded attorneys' fees under section 1021.5. Defendants contend that Plaintiffs' suit was not a material cause-in-fact of their decisions to recall the Bendix 9 and 10 ABS. Oral argument was heard on September 25, 2006.

## II.    Subject-Matter Jurisdiction and Choice-of-Law

This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiffs' common law fraud and deceit, and breach of express and implied

warranty claims.[3]  See Chin v. DaimlerChrysler Corp., No. 95-5569, slip op. at 1-6 (D.N.J. Dec. 5, 2005).  It is axiomatic that "[a] federal district court sitting in diversity or exercising supplemental jurisdiction over state law causes of action must apply the applicable substantive law of the State as interpreted by the State's highest court."  Doe v. Div. of Youth & Family Servs., 148 F. Supp. 2d 462, 493 n.6 (D.N.J. 2001) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938)).  As the Court ruled on September 11, 1998, New Jersey choice-of-law rules dictate that it is necessary to apply the substantive law of each Plaintiff's home state.  Chin, 182 F.R.D. at 457.  Twenty-five Plaintiffs are citizens of the state of California.  (Third Compl. ¶¶ 13-136.)  Under Erie, section 1021.5 is a "substantive" state rule of law, and accordingly, this Court will apply that statute here in determining whether the 25 California Plaintiffs are entitled to attorneys' fees. Chin v. DaimlerChrysler Corp., No. 95-5569, slip op. at 9-11 (D.N.J. Aug. 14, 2003).[4]

---

[3] The Court's original jurisdiction is grounded on federal question jurisdiction, 28 U.S.C. § 1331, by virtue of Plaintiff's Magnuson-Moss Act claim.

[4] Despite the Court's August 14, 2003 ruling that it may apply section 1021.5 under the dictates of Erie, Chrysler continues to insist that "this federal court, exercising federal question jurisdiction, [cannot] award attorneys' fees under California's Code of Civil Procedure . . . ." (Defendant's Memorandum in Opposition ("Def.'s Mem. Opp.") at 2.)

As the Court has already explained, despite its inclusion in the state's procedural code, section 1021.5 is "substantive" in the Erie sense, because a "federal court sitting in diversity [or exercising supplemental jurisdiction] applies state law in deciding whether to allow attorney's fees when those fees are connected to the substance of the case." Galam v. Carmel, 249 F.3d 832, 838 (9th Cir. 2001) (emphasis added) (citing Klopfenstein v. Pargeter, 597 F.2d 150, 152

III.   **Discussion**

A.   **California Code of Civil Procedure § 1021.5 and the Catalyst Theory**

California Code of Civil Procedure § 1021.5 permits the award of attorneys' fees to a "successful party" in certain actions that "result[] in the enforcement of an important right affecting the public interest . . . ."[5]  The California legislature

_____

(9th Cir. 1979) (holding that Alaska R. Civ. P. 82 authorized the district court's award of attorneys' fees to the prevailing party)); see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 259 n.31 (1975) (stating that even pre-Erie, "this Court held that a state statute requiring an award of attorneys' fees should be applied in a case removed from the state courts to the federal courts," and that "[w]e see nothing after Erie requiring a departure from this result").

Indeed, the very case in which the California Supreme Court reaffirmed its fidelity to the catalyst theory under section 1021.5, Tipton-Whittingham v. City of Los Angeles, 34 Cal. 4th 604, 608 (2004), came before that Court on a certified question of law from the Ninth Circuit, which was reviewing a district court's award of attorneys' fees under section 1021.5 to the plaintiffs in a class action suit. See Tipton-Whittingham v. City of Los Angeles, 316 F.3d 1058, 1059-61 (9th Cir. 2003).  Thus, Chrysler's repeated assertions that this Court is erroneously applying section 1021.5 are, again, rejected.

[5] Section 1021.5, which became effective January 1, 1978, see Woodland Hills Residents Ass'n v. City Council of Los Angeles, 593 P.2d 200, 202 n.1 (Cal. 1979), reads in relevant part:

Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if

8

enacted section 1021.5 as an exception to the so-called "American Rule" that litigants bear the cost of their own attorneys' fees.  <u>Graham</u>, 34 Cal. 4th at 565. The fee-shifting provision codified the common law "private attorney general" doctrine of attorney fees developed in prior judicial decisions, which sought "to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases."  <u>Maria P. v. Riles</u>, 743 P.2d 932, 935 (Cal. 1987) (citing <u>Woodland Hills Residents Ass'n v. City Council of Los Angeles</u>, 593 P.2d 200, 208 (Cal. 1979)).

The issue before this Court is whether Plaintiffs are a "successful party."[6]  It is clear that a "party" is "successful" when it achieves a favorable final judgment from a court.  <u>See, e.g.</u>, <u>Woodland Hills</u>, 593 P.2d at 204-05 (remanding for application of section 1021.5 to plaintiffs' motion for fees after winning a court order against city).  Even if a plaintiff's suit did not achieve a favorable final judgment, California courts have held that a party is "successful," nevertheless, if his suit "was a *catalyst* motivating defendants to provide the primary relief sought," thus, vindicating an important right "by activating defendants to modify

---

any.

[6] The Court has already determined that Plaintiffs' suit satisfies the other substantive requirements of section 1021.5.  <u>See</u> <u>Chin v. DaimlerChrysler Corp.</u>, No. 95-5569, slip op. at 11-14 (D.N.J. Aug. 14, 2003).

their behavior." Westside Cmty for Indep. Living, Inc. v. Obledo, 657 P.2d 365, 367 (Cal. 1983) (internal quotations omitted).  The California Supreme Court explained that, in fashioning section 1021.5, the state legislature looked to state and federal decisions applying the private attorney general doctrine, and in those precedents, the courts commonly applied the catalyst theory.  Westside, 657 P.2d at 367 (citing Northington v. Davis, 593 P.2d 221, 224 n.2 (Cal. 1979); Fletcher v. A.J. Industries, Inc., 72 Cal. Rptr. 146 (Cal. Ct. App. 1968); Sullivan v. Com. of Pa. Dept. of Labor, 663 F.2d 443, 447-50 (3d Cir. 1981); Robinson v. Kimbrough, 652 F.2d 458, 465-66 (5th Cir. 1981); American Constitutional Party v. Munro, 650 F.2d 184, 187-88 (9th Cir. 1981)).  When reaffirming the catalyst theory's applicability to section 1021.5 after Buckhannon, the California Supreme Court explained that

> [t]he term 'successful party,' as ordinarily understood, means the party to litigation that achieves its objectives. . . . [W]here the ultimate goal is not an arbiter's approval, but a favorable alteration of actual circumstances, a formal declaration is not essential. . . . On this common understanding, if a party reaches the sought-after destination, then the party prevails regardless of the route taken.

Graham, 34 Cal. 4th at 571.

The Graham Court, however, did make two additions to California's catalyst theory's requirements.  Previously, a party moving for fees was only required to demonstrate "a causal connection between the lawsuit and the relief obtained."

Westside, 657 P.2d at 367.  Seeking to prevent the catalyst theory from "rewarding

a significant number of extortionate lawsuits," the Graham Court added that the

"trial court must [also] determine that the lawsuit is not frivolous, unreasonable or

groundless," and that the plaintiff "reasonably attempt[ed] to settle the matter short

of litigation."  Graham, 34 Cal. 4th at 575, 577.  Chrysler does not contest that

Plaintiffs have met these new requirements.  It only argues that there is no causal

connection between the suit and their recalls.

The California Supreme Court has described the required strength of the

requisite "causal connection" in varying ways.  It has said that the plaintiff's suit

must have been a "factor" that was "substantial," Graham, 34 Cal. 4th at 577,

"material," that "contributed in a significant way to the result achieved," Westside,

33 Cal. 3d at 353 (internal quotations omitted), or that "induced" the corrective

action, Northington, 593 P.2d at 224 n.2.  Despite these differing descriptions, a

few boundaries can be discerned from the case law.

On the one hand, the lawsuit cannot have been "completely superfluous in

achieving the improvements undertaken by defendants on plaintiff's behalf."  See

Westside, 657 P.2d at 368 (quoting Nadeau v. Helgemoe, 581 F.2d 275, 281 (1st

Cir. 1978)).  On the other hand, it is apparent that the plaintiff's lawsuit need not

11

have been the *only* factor motivating the defendant's corrective action to qualify.

While the adjectives used by the California Supreme Court to describe the

causation standard have not always been consistent, that language has consistently

indicated that a catalyst suit may be one of a number of factors influencing the

defendant's decision-making process.  See Graham, 34 Cal. 4th at 577 ("[T]he

lawsuit was in fact *a substantial* causal factor in [defendant's] change in policy . . .

." (emphasis added)); Westside, 657 P.2d at 367 ("[T]here must be *a* causal

connection between the lawsuit and the relief obtained." (emphasis added)); id. at

368 ("The federal decisions have required that a plaintiff's action be *a* 'material'

factor or have '*contributed* in a significant way' to the result achieved." (emphases

added)).  Moreover, the Westside Court's citation, with approval, of the Third

Circuit Court of Appeals' decision in Sullivan v. Pennsylvania, see 657 P.2d at

368, further evidences that the suit need not be the lone factor.[7]  In Sullivan, the

Third Circuit, while applying the catalyst theory to the fee-shifting provisions of

Title VII, 42 U.S.C. § 2000e-5(k), explained that under the "expansive view" of the

causation requirement adopted by itself and other Courts of Appeals,

---

[7] The California "[l]egislature relied heavily on federal precedent when
enacting [section 1021.5], and California courts often look to federal decisions
when interpreting it."  Westside, 657 P.2d at 352 n.5.

12

> the [plaintiff's] action need not be the sole cause.  Where there is
> more than one cause, the plaintiff is a prevailing party if the action
> was a material factor in bringing about the defendant's action. . . . To
> require some stricter standard of causation would mean that the
> defendant could hide his true motivation behind what seems a
> plausible alternate justification.

663 F.2d at 448 (quoting Morrison v. Ayoob, 627 F.2d 669, 671 (3d Cir. 1980)

(per curiam)).

Thus, in order to be entitled to attorneys' fees under section 1021.5 utilizing

the catalyst theory, Plaintiffs' suit cannot have been completely superfluous to

Chrysler's remedial action; the suit must have been at least a material factor in

Chrysler's decision-making.

The "appropriate benchmarks" for making this determination are "(a) the

situation immediately prior to the commencement of suit, and (b) the situation

today, and the role, if any played by the litigation in effecting any changes between

the two."  Maria P., 743 P.2d at 937.   Two Chrysler recall actions are at issue in

this case.  The events surrounding each will be examined in turn.

**B.    The Bendix 10 Action**

   **i.    Chronology**

Plaintiffs first point to the chronology of events in claiming that their suit

was a catalyst.  Chronology plays an important, but not necessarily determinative,

role in examining causation.  "When action is taken by the defendant after

plaintiff's lawsuit is filed the chronology of events may permit the inference that

the two events are causally related."  <u>Californians for Responsible Toxics Mgmt. v.</u>

<u>Kizer</u>, 211 Cal.App. 3d 961, 968 (1989).

  The Plaintiffs filed their class action suit on October 27, 1995, alleging that

Chrysler's vehicles were defective due to the repeated failure of the Bendix 10's

"hydraulic assembly and pump . . . leading to the complete loss of or greatly

impaired braking ability."  (Compl. ¶ 66.)  Plaintiffs sought to compel Chrysler to

<u>inter</u> <u>alia,</u> (1) "inspect and repair the defective vehicles without charge," (2)

"eliminate any time, mileage and damage limitations" on the implied or written

warranties covering the defective vehicles, (3) "reimburse Plaintiffs and members

of the Class for all costs they incurred in connection with the replacement or repair

of the Bendix 10," (4) notify all Chrysler consumers of the defect and of what

Chrysler planned to do to fix the problem, and (5) pay compensatory and punitive

damages.  (Compl. pp. 47-48.)  On March 8, 1996, Plaintiffs amended their

complaint and more specifically identified the alleged defect in the Bendix 10: "a

leak in the master cylinder seal which caused a continuous bleeding of pressure,

leading to an eventual failure of the ABS pump and a loss of power-assisted braking." (Amend. Compl. ¶ 2.)

Just short of six weeks later, on April 15, 1996, Chrysler announced a voluntary "(ABS) repair campaign [for vehicles equipped with the Bendix 10] to address concerns with a potential component problem" including "hydraulic pump deterioration and/or seal wear in the hydraulic control unit of the ABS," which could possibly "lead to reduced power assist during vehicle braking and loss of the ABS feature."  (Affidavit of D. Brian Hufford ("Hufford Aff.") Ex. 16.)  As part of the Bendix 10 Repair Campaign, Chrysler pledged to (1) "[i]nspect any Chrysler vehicle identified in the campaign if the owner suspects a problem;" (2) "[r]eplace malfunctioning ABS components free of charge;" (3) "[r]eimburse owners for previous repairs of the ABS;" and (4) extend the warranty on Bendix 10 ABS components to either 100,000 miles or for the lifetime of the vehicle (hereinafter, the "Bendix 10 Repair Campaign" or "Bendix 10 recall").  (Hufford Aff., Ex. 16, 17 ("Edwards Aff.") ¶ 14.)  Chrysler then notified the owners of affected vehicles.[8] (Edwards Aff, Ex. A.)

---

[8] Those vehicles were: 1990 - 1993 Chrysler New Yorker, Fifth Avenue, and Imperial; 1990-1993 Dodge Dynasty; 1991-1993 Chrysler Town & Country, Dodge Caravan/Grand Caravan, and Plymouth Voyager/Grand Voyager; and 1991-1992 Eagle Premier, and Dodge Monaco.

This abbreviated chronology demonstrates that after filing suit, Plaintiffs received almost precisely the relief they were looking for in order to address the exact defect in the Bendix 10 of which they complained, thus raising an inference of causation.  See, e.g., Morrison, 627 F.2d at 671-72.

  **ii.** **Chrysler Claims It Was Only Motivated to End NHTSA's Investigation**

This inference may be successfully rebutted, however, by evidence "showing [that] the filing of the suit had no impact upon [defendants'] action." Kizer, 211 Cal.App. 3d at 968.  Accordingly, Chrysler responds that its Bendix 10 repair campaign was not motivated by Plaintiffs' suit, but by a then-ongoing NHTSA investigation.  In March 1994, approximately one-year and five months prior to the filing of Plaintiffs' suit, NHTSA opened a preliminary investigation into customer safety complaints over Chrysler vehicles containing the Bendix 10 ABS.  (Edwards Aff. ¶ 3.)  Over the course of the two-year investigation, NHTSA performed two engineering analyses on the defective Chrysler cars, and directed Chrysler to answer questions with responsive documentation.  Id.  In total, about 7,000 pages of documents were exchanged between Chrysler and NHTSA, and the two were in almost daily communication leading up to the Bendix 10 recall.

16

While Chrysler was not ordered to carry out its Bendix 10 Repair Campaign, it points out that just prior to the campaign's public announcement, on March 21, 1996, it met with NHTSA to ensure that its action would end NHTSA's Bendix 10 investigation.  (Declaration of Kathy A. Wisniewski ("Wisniewski Decl."), Ex. A ("Dawkins Dep.") 64:1-65:19.)  NHTSA was satisfied, and agreed to close its investigation.  Id.  In contrast, Chrysler made no attempt to contact or negotiate with Plaintiffs to ensure the Bendix 10 recall would end the class-action suit; indeed, Chrysler stresses that Plaintiffs' suit was so new, that it had yet to even file a motion to dismiss Plaintiffs' complaint.  Furthermore, Chrysler argues that had it really been concerned with allaying the concerns of the class action, it would have also included the substantially similar Bendix 9 ABS to its April 15, 1996 repair campaign announcement.  The Plaintiffs had added allegations including the Bendix 9 to its Complaint over a month earlier on March 8, 1996.  (Amend. Compl. ¶ 1.)  There is no evidence that Chrysler considered recalling the Bendix 9 until June 1996.

### iii.    Evidence Suggesting NHTSA Was Not the Only Cause of the Bendix 10 Repair Campaign

Plaintiffs acknowledge that the NHTSA investigation was one factor

motivating Chrysler's repair campaign.  They argue that nevertheless, the evidence demonstrates that their suit was a material factor motivating Chrysler's Bendix 10 Repair Campaign.

### a.    Despite NHTSA's Investigation, Chrysler's Recall Decision Came After Plaintiffs Filed Suit

First, Plaintiffs point out that despite NHTSA's investigation, Chrysler maintained to NHTSA and to the public that there was no need to recall vehicles with the Bendix 10 until *after* Plaintiffs filed their class action suit on October 27, 1995.  During an October 12, 1995 meeting with NHTSA, Chrysler gave a presentation aimed at convincing NHTSA that the Bendix 10's problem was "not a safety related defect" and thus, "[n]o unreasonable risk to motor safety exists" that would justify the need for a recall action.  (Hufford Aff. Ex. 38 at 15; see also id., Ex. 37 (Chrysler "Draft NHTSA Discussion-Review" memo, dated August 11, 1995, stating that it intended to "[c]onvince NHTSA" that the Bendix 10 is not unsafe "and that their ongoing investigation should be closed"); id., Ex. 36 (August 8, 1995 meeting notes of Robert Sattler, Chrysler's Senior Product Engineer, stating that "Chrysler will refute any need for recall action"); Wisniewski Decl., Ex. H ("Sattler Dep.") at 83:9-12.).

18

Chrysler was also trying to convince the public that the Bendix 10 did not present a safety problem.  For example, in a letter sent to a dissatisfied customer on October 17, 1995, Chrysler claimed that "[c]urrently, there has been no clear pattern of problems with the ABS."  (Hufford Aff., Ex. 8.)  Chrysler employees answering its toll-free customer service telephone number were instructed to inform callers that "we have no reason to believe there is a technical defect in the [anti-lock braking] system," and that there was "no unreasonable safety risk."  (Id., Ex. 9.)

Indeed, the evidence demonstrates that Chrysler continued to maintain that no recall was necessary for vehicles with the Bendix 10 until at least nearly four months after the filing of Plaintiffs' suit on October 27, 1995.  On February 17, 1996, Dale Dawkins, Chrysler's Director of Vehicle Compliance and Safety Affairs (the "Safety Office"), circulated a proposed response to a NHTSA request for information to his co-workers, which again maintained that the "Bendix 10 ABS is safe" and "poses no unreasonable risk to motor vehicle safety," and urged NHTSA to end its investigation.  (Hufford Aff., Ex. 40.)

Thus, despite NHTSA's investigation, Chrysler did not decide to institute the Bendix 10 Repair Campaign until after Plaintiffs filed their suit.  This, of

19

course, does not necessarily mean that the suit was a factor in the decision, material or otherwise, but it does mean that the NHTSA investigation cannot completely rule out Plaintiffs' class action suit as a possible factor.

> **b.     Chrysler Was Concerned About Class Action
>          Lawsuits When Deciding to Recall the Bendix 10**

Second, Plaintiffs point to additional evidence which shows that, at the very least, then-pending class action suits, in general, were on the minds of Chrysler's key decision-makers when they instituted the Bendix 10 Repair Campaign.

As director of Chrysler's Safety Office, Dawkins was responsible for overseeing Chrysler's handling of the NHTSA Bendix 10 investigation.  (Dawkins Dep. at 17:4-7.)  Dawkins, who had been aware since "sometime in 1995" that Chrysler faced at least one class action suit over the Bendix 10 (Dawkins Dep. 13:8-17.), never sent the February 17, 1996 proposed response, referred to above, to NHTSA.  (Dawkins Dep. 30:15-32:8.)  Instead, he and his supervisor, Ronald Boltz,[9] decided in early February to present various options for a Bendix 10 recall action to Chrysler's Corporate Executive Committee ("CEC").[10]  (Dawkins Dep.

---

[9] Boltz was Chrysler's Senior Vice President of Product Strategy and Regulatory Affairs, and General Manager of Small Car Operations.

[10] It was not Chrysler's usual procedure to involve the CEC in a recall decision.  Boltz had final authority to order a recall, and he usually did so with the help and advice of Chrysler's Vehicle Regulations Committee ("VRC"), of which

34:8-20).  In a February 14, 1996 memorandum copied to the head of Chrysler's

legal office, Lewis Goldfarb, Dawkins informed members of the Safety Office that

the "technical and cost homework" on the Bendix 10 ABS was complete, and

therefore they were "ready to go forward to the CEC to resolve future customer

actions."  (Hufford Aff., Ex. 41.)  A meeting with the CEC was scheduled for

March 11, 1996, and a proposed agenda was attached to Dawkins's memo.  (Id.)

_____

he was in charge.  (Wisniewski Decl., Ex. B ("Boltz Dep.") at 18:2-8.)  The VRC
was "chartered to review open investigations, product investigations that were
being conducted under Dale Dawkins's authority to respond to NHTSA"
investigations, and "had the authority to approve vehicle recalls for safety
reasons."  (Id. at 11:1-16.)

   If Boltz wanted to, he could present a recall issue to the CEC, but such a
move was rare.  (Boltz Dep. 16:3-16; Dawkins Dep. 33:10-24 (stating that it was
"very rare" to involve the CEC in recall decisions).)  The CEC is a "committee of
the top officers of the company, chief administrative officer, the CEO, the
president and the executive vice presidents," (Boltz Dep. 10:1-9), that handles "all
major operations issues of the corporation," (Wisniewski Decl., Ex. E ("Edwards
Dep.") at 63:8-12.).  In addition the "platform general managers" including Boltz,
were "ad hoc members" of the CEC.  (Boltz Dep. 10:1-9.)  Plaintiffs suggest that
Dawkins and Boltz took this unusual step because Chrysler was concerned over
Plaintiffs' class action suit, but there is no convincing evidence that this is the case.
It may have been rare to involve the CEC, but it is not clear why.  Dawkins
suggested the issue was brought to the CEC in this case because of complications
with AlliedSignal Corporation, the maker of the Bendix ABS, and due to publicity
over the ABS defects. (Dawkins Dep. 32:18-33:4.)  The significance of the CEC's
mere involvement is hazy at best, and in any event, not essential to the outcome of
the case.

The agenda, which he prepared after discussions with "key corporate people" at Chrysler (Dawkins Dep. 35:22-36:9), proposed three possible "customer actions" to present to the CEC: (1) "Recall to test for piston seal and/or pump problems - W/WO reimbursement"; (2) "Owner notification - 'Fix it if it's broke' field action - W/WO reimbursement"; and (3) "No action," (Hufford Aff., Ex. 41.).  The agenda also listed issues to be discussed in relation to these options.  In addition to the "pros," "cons," "costs," and "[e]ffect on NHTSA investigation," the agenda indicates that Goldfarb was scheduled to speak to the CEC on the recall's "[e]ffect on class action lawsuits & Potential other Gov'nt Actions."  (Id.)

In a revised, and more detailed, CEC meeting agenda circulated by Dawkins on March 5, 1996, a heading entitled, "Class Action Lawsuits and Other Potential Legal Actions," with the details "[t]o be discussed verbally in meeting," was prominently placed after a heading detailing the NHTSA investigation and just before a heading listing three proposed "Alternatives For Owner Action." (Hufford Aff., Ex. 43.)  In a third and final version of the agenda, dated March 8, 1996, the "Class Action Lawsuits," and "Alternatives For Owner Action" headings were again included.  Additionally, the final agenda discussed in some detail the "pros" and "cons" of each of the three proposed options for a customer action.

22

Alternative "A," which was to "Take no Additional Formal Action," had the

drawback of "not address[ing] NHTSA concerns or Class Action/other concerns."

Alternative "B," which was to recall all affected vehicles, along with "owner

reimbursement for previous repairs," had the benefit of being "likely to result in

getting NHTSA to close investigation, and addresses class action/other concerns."

Finally, alternative "C" was to "Fix it if it's broken," i.e., to notify owners of

affected vehicles that if their car experiences an ABS problem to bring it to a dealer

for repair.  A "con" of this option was that it was "[l]ess likely to satisfy NHTSA

and class action concerns," while still being expensive.  (Hufford Aff., Ex. 44.)

Immediately after the "pros" and "cons," the agenda indicates that the Safety

Office planned to "recommend" that the CEC choose alternative C, but stressed

that, "as field action is to be taken to resolve owner issues, the action should be

tailored to cause NHTSA to close its investigation *and to most effectively address*

*the class action lawsuits*.  This may require moving to Alternative B;"  (Id. (first

emphasis added).)

Dawkins testified that the agendas contained references to class action

lawsuits because,

[w]e were aware – the CEC was aware, the company was aware, that

23

> class action lawsuits had been filed involving the subject.  And we felt
> that if we were going to discuss the subject with the CEC, that since
> that was one of the peripheral issues, that we should describe what
> effect that might have if any at all on these lawsuits.

(Dawkins Dep. 39:9-15.)  Dawkins further explained that there was an

"agreement" that Chrysler's "legal staff" would provide "an update on the class

action lawsuits" at the CEC meeting.  (Id. at 46:8-23.)  Moreover, evidencing that

not only were class action lawsuits in general a concern, but that Plaintiffs' suit in

particular was a concern, is the deposition testimony of Joe McCormick, Chrysler's

Director of Dealer Technical Operations.  McCormick testified that prior to the

CEC meeting he had "numerous discussions" with Dawkins and W. Randall

Edwards,[11] "about the affect of a NHTSA recall on *this* class action lawsuit."

(Wisniewski Decl., Ex. C ("McCormick Dep.") at 37:9-38:2 (emphasis added).)

The members of the CEC received a copy of Dawkins's agenda several days

before the March 11, 1996 meeting.  (Dawkins Dep. 49:2-19; Boltz Dep. 52:8-24.)

Boltz described the meeting as a "relatively free flowing discussion of the issues,"

at which Dawkins presented his agenda.  (Boltz Dep. 52:18-53:5.)  During the

meeting, a member of Chrysler's legal department discussed the status of pending

---

[11] Chrysler's then-Senior Manager of Vehicle Safety and Emissions
Compliance.

class action lawsuits.  (Dawkins Dep. 50:7-9, 50:15-17.)  Boltz recalled that this

person was Lewis Goldfarb.[12]  (Boltz Dep. 46:9-12.)  That pending class action

lawsuits were discussed at the meeting is further confirmed by handwritten notes

next to the "Class Action Lawsuits" point heading on an agenda produced from the

CEC meeting.  Those notes read: "2 cases, breach of warranty, fraud and

deceit"—the very state law claims Plaintiffs assert in this case.  (Hufford Aff., Ex.

45 at p. 4; cf. Third Compl. ¶¶ 241-56.)

    Dawkins presented his three recommendations to the CEC, including his

suggestion that Chrysler take the "rare" but "not unprecedented" step of

reimbursing owners who repaired their defective vehicles.  (Dawkins Dep. 56:21-

57-16.)  Additionally, Dawkins proposed that as a part of the recall, the warranty

on the Bendix 10 ABS components be extended.  (Id. at  61:23-62:3, 62:9-21.)  His

testimony confirms what is obvious from the CEC meeting agendas—in deciding

whether to initiate the Bendix 10 Repair Campaign, Chrysler was concerned, in

part, about avoiding class action liability:

    Q. At the time you attended the CEC meeting and made this
    recommendation, did you agree that the action to be taken by Chrysler

---

[12] The details of what Goldfarb said at the CEC meeting with regard to the
class actions is unknown due to Chrysler's assertion of the attorney-client
privilege.  (See, e.g., Dawkins Dep. 50:5-14.)

25

should in fact be tailored to cause NHTSA to close it's [sic] investigation and to most effectively address the class action lawsuits?

[Dawkins:] This is the preferred direction it's stated here in the paper. I could only testify that our concerns were that as we took an action, we should optimize it to resolve whatever open issues there were. And since obviously the key one was NHTSA. *But since the class action lawsuits were open issues with the Company, if we could take action to help resolve those, we should do that.*

(Id. at 60:3-16. (emphasis added).)

At the end of the meeting, the CEC "essentially accepted the recommendation made [in Dawkins's March 8, 1996 final agenda]." (Boltz Dep. 52:18-53:5.) The agendas containing Dawkins's "recommendations," and both his and Boltz's descriptions of the meeting suggest that the CEC had the final say over whether Chrysler took action to remedy problems with the Bendix 10. (See also Edwards Dep. 70 ("[I]t's my understanding that the Executive Committee, which is over and above VRC, took on [approving the Bendix 10 recall].")

The events following the CEC meeting only further confirm that class action suits were a factor. The day the Bendix 10 Repair Campaign was formally announced, April 15, 1996, Dawkins and other Chrysler officials held a meeting with Goldfarb to discuss the execution of the recall. (Dawkins Dep. 68:5-15.) On the agenda for the meeting: "Status of Class Action Lawsuits." (Hufford Aff., Ex.

26

48.)  Moreover, two days after ordering the recall, Chrysler instructed its customer service employees to answer questions about how the recall would "affect the class action law suits" with the following response:

> There was no reason for the class action law suits in the first place. They were filed after the NHTSA announced its investigation and Chrysler began its effort to find the cause of the problem.  Now that the safety recall has been announced, there's no reason for them to pursue it.

(Hufford Aff., Ex. 49, at 4.)

From this evidence, the Court concludes that the class action suits played a part in motivating Chrysler to take action, and also that Chrysler expected the Bendix 10 Repair Campaign to obviate the class actions' need for court-ordered relief.[13]

### c.      The Bendix 10 Repair Campaign Offered More Relief Than NHTSA Could Have Demanded

Plaintiffs raise a third, and important, point.  In addition to free inspection

---

[13] It also appears, although it is not entirely clear, that Chrysler sought a settlement with Plaintiffs about three-weeks after announcing the Bendix 10 Repair Campaign.  On May 15, 1996, counsel for Plaintiffs sent a letter to counsel for Chrysler stating, "[w]e have received your May 8, 1996 letter in which you summarize your proposed safety recall . . . . However, additional steps are required before we will recommend a settlement to the Court." (Hufford Aff., Ex. 22.)  The purported May 8, 1996 letter does not appear to be in the record, but nevertheless, the May 15 letter further suggests that Plaintiffs' suit in particular, influenced Chrysler's Bendix 10 Repair Campaign decision.

27

and replacement of defective parts, the Bendix 10 Repair Campaign included

reimbursement for owners' previous repairs and a warranty extension.  While

Chrysler claims that satisfying NHTSA was the sole, or main, impetus for its

Repair Campaign, NHTSA only has the legal authority to order Chrysler to offer

free inspection and repair, not reimbursement and warranty extension.  Under the

Safety Act, NHTSA is required to order the manufacturer of a "motor vehicle [that]

contains a defect related to motor vehicle safety," 49 U.S.C. §§ 30118(b)(2)(A) and

(B), to, "without charge . . . remedy the defect" by either "repairing . . . [or]

replacing the vehicle . . . [or] by refunding the purchase price," id. §§

30120(a)(1)(A)(i),(ii) and (iii).[14]  According to a NHTSA informational brochure

published for auto consumers, the Safety Act "makes no provision for

compensation to motorists who experienced the problem before the recall and had

corrections made at their own expense."  (Hufford Aff., Ex. 50A.)  Indeed,

Dawkins and Boltz both testified that satisfying NHTSA did not factor into the

decision, made at the CEC meeting, to offer reimbursement.  (Dawkins Dep.

57:17-24; Boltz Dep. 54:10-15.)

_____

[14] NHTSA has the authority to carry out the provisions of the Safety Act by virtue of a grant of authority from the Secretary of Transportation.  See 49 C.F.R. §§ 1.50(a), 501.2(a)(1).

Reimbursement and warranty extension were not frivolous aspects of the Bendix 10 Repair Campaign.  According to Dawkins's final agenda for the CEC meeting, reimbursement alone was predicted to cost $8 million, that is, just under one-quarter of the estimated $33 million price tag for alternative B (the full recall option), and just under one-third of the estimated $25 million cost of alternative C (the adopted "Fix it if it's broken" option).  (Hufford Aff., Ex. 44.)

Chrysler claims that it was its normal practice to offer reimbursement as a part of a recall action.  It points out that Edwards called the practice "fairly standard" during his deposition.  (Edwards Dep. 69:5-9.)  However, the impact of this statement is countered somewhat by Dawkins, who testified that reimbursement was "rare . . . but certainly not unprecedented."  (Dawkins Dep. 57:4-16.)  Whatever the frequency, Chrysler's motive for offering reimbursement in the past is not clear from the evidence.  What is clear is that NHTSA had no legal authority to force Chrysler to give consumers two important aspects of the relief it offered in the Bendix 10 (and Bendix 9) Repair Campaign, which Chrysler claims was solely or mainly motivated by a desire to satisfy NHTSA's demands.  Chrysler may or may not have frequently offered reimbursement in other cases, but in this case it did.  Chrysler said that its Bendix 10 remedial action "should be

29

tailored" to achieve two goals: (1) "to cause NHTSA to close its investigation," and (2) "to most effectively address the class action lawsuits."  (Hufford Aff., Ex. 44 at p. 5.)  Once NHTSA is taken out of this equation, as it must be for the reimbursements and warranty extension, only one motivating factor remains: resolution of the class actions.

### iv.   Chrysler's Unsubstantiated Denials That Plaintiffs' Suit Was a Factor

Chrysler attempts to discredit Plaintiffs' evidence as merely circumstantial, and as only offering "inferences based on inferences," in the face of Chrysler executives' testimony that Plaintiffs' suit played no part in its decision.  For instance, Dawkins testified that "the lawsuits that were filed against the Company played *no role* in our field action decisions." (Dawkins Dep. 83:2-5 (emphasis added).)  Also, Boltz testified in response to the question: "Did the case of Chin versus Chrysler play *any role* in your decision to recommend and authorize the Company to conduct a service action . . . ?," "No, it did not."  (Boltz Dep. 67:8-25 (emphasis added).)  Additionally, Robert Eaton, Chrysler's then-Chief Executive Officer stated that "[a] lawsuit of any type *would not have had any impact whatsoever* on how we would have or I would have decided action that happened

with respect to the safety of our vehicles."  (Wisniewski Decl., Ex. D ("Eaton Dep.") 92:2-5 (emphasis added).)

Chrysler claims that in light of this testimony, the inferences Plaintiffs wish the Court to draw from the documentary evidence detailed above are impermissible.  Chrysler cites the Supreme Court's 1933 statement in Pennsylvania R.R. Co. v. Chamberlain, that drawing a "desired inference . . . [from] the existence of a particular fact . . . is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist."  288 U.S. 333, 340-41 (1933).  Even assuming that this 73-year old proposition is still good law, see Mays v. Pioneer Lumber Corp., 502 F.2d 106, 108 (4th Cir. 1974) (questioning Chamberlain's suggestion that "an inference can never sustain a verdict against contrary testimony"), it is clear that the testimony Chrysler cites is *far* from "uncontradicted" or "consistent with the facts actually proved."  Indeed, these statements are contradicted by other statements made by the deponents.  Before claiming that Plaintiffs' suit was not a factor in Chrysler's decision, Boltz said that "the class action lawsuits *did not loom large* in this decision."  (Boltz Dep. 56:4-19 (emphasis added).)  Likewise,

31

Dawkins's claim that the class action suits "played no role" in Chrysler's decision is entitled to minimal weight given his admissions that the class action suits were "one of the peripheral issues" at the CEC meeting, on which there was discussion about "what effect [a recall action] might have if any at all on these lawsuits." (Dawkins Dep. 39:7-15, 49:20-50:9.).  Additionally, he stated that although NHTSA was the "key" issue, "since the class action lawsuits were open issues with the Company," the course of action he suggested was, at least in part, tailored to "help resolve" the class actions, (Id. at 60:3-16.).[15]

The documentary evidence, and Boltz and Dawkins's testimony also cast serious doubt on Eaton's claim that a suit "would not have had any impact" on Chrysler's action.  Furthermore, the evidence discredits the declarations of Chrysler CEC members Thomas G. Denomme, Francois J. Castaing, Thomas T. Stallkamp, and Eaton that they had "no recollection or personal knowledge as to Chrysler's decision-making and motivations in initiating the recall of the Bendix 9 and 10 anti-lock brake systems," and that they "first learned that a class action had

---

[15] Chrysler's own brief on this issue even contradicts Dawkins's, Eaton's, and Boltz's claims that class actions played no role, admitting that "[t]here was also the hope that a voluntary field action would bring an end to the pending class action lawsuits," while trying to downplay their significance.  (Mem. in Opp. p. 6 n.3.)

been filed relating to the Bendix 9 and 10 . . . in June 2000." (Hufford Aff. Ex. 46; Reply Aff. of Allyn Z. Lite, Ex. B.)  In light of the documents and testimony surrounding the March 11, 1996 CEC meeting, it is hard to understand how this is possible.

C.   **The Bendix 9 Action**

i.   **Chronology**

Plaintiffs also point to the chronology surrounding the Bendix 9 recall to support their catalyst claim.  On March 8, 1996, Plaintiffs amended their Complaint to include allegations that the largely interchangeable Bendix 9 ABS suffered from the same defect as the Bendix 10.[16]  On May 15, 1996, Plaintiffs' counsel rejected an apparent May 8, 1996 settlement proposal from Chrysler, in part because the April 15, 1996 Bendix 10 Repair Campaign did not address their allegations over the Bendix 9 ABS.  (Hufford Aff., Ex. 22.)  On September 26, 1996, Chrysler's VRC approved extending the identical terms of the Bendix 10 Repair Campaign to vehicles with the Bendix 9.  (Id., Ex. 18; Boltz Dep. 63:1-21.) On March 7, 1997, Chrysler's motion to dismiss Plaintiffs' complaint was denied by this Court.  The next month, in April 1997, Chrysler formally launched the

_____

[16] The affected vehicles containing the Bendix 9 were the 1989-1991 Jeep Cherokee and Jeep Wagoneer.

Bendix 9 Repair Campaign by giving notice to its dealers and consumers.

(Hufford Aff., Ex. 19 ("Pelliccia Dep.") 9:23-10:1, Ex. 20, 21.)

### ii. Chrysler Claims it was Only Motivated to End NHTSA's Investigation

Just as with the Bendix 10 recall, Chrysler claims that its "decision to extend

the recall to vehicles equipped with the Bendix 9 ABS was a direct result of the

NHTSA's demand that those vehicles be recalled as part of the Bendix 10 recall."

(Def.'s Mem. Opp. p. 25.)  Chrysler points out that it never responded to Plaintiffs'

May 15, 1996 settlement counter-proposal, but that it did notify NHTSA of its

Bendix 9 recall on October 1, 1996, leading NHTSA to end its investigation.

(Hufford Aff., Ex. 33-35.)  Additionally, Chrysler stresses that the VRC's vote to

recall the Bendix 9 on September 26, 1996, came after NHTSA first opened a

formal investigation into the Bendix 9 on September 6, 1996.  (See Hufford Aff.,

Ex. 32.)   Furthermore, Boltz testified that there was no discussion regarding

litigation over the Bendix 9 at the VRC meeting.  (Boltz Dep. 64:18-65:2.)

### iii. Evidence Suggesting That Plaintiffs' Suit Did Influence Chrysler's Bendix 9 Recall

It is apparent, however, that Chrysler set the Bendix 9 recall in motion

before NHTSA's September 6 letter, and before the VRC's short meeting formally

34

approving the Bendix 9 action.[17]  A little over a month after Plaintiffs' May 15,

1996 settlement counter-proposal, Edwards called a meeting for June 25, 1996, to

be attended by Dawkins and Goldfarb, among others, to discuss the Bendix 9.

(Hufford Aff., Ex. 23.)  It is plain from the meeting agenda that Chrysler was

considering "[a]ppropriate Bendix 9 Customer Action," and comparing the

already-recalled Bendix 10 with the Bendix 9.  (Id.)  More importantly, under the

point heading called "Introduction," the agenda lists two subheadings for

discussion: "a. Customer Complaints" and "b. Class Action Lawsuit."  (Id.)

James Quell, who was then responsible for buying service parts for Chrysler,

attended the meeting.  (Wisniewski Decl., Ex. I ("Quell Dep.") 4:1-13, 33:23-

34:1.)  On his copy of the agenda from the meeting, he wrote, "in negotiations,"

next to the "Class Action Lawsuit" heading.  (Hufford Aff., Ex. 23; Quell Dep.

44:2-4.)  He claimed, however, he could not recall any discussions of a class action

suit from the meeting.  (Quell Dep. 44:5-16.)

On July 2, 1996, Edwards called another meeting to discuss the "feasibility"

of performing a Bendix 9 recall.  (Edwards Dep. 89:16-90:3; Hufford Aff., Ex. 26.)

---

[17] Boltz testified that the VRC meeting was "[n]ot very long at all, nothing –
not longer than it would take to display that document, read through it and then act
on the recommendation."  (Boltz Dep. 64:5-11.)

The agenda for that meeting included the heading: "Bendix 10 program for Bendix 9?" (Hufford Aff., Ex. 26.)  On July 23, 1996, a third meeting was held to follow up on issues from the July 2 meeting, and at that meeting it was recommended Chrysler start buying necessary equipment for a potential Bendix 9 recall. (Pelliccia Dep. 32:9-33:17.)

Finally, on August 14, 1996, Chrysler's Safety Office ordered Chrysler's parts division to "kickoff the procurement process for all components" for a possible Bendix 9 recall.  (Hufford Aff., Ex. 28.)  Dawkins explained that this meant his office was given the authority to start buying recall components so that, were a final decision to recall the Bendix 9 made, the recall process would be expedited.  (Dawkins Dep. 80:21-81:6.)  Although the decision to recall the Bendix 9 was not yet officially made by this date, Dawkins–who attended the June 25, July 2, and July 23 meetings–agreed that he was "confident" that the Bendix 9 recall would happen.  (Id. 81:20-82:2.)  The process of identifying and procuring the necessary parts continued through the September 6 launch of NHTSA's Bendix 9 investigation, and until the September 26 VRC approval of the Bendix 9 recall, and subsequently, the recall's formal launch in April 1997.

Plaintiffs argue that this evidence demonstrates that Chrysler set its Bendix 9

36

recall in motion before NHTSA could have been a motivating factor, and thus, its class action lawsuit must have been a material factor in its decision.

**D.** **Whether Plaintiffs' Suit Was a Material Factor**

**i.** **Plaintiffs' Suit Was Not Completely Superfluous to Chrysler's Decision**

As stated above, if a lawsuit was "completely superfluous" to a defendant's voluntary decision to grant the relief the plaintiff sought, the requisite causal connection is lacking, and thus, the suit was not a "catalyst." See Westside, 657 P.2d at 368. In Westside, the California Supreme Court reversed an award of attorneys' fees under section 1021.5 in a case where the plaintiffs sought a court order forcing a state agency to issue final regulations implementing a state anti-discrimination law. Id. at 365-66. Although the agency voluntarily issued the regulations after the suit was filed, the Court found the suit was not a catalyst because two weeks prior to the suit's filing, a draft of the proposed regulations had already been approved by the agency. Id. at 366. The agency's action was only delayed until after the filing of suit because it was required to comply with time-consuming statutory requirements for finalizing the regulations. Id.

This is not the situation here. The record makes clear that Plaintiffs' class

action suit, at some level, influenced Chrysler's decisions to institute the Bendix 9 and 10 Repair Campaigns. Despite NHTSA's investigation of the Bendix 10, Chrysler maintained that there was no need to recall the ABS until after the filing of Plaintiffs' suit. The CEC, after being briefed on the then-pending class action suits, and on how various courses of action would affect the class actions, made the decision to approve the Bendix 10 Repair Campaign. A key part of that campaign, reimbursement and warranty extension, could not have been motivated by a desire to satisfy NHTSA, and was explicitly demanded by Plaintiffs' class action. As to the Bendix 9, Chrysler started to take the steps necessary for that recall after Plaintiffs refused Chrysler's request to settle their class action, and before NHTSA started its investigation. A "Class Action Lawsuit" that was then "in negotiation" was explicitly a concern of those deciding to extend the Bendix 10 recall to the Bendix 9. The testimony of those involved only strengthens any inferences drawn from the documentary evidence. At the very least, Plaintiffs' suit was not completely superfluous to Chrysler's actions. As the Court sees it, Plaintiffs' suit was one of two factors influencing Chrysler's actions.

     ii.     **The Existence of other Bendix Class Actions Against Chrysler**

Chrysler attempts to dilute the causal connection between Plaintiffs' suit and

its actions by pointing out that many of the documents referenced above indicate

that multiple class action lawsuits concerned Chrysler, not just one.[18]  In fact,

Chrysler claims that Plaintiffs' suit could not have been a material factor because it

was only one of six contemporaneous Bendix class actions against Chrysler.  Of

those five other suits, however, only one was even pending when Chrysler ordered

both recalls,[19] and the California resident plaintiffs in that suit neither sought to

_____

[18] This argument is not supported by the evidence.  See McCormick Dep. 37:9-38:2 (stating that he spoke with Dawkins and Edwards about the effect a Bendix 10 recall would have on Plaintiffs' suit in particular before the CEC meeting); Hufford Aff., Ex. 23 (agenda indicating only one "Class Action Lawsuit" was to be discussed at a June 25, 1996 meeting concerning extending the Bendix 10 recall to the Bendix 9, and that this suit was "in negotiations"); Hufford Aff., Ex. 22 (plaintiffs' counsel's letter sent to Chrysler about one month prior to the June 25 meeting indicating that there had been some discussion of settlement between the parties).

[19] Two of the five class actions were voluntarily dismissed by the plaintiffs months *before* the Bendix 10 recall.  See Beam v. Chrysler Corp., No. 95-8436 (Cir. Ct. Mo.) (filed, Aug. 25, 1996; dismissed Dec. 22, 1995); Chrysler Corp. v. Carey, 5 F. Supp. 2d 1023, 1030 (E.D. Mo. 1998) (discussing the Beam litigation); Sakalarios v. Chrysler Corp., No. 2:95-CV-00362-CWP (S.D. Miss.) (filed Oct. 11, 1995; dismissed Jan. 9, 1996) (Wisniewski Decl., Ex. O (Sakalarios docket index).)  Another class action Chrysler cites was filed *after* Chrysler announced both recalls.  See Handle v. Chrysler, No. 96-cv-5020 (D.N.J.) (filed Oct. 24, 1996; consolidated with Chin, No. 95-5569, on June 9, 1997).  Finally, Brown v. Chrysler Corp., No. CV-96-56 (Circuit Court, Sumter County, Alabama) (filed June 17, 1996) was filed after the Bendix 10 recall, but before the Bendix 9 recall. (Wisniewski Decl., Ex. R (Brown complaint).)

certify a nationwide class, as the Plaintiffs here did, nor make allegations against the Bendix 9.  See Villarreal v. Chrysler Corp., No. 95cv4414 (N.D. Cal.) (Wisniewski Decl. Ex. Q (Villarreal docket index).)  Thus, no other class action was similarly positioned to Plaintiffs' suit.  Even if such class actions existed, however, Chrysler offers no authority suggesting that a class action no longer has a sufficient causal connection with remedial action merely due to the existence of other similar contemporary actions.  Indeed, Plaintiffs' "action need not be the sole cause" of Chrysler's recalls.  See Sullivan, 663 F.2d at 448 (quoting Morrison, 627 F.2d at 671).

### iii.    Following Graham, Plaintiffs' Suit Was a Material Factor

The question remains, would the California Supreme Court view Plaintiffs' suit as a factor that was substantial, material or that contributed in a significant way to the result achieved?  Under that Court's decision in Graham, the answer is yes.

At issue in Graham was Chrysler's decision to offer repurchase or replacement to all buyers of its Dakota R/T model vehicle, which it erroneously marketed as having a towing capacity well beyond its actual ability.  See 34 Cal. 4th at 561.  Chrysler admitted that at the time it made the offer it was aware of the plaintiff's pending class action lawsuit, filed approximately two weeks earlier,

40

demanding return of their purchase or lease payments and compensatory damages. Id. at 563.  Chrysler's action mooted the suit, but nevertheless, the trial court awarded plaintiffs attorneys' fees under section 1021.5 and the catalyst theory.  Id. It made this finding despite the fact that Chrysler had begun to address its error six months prior to the filing of the class action, and that the county district attorney and California Attorney General threatened an enforcement action against Chrysler one month prior to the filing of the class action.  Id. at 562.  The trial court rejected Chrysler's contention that the threatened enforcement action was the true motivating factor, in part, because the District Attorney and Attorney General "were only concerned with DaimlerChrysler's false advertising materials and never sought any remedies on behalf of the consumers who acquired these vehicles while they were being misrepresented."  Id. at 564.[20]

There is clearly a stronger case here that Plaintiffs' suit was a catalyst than there was in Graham.  Like Graham, Chrysler here was aware of Plaintiffs' suit

---

[20]Although the California Supreme Court remanded the catalyst issue to the trial court, it did so only with regard to prongs two and three of its newly clarified catalyst test, i.e., whether the suit had merit, and whether the plaintiff attempted to settle the matter short of litigation.  See 34 Cal. 4th at 577.  The court did not disturb the trial court's conclusion "that the lawsuit was in fact a substantial causal factor" in Chrysler's action, and even pointed out that Chrysler did not challenge this finding on appeal.  Id.

prior to initiating its Bendix 10 and 9 Repair Campaigns.  Unlike <u>Graham</u>,
however, Chrysler here did not begin to remedy the Bendix defects until after
Plaintiffs filed suit.  The Court rejects Chrysler's argument that Plaintiffs' then six-
month old suit was too new at the time of the Bendix 10 recall to have had a
substantial effect on its decision-making.  The suit in <u>Graham</u> was found to be a
catalyst despite being filed only *two weeks* prior to Chrysler's remedial action.  <u>See</u>
34 Cal. 4th at 562-63.  Furthermore, just as in <u>Graham</u>, the relief Chrysler offered
its customers was overbroad if it truly were only motivated by the government's
investigation; the District Attorney and Attorney General in <u>Graham</u> were not
concerned with providing direct remedies for wronged consumers, and NHTSA
here had no power to require Chrysler to reimburse customers for prior repairs or
to extend the Bendix warranty.

Chrysler's central argument, that it was motivated by a desire to end
NHTSA's investigations, is well-taken.  It is obvious that NHTSA was one factor.
But the existence of multiple factors does not preclude a finding that Plaintiffs' suit
was a material factor.  As explained earlier, it is particularly apt here to note that
"[t]o require some stricter standard of causation would mean that the defendant
could hide his true motivation behind what seems a plausible alternate

justification." <u>Sullivan</u>, 663 F.2d at 448 (quoting <u>Morrison</u>, 627 F.2d at 671.)

Plaintiffs' suit was a material factor motivating Chrysler's decision to recall the Bendix 9 and 10 ABS, and therefore, they have satisfied the causal connection prong of <u>Graham</u>'s catalyst theory test.

It is not contested that Plaintiffs also satisfy <u>Graham</u>'s second and third prongs, that is, their suit was not frivolous, and they reasonably attempted to settle the matter short of litigation.  As such, Plaintiffs are a "successful party."  The Court has already held that Plaintiffs meet section 1021.5's other requirements.

## III.   <u>Conclusion</u>

California Code of Civil Procedure § 1021.5, and the private attorney general doctrine from which it was born, were intended "to encourage suits enforcing important public policies." <u>Maria P.</u>, 743 P.2d at 935.  If a party on the losing end of a plaintiff's meritorious public interest suit could avoid paying fees by voluntarily granting the relief sought before a court order, attorneys will be deterred from asserting such cases in the future. <u>Graham</u>, 34 Cal. 4th at 574. Though not by Court order, Plaintiffs achieved "a favorable alteration of actual circumstances," and it was the intent of the California legislature, as interpreted by

43

the California Supreme Court, that such "successful part[ies]" should be awarded attorneys' fees.  Accordingly, Plaintiffs' motion under section 1021.5 will be granted.

/s/ John C. Lifland, U.S.D.J.

November 8, 2006