# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
CLOSING

```
_____
                              :
                              :
DAVID CHIN, et al.            :
                              :
             Plaintiffs,      :        CIVIL ACTION NO.: 95-5569 (JCL)
                              :
     v.                       :        OPINION
                              :
DAIMLERCHRYSLER               :
CORPORATION                   :
                              :
             Defendant.       :
_____:
```

**LIFLAND, District Judge**

I.   **Background**

On November 8, 2006, the Court ruled that the 25 California-citizen

Plaintiffs in this action are entitled to attorneys' fees under California Code of

Civil Procedure § 1021.5 from Defendant DaimlerChrysler Corporation

("Chrysler").  See Chin v. Daimler Chrysler Corp., No. 95-5569, slip op. at 7, 43-

44 (D.N.J. Nov. 8, 2006).  The factual and procedural history of the case is detailed

in that opinion, and will not be recounted here.  See id. at 1-7.

Now before the Court is Plaintiffs' application for fees under section 1021.5.

Plaintiffs, represented by the law firms of Lite DePalma Greenberg & Rivas, LLC

1

("Lite DePalma"), Pomerantz Haudek Block Grossman & Gross, LLP

("Pomerantz"), the Law Offices of James V. Bashian, PC ("Bashian"), and Gruhin

& Gruhin, PA ("Gruhin"), seek $11,465,020.26 in fees and expenses.  Plaintiffs

arrive at that number as follows:

| **Requested Attorneys' Fees** | | | |
|---|---|---|---|
| Firm | Hours Billed | Ave. Hourly Rate | Lodestar |
| Pomerantz | 4008.6 | $541.17 | $ 2,169,351.00 |
| Lite DePalma | 2037.3 | $455.87 | $    928,755.00 |
| Bashian | 194.5 | $438.68 | $      85,325.00 |
| Gruhin | 112.0 | $375.00 | $      42,000.00 |
| Totals: | 6,352.4 | $507.74 | $ 3,225,431.00 |
| Proposed Multiplier: | | | x            3.5 |
| Total Attorney Fee Request: | | | **$11,289,008.50** |
| **Requested Expenses** | | | |
| Firm | | | Expenses |
| Pomerantz | | | $    137,406.62 |
| Lite DePalma | | | $      38,517.20 |
| Bashian | | | $            87.94 |
| Gruhin | | | $              0 |
| Total Expenses: | | | **$    176,011.76** |
| **Grand Total Fee & Expense Request:** | | | **$11,465,020.26** |

Chrysler replies that this figure is unreasonably excessive, and asserts that

$95,389.23 would be a proper award of fees and expenses.  For the reasons that

follow, the Court will grant Plaintiffs attorneys' fees and expenses in the total amount of $4,654,433.14.[1]

## II.   Discussion

### A.   Attorneys' Fees

To determine the proper amount of a statutory fee award under section 1021.5, California courts apply the so-called "lodestar adjustment method." See Ketchum v. Moses, 17 P.3d 735, 741-42 (Cal. 2001) (citing Serrano v. Unruh, 652 P.2d 985, 987-88 (Cal. 1982) ("Serrano IV")).  Under this method, the Court must first set a lodestar figure that represents the product of the "'time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case.'"  Id. at 741 (quoting Serrano v. Priest, 569 P.2d 1303, 1316 (Cal. 1977) ("Serrano III")).  Then, the lodestar figure may be adjusted with a multiplier based on certain factors in order to fix the basic "fee at the fair market value for the particular action."  Id.

The lodestar adjustment method serves to "'anchor[] the trial court's analysis to an objective determination of the value of the attorney's services,

_____

[1] The Court declines Chrysler's invitation to deny Plaintiffs' fee petition in its entirety.  For the same reasons that the Court grants a substantial amount of Plaintiffs' request (as detailed below), the Court also finds that Plaintiffs' original request was not "outrageously unreasonable" under Serrano v. Unruh, 652 P.2d 985, 994 (Cal. 1982).

ensuring that the amount awarded is not arbitrary.'" Id. at 743 (quoting PLCM Group, Inc. v. Drexler, 997 P.2d 511, 518 (Cal. 2000)).  The goal of the method is to arrive at a fee award that is "fully compensatory."  Id. at 742.

### 1.   Lodestar

The lodestar equals (1) "the reasonable hours spent," (2) "multiplied by the hourly prevailing rate for private attorneys in the community conducting *noncontingent* litigation of the same type."  Id. (citing Serrano IV, 17 P.3d at 986-87).  The verified time records submitted by Plaintiffs' attorneys will provide the starting point for the Court's lodestar determination.  See Horsford v. Bd. of Trustees, 33 Cal. Rptr. 3d 644, 673 (Cal. Ct. App. 2005).  The "verified time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear indication the records are erroneous."  Id.

### a.   Reasonable Hours Spent

The California Supreme Court has explained that "absent circumstances rendering the award unjust, fees recoverable under section 1021.5 ordinarily include compensation for all hours *reasonably* spent, including those necessary to establish and defend the fee claim."  Serrano IV, 652 P.2d at 997 (emphasis added).  Lite DePalma, Pomerantz, Bashian, and Gruhin have submitted affidavits and a declaration detailing the 6,352.40 hours they allege were spent representing

4

Plaintiffs from October 8, 1995 to the present.[2]  Chrysler contends that, for

numerous reasons, a large number of these hours were not reasonably spent.  These

objections can be categorized into two groups.  First, Chrysler argues that hours

spent on activities that did not specifically help achieve the recalls are not

compensable.  Second, Chrysler contends that a number of claimed hours are "not

subject to compensation" because they represent "'padding' in the form of

inefficient or duplicative efforts."  See Ketchum, 17 P.3d at 741.

### (1)    Hours Allegedly Not Spent to Obtain the Sought After Relief

"Attorney time spent on services which produce no tangible benefit for the

client is not time 'reasonably spent.'"  Meister v. The Regents of the Univ. of Cal.,

78 Cal. Rptr. 2d 913, 923 (Cal. Ct. App. 1998).  The Court has the discretion to

"'reduce the amount of the attorney fees to be awarded where a prevailing party

plaintiff is actually unsuccessful with regard to certain objectives of its lawsuit.'"

Olson v. Auto. Club of So. Cal., 44 Cal. Rptr. 3d 1, 7 (Cal. Ct. App. 2006) (quoting

Sokolow v. County of San Mateo, 261 Cal. Rptr. 520, 530 (Cal. Ct. App. 1989)).

---

[2] (See Affidavit of Allyn Z. Lite in Support of Plaintiffs' Petition for Attorneys' Fees ("Lite Aff."), Exs. A, D; Declaration of D. Brian Hufford Pursuant to 28 U.S.C. § 1746 in Support of Plaintiffs' Petition for Attorneys' Fees ("Hufford Decl."), Ex. A.); Affidavit of James V. Bashian in Support of Joint Petition for Attorneys' Fees and Disbursements Filed on Behalf of the Law Offices of James V. Bashian, P.C. ("Bashian Aff."), Ex. 1; Affidavit of Paul J. Linker in Support of Plaintiffs' Petition for Attorneys' Fees ("Linker Aff."), ¶ 8.)

In doing so, the "'court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.'" Id. (quoting Sokolow, 261 Cal. Rptr. at 530).

> **(a)   Plaintiffs' Opposition to Chrysler's Notice of Recall**

Chrysler argues that Plaintiffs' attorneys spent 188.01 hours seeking to "prevent the notice of the recall" Chrysler initiated for its vehicles with the Bendix 10 Anti-Lock Breaking System ("ABS"), and that Plaintiffs should not receive fees for these hours.  Chrysler contends that this work "was arguably antagonistic" to Plaintiffs' interests insofar as the relief sought included a recall, and consequently produced no tangible benefit.  (Chrysler's Mem. of Law in Opp'n to Pls.' Pet. for Award of Attys' Fees ("Def.'s Br."), 15-17; Decl. of John L. Trunko ("Trunko Decl."), Ex. F.)

Chrysler's characterization of Plaintiffs' work relating to Chrysler's notice of recall is misleading.  Plaintiffs' attorneys did not seek to prevent Chrysler from executing the Bendix 10 recall.  Nor did Plaintiffs' attorneys seek to prevent beneficiaries of the recall, including their own clients, from being notified. Plaintiffs sought, pursuant to Federal Rule of Civil Procedure 23(d)(2), a Court order adding language to Chrysler's recall notice making clear that recipients could take advantage of the recall without waiving any rights or remedies they may be

entitled to as potential class members of the <u>Chin</u> litigation.  (<u>See</u> Supp. Reply Decl. of D. Brian Hufford ("Hufford Reply Decl."), Ex. C, at 6-9, 11.)  Far from being "antagonistic" to the proposed class, Plaintiffs' attorneys sought to protect their clients' interests.

However, Plaintiffs efforts were unsuccessful.  On August 30, 1996, the Court issued an order denying Plaintiffs' motion.  Therefore, even if not antagonistic to Plaintiffs' interests, Chrysler argues that this work did not contribute to any relief, and should not be compensated.

California courts have explained that the kind of limited litigation success that justifies a reduction in fees is best measured in terms of a party's failure to achieve ultimate litigation *objectives*, as opposed to mere unsuccessfully advanced legal *theories* in support of litigation objectives that were nevertheless achieved on other grounds.  <u>See</u>  <u>Sokolow</u>, 261 Cal Rptr. at 530-31; <u>Sundance v. Municipal Court</u>, 237 Cal. Rptr. 269, 272-73 (Cal. Ct. App. 1987); <u>Olson</u>, 44 Cal. Rptr. 3d at 7-8.  Where "'a lawsuit consists of related claims, and the plaintiff has won substantial relief, a trial court has discretion to award all or substantially all of the plaintiff's fees even if the court did not adopt each contention raised.'"  <u>Olson</u>, 44 Cal. Rptr. 3d at 7 (quoting <u>Downey Cares v. Downey Comm'y Development Com.</u>, 242 Cal. Rptr. 272, 280 (Cal. Ct. App. 1987)); <u>see also</u> <u>Sokolow</u>, 261 Cal.

7

Rptr. at 531 ("Where plaintiffs are entirely successful on all their claims for relief, it is not important that some of the legal theories used to support those claims were not found meritorious, so long as the plaintiffs did prevail.").  The California Court of Appeal has recognized that

> [c]ompensation should not be strictly limited to efforts that were demonstrably productive.  "Lawyers for plaintiffs . . . must evaluate, accept and prosecute suits on the basis of the entire spectrum of theories that show early promise of vindicating their clients' rights. Every lawyer, indeed every judge, has pursued blind alleys that initially seemed reasonable or even professionally obligatory.  To reward only the pursuit of a successful theory in cases such as this undercompensates the inevitable exploratory phases of litigation, and may also invite overly conservative tactics or even prohibit some high-risk but deserving actions entirely."

Thayer v. Wells Fargo Bank, N.A., 112 Cal. Rptr. 2d 284, 289 (Cal. Ct. App. 2001) (applying section 1021.5) (quoting Seigal v. Merrick, 619 F.2d 160, 164-65 (2d Cir. 1980)); see also Olsen, 44 Cal. Rptr. 3d at 7 (acknowledging "that litigants should be accorded breathing room to raise alternative legal grounds without fear that merely raising an alternative theory will threaten the subsequent request for attorney compensation"); Sokolow, 261 Cal. Rptr. at 531 ("Attorneys generally must pursue all available legal avenues and theories in pursuit of their clients' objectives; it is impossible, as a practical matter, for an attorney to know in advance whether or not his or her work on a potentially meritorious legal theory will ultimately prevail.").

8

For example, in Sundance, the plaintiffs' class-action lawsuit against the city of Los Angeles successfully "resulted in a court order significantly changing the procedures for the incarceration and treatment of public inebriates" arrested under California's public intoxication statute.  237 Cal. Rptr. at 271.  The trial court awarded the plaintiffs attorneys' fees under section 1021.5, but in doing so excluded 458 hours of time spent unsuccessfully arguing that the statute was invalid as a waste of taxpayer money, and a violation of equal protection.  Id. at 272.  The California Court of Appeal reversed the exclusion of the 458 hours, noting that under section 1021.5, hours spent by a successful party on unsuccessful legal theories are not unreasonable per se.  Id.  "To reduce the attorneys' fees of a successful party because he did not prevail on all his arguments, makes it the attorney, and not the defendant, who pays the cost of enforcing that public right." Id.  The court remanded so the trial court could exercise its discretion and determine whether the hours were reasonably spent.  Id. at 273.

Here, as explained in the Court's November 8, 2006 opinion, Plaintiffs were successful parties under section 1021.5 by catalyzing the relief sought in their suit: free inspection, free replacement of malfunctioning ABSs, reimbursement for previous repairs, warranty extension, and notification of owners of affected vehicles.  See, e.g., Chin v. Chrysler, No. 95-5569, slip op. at 14-15, 43-44 (D.N.J.

9

Nov. 8, 2006).  Chrysler estimated that the Bendix 9 and 10 recalls combined

would affect approximately 403,000 vehicles, and would cost Chrysler

approximately $30 million.  (See Affidavit of D. Brian Hufford, dated Feb. 28,

2001 ("Hufford Aff."), Exs. 16, 20, 45.)  Plaintiffs estimate that the inspections and

repairs alone cost Chrysler upwards of $54 million.  (See Supp. Reply Decl. of D.

Brian Hufford ("Hufford Reply. Decl."), ¶ 8.)  This is substantial relief.  There is

no evidence that Plaintiffs' attorneys' failed attempt to add language to the Bendix

10 recall notice in order to protect their clients' rights was a major litigation

objective in and of itself; instead, it was an attempt to improve a positive result

already obtained.[3]  Therefore, the Court concludes that this failure does not

constitute limited success with regard to the objectives of Plaintiffs' lawsuit, which

would justify a reduction of fees.  Instead, it was time reasonably spent in pursuit

---

[3] In a hearing held before the Court on August 30, 1996 addressing
Plaintiffs' motion to amend the language of Chrysler's Bendix 10 recall notice,
Plaintiffs' counsel Allyn Z. Lite, Esq., of Lite DePalma, explained to the Court:
> And I want the Court to be very clear on that, that we want this recall
> to go ahead because we have asked for the recall.  Having said all of
> that, we have concerns . . . .  We have a concern that if this notice goes
> out to class members . . . the way that it is, that there will be
> individuals who will not take advantage of it because they think in
> some way that this may wipe out or dispose of or release them from
> any rights and claims that they have in our litigation.
(Hufford Supp. Decl, Ex. C, p. 7, ll. 8-11, p. 8, ll. 1-6.)

10

of an achieved litigation objective: notice to their clients informing them of the terms of the Bendix 10 recall.

**(b)** **Plaintiffs' Post-Recall Announcement Merits Work**

Chrysler argues that the 1,548.47 hours Plaintiffs spent litigating the merits of the case after the Bendix 9 recall announcement should be excluded from the lodestar award.  (See Trunko Decl. ¶ 11 & Ex. E-2.)  After Chrysler's April 17, 1997 announcement of the Bendix 9 recall, the litigation continued.  Both parties continued to seek discovery from one another, the action was consolidated with another action against Chrysler on June 6, 1997, Plaintiffs filed a third amended complaint on April 16, 1998, and Plaintiffs continued to pursue their July 26, 1996 motion for class certification.  On September 11, 1998, the Court denied Plaintiffs' motion under Rule 23(b)(3), effectively ending the merits phase of the action.  See Chin v. Chrysler Corp., 182 F.R.D. 448, 451, 465 (D.N.J. Sept. 11, 1998). Chrysler contends that these efforts provided no benefit to Plaintiffs since they were unsuccessful and came *after* Plaintiffs had already secured their major litigation objectives with the announcement of the two Bendix recall campaigns.

Plaintiffs first counterargument asserts that the California Supreme Court's decision in Graham v. DaimlerChrysler Corp., 34 Cal. 4th 553 (2004) (Graham I), dictates that post-recall announcement merits work is compensable under

11

California law.  It does appear that the <u>Graham</u> trial court granted fees for post-recall announcement merits work, and that this grant was affirmed by the California Court of Appeal, and left undisturbed by the California Supreme Court. As explained in <u>Graham I</u>, the plaintiffs filed their class action on August 23, 1999, and Chrysler thereafter offered the relief the plaintiffs sought on September 10, 1999.  <u>Id.</u> at 563.  On September 27, 1999, Chrysler filed a demurrer.  <u>Id.</u>; <u>Graham v. DaimlerChrysler Corp.</u>, No. B189259 x-ref. B152928, 2007 Cal. App. Unpub. LEXIS 906, at *14 (Cal. Ct. App. Feb. 5, 2007) (<u>Graham III</u>).  On November 1, 1999, the plaintiffs amended their complaint to reflect Chrysler's offer of relief. On January 27, 2000, the trial court granted Chrysler's demurrer and dismissed the complaint, ruling that Chrysler's agreement to "offer[] all purchasers the relief plaintiffs sought" mooted the case.  <u>Graham I</u>, 34 Cal. 4th at 563; <u>Graham III</u>, 2007 Cal. App. Unpub. LEXIS 906, at *14.  The <u>Graham</u> plaintiffs' November 1, 1999 amendment of the complaint, of course, came *after* Chrysler's offer of relief. Thus, like the post-recall announcement merits work at issue here, the attorneys' work on the merits came after the announcement of relief, but before the trial court's termination of the case.[4]

---

[4] Nevertheless, Chrysler contends that "there was no post-relief merits work performed in <u>Graham</u>," because the plaintiffs allegedly "did not continue to prosecute the merits of their case after [Chrysler] voluntarily provided relief," and instead, "instantly acknowledged that [Chrysler's] offer mooted their claims."

The <u>Graham</u> trial court granted a lodestar of $329,620 for all work ($34,779 for merits litigation; $294,841 for fee litigation) performed from the filing of the complaint to October 18, 2000.  This encompasses the September 10, 1999 to November 1, 1999 time period in which the amended complaint must have been worked on and was filed.  See <u>Graham I</u>, 34 Cal 4th at 564; <u>Graham v. DaimlerChrysler Corp.</u>, No. BC215624, slip op. at 14-15 (Cal. Sup. Ct. Dec. 23, 2005) (<u>Graham II</u>).  Neither the California Supreme Court on appeal, nor the trial court on remand, made any mention that the lodestar was discounted for the work plaintiffs' attorneys performed in order to amend the complaint.  The entire fee award was affirmed by the California Court of Appeal, <u>see Graham I</u>, 34 Cal 4th at 565, and the lodestar amount was left untouched by the California Supreme Court, which reversed on the issue of the proper multiplier to apply to the portion of the lodestar attributable to fee litigation, <u>see id.</u> at 578-84.

Nevertheless, the Court does not agree with Plaintiffs that <u>Graham</u> dictates that "[u]nder California law . . . there is no difference between the pre-campaign

---

(Def.'s Br. 9.)  However, the Court cannot help but notice that amending a complaint, and opposing a demurrer (the California equivalent of a federal motion to dismiss for failure to state a claim upon which relief can be granted) are curious ways to discontinue prosecuting the merits of one's case, and an even more confounding method of "instantly" acknowledging that one's claims are moot. Chrysler's arguments contradict the <u>Graham</u> record as recounted in <u>Graham I</u>, and <u>Graham III</u>.

13

and post-campaign periods for purposes of a fee award or a fee multiplier." (Pls.' Mem. of Law in Supp't of Their Pet. for Award of Attys' Fees ("Pls.' Br."), 17.) As far as can be told from the Graham opinions, the issue of whether post-recall announcement merits litigation work is compensable was never raised by the parties, and thus, was not squarely presented to any of the California courts hearing Graham. In the absence of a state supreme court ruling on the issue, the Court must predict how the California Supreme Court would rule, while considering the decisions of lower state courts and district court cases interpreting California law. See, e.g., State Farm Mut. Auto. Ins. Co. v. Coviello, 233 F.3d 710, 713 (3d Cir. 2000).

Chrysler seeks to draw a parallel between this case and Meister v. The Regents of the University of California, 78 Cal. Rptr. 2d 913 (Cal. Ct. App. 1998). In that case, the California Court of Appeal found that a trial court did not abuse its discretion when it subtracted hours from a lodestar attributable to the plaintiff's attorneys' merits work performed subsequent to rejecting a settlement offer that would have provided greater relief than that later obtained from the court. Id. at 921, 925. The court reasoned that "[i]n a case where a rejected settlement offer exceeds the ultimate recovery, the plaintiff–although technically the prevailing party–has not received any monetary benefits from the postoffer services of his

14

attorney," and thus, the postoffer hours were not "reasonably spent" because they "produce[d] no tangible benefit for the client."  Id. at 923 (internal quotations and citations omitted).  Chrysler argues that the same logic applies here since Plaintiffs' counsel procured no additional benefits for their clients with their worked performed from the April 17, 1997 Bendix 9 recall announcement to the September 11, 1998 denial of class certification.

Plaintiffs respond that their post-recall announcement merits work did provide a benefit: it allegedly "helped induce Chrysler to follow through on the recalls."  (Pls.' Br. 18.)  Without its suit's continued existence acting as a "watchdog," Plaintiffs claim, Chrysler could have ceased or delayed its voluntarily initiated recall programs.  Chrysler replies that its Bendix recalls were not voluntary because NHTSA had the power to enforce the recalls, and thus, NHTSA was the true "watchdog."

The Court agrees with Plaintiffs.  Meister is inapposite because had the plaintiff there accepted the settlement offer, the terms of the agreement would have been judicially enforceable pursuant to California Code of Civil Procedure § 664.6. See Assemi v. Assemi, 872 P.2d 1190, 1194-95 (Cal. 1994).  As a result, the plaintiff would have been assured of receiving its promised relief, with the trial court acting as the "watchdog."  Because the plaintiffs' attorneys turned down this

relief, the only tangible benefit the attorneys' post-offer efforts could possibly have provided would have been greater relief.  Since the attorneys failed to accomplish this, the attorneys' time was unreasonably spent.

In contrast here, the Bendix 9 and 10 recall announcements *were not settlement offers*; they were merely announcements.  Plaintiffs could not "accept" these announcements in order to form a binding agreement, and thus, this Court could not force Chrysler to follow through with its announced recalls.  Therefore, it is inaccurate to call the work Plaintiffs' attorneys performed after the April 17, 1997 Bendix 9 recall announcement, "post-*relief*" work, as Chrysler does.  On April 17, 1997, despite Chrysler's announcement, Plaintiffs received no relief, and were guaranteed no relief.  It is entirely reasonable, therefore, that Plaintiffs' attorneys continued to prosecute the merits of the case, and sought class certification in hopes of either convincing Chrysler to settle, procuring a Court order enforcing the terms of the Bendix recall campaigns, or simply ensuring that Chrysler followed through with its promised recalls.  The tangible benefit Plaintiffs received is that the post-April 17, 1997 work helped ensure that they actually received relief, in addition to the mere promise of relief in the future.[5]

---

[5] Indeed, in attempting to distinguish Hanlon v. Chrysler Corp. (discussed further below), Chrysler itself acknowledges that "[b]ecause there was no settlement in this case, Plaintiffs had nothing to enforce."  (Def.'s Br. 13.)  Precisely because there was no enforceable settlement, Plaintiffs attorneys'

Chrysler contends that NHTSA was the true "watchdog" ensuring the execution of the Bendix recall actions, not Plaintiffs.  Chrysler correctly points out that despite voluntarily initiating the Bendix recalls, once it reported the existence of a safety-related defect to NHTSA, it was no longer "voluntary" for Chrysler to carry out the recalls.  Under the Motor Vehicle Safety Act ("Safety Act"), 49 U.S.C. §§ 30118(a) and (b)(1), NHTSA may determine, pursuant to its own investigation, that a motor vehicle contains a safety-related defect.  Once that decision is made, NHTSA must notify the manufacturer, and must order it to notify owners of the subject vehicles, and to remedy the defect.  Id. § 30118(b)(2).  Alternatively, if a manufacturer identifies a safety defect on its own, as Chrysler did here, it must notify NHTSA and owners, purchasers and dealers of the defect.  Id. § 30118(c).  Regardless of whether the safety-related defect is identified by NHTSA or by the manufacturer, the manufacturer is *required* to remedy the defect free of charge by either repairing it, replacing it, or by refunding the purchase price.  Id. § 30120(a)(1).  The Safety Act requires the manufacturer to file a copy of its program for remedying the defect with NHTSA, id. § 30120(d), and the Safety Act gives NHTSA the authority to "order the manufacturer to take specified action" to remedy the safety-related defect, id. § 30120(e).

_____

continued prosecution of the case on the merits after the recall announcements was valuable in ensuring that Plaintiffs received relief.

To this extent, NHTSA did indeed act as a watchdog over Chrysler's execution of its Bendix recalls.  However, Plaintiffs' attorneys' continued prosecution of the merits of the case after the Bendix 9 announcement provided their clients two tangible benefits over and above the recall oversight provided by NHTSA.

First, counsels' efforts served to ensure that Chrysler followed through on two aspects of its Bendix 9 and 10 repair campaigns that NHTSA had no authority to enforce: its promise to reimburse owners for previous repairs of the Bendix ABSs, and its promise to extend the warranty on Bendix ABS components.  See Chin, No. 95-5569, slip op. at 15, 28, 33,  (D.N.J. Nov. 8, 2006).   NHTSA can only require a manufacturer to repair or replace a defective vehicle, or to refund the defective vehicle's purchase price.  49 U.S.C. § 30120(a)(1)(A).  Indeed, this fact was key in the Court's decision finding that Plaintiffs' suit was a catalyst for the relief provided by Chrysler despite Chrysler's obvious desire to also end NHTSA's investigations into the Bendix 9 and 10.  Chin, No. 95-5569, slip op. at 27-30, 38 (D.N.J. Nov. 8, 2006).

Second, as to the aspects of the Bendix repair campaigns that NHTSA could enforce, a settlement or Court order mandating such relief would be far more valuable to Plaintiffs than Chrysler's NHTSA-supervised promise to deliver such

18

relief.  Chrysler has so argued.  In <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1018 (9th Cir. 1998), Chrysler voluntarily initiated a service action to replace rear liftgate latches on a number of its minivans, ending a NHTSA preliminary investigation into the safety of the latches.  Nevertheless, several months later Chrysler negotiated a settlement with the plaintiffs of a class action suit filed against Chrysler over the latches, effectively agreeing to provide the same relief that Chrysler had already informed NHTSA that it would voluntarily carry out.  <u>Id.</u> at 1018, 1027 ("The settlement presented to the district court obligates Chrysler to make the minivans safe."); <u>see also</u> Joint Decl. of Hufford and Lite ("Joint Decl."), Ex. M, at 7 (Chrysler's reply memorandum in support of the <u>Hanlon</u> settlement, stating that "[t]he class benefits under the [Settlement] Agreement include: Chrysler enters into a binding contract to perform its previously-announced Service Action"].  The <u>Hanlon</u> parties submitted the settlement agreement to the District Court for approval.  <u>Id.</u> at 1018.  In arguing that the settlement was fundamentally fair, adequate, and reasonable under Fed. R. Civ. P. 23(e) against various objectors, Chrysler explained why the plaintiff class would benefit from the settlement despite the fact that its NHTSA-supervised recall action had already started:

> ***In short, under the [Settlement] Agreement, Class Plaintiffs and Chrysler entered into an enforceable contract to replace the***

> *liftgate latch on every 1984-95 Minivan.  Further, and upon approval of the Agreement, this contractual commitment is transformed, as contemplated, into an enforceable, final judgment of this Court. . . . Moreover, through the Agreement, Chrysler committed to all of the above. Yet prior to signing this contract, Chrysler's Service Action was a voluntary effort.*
>
> Therefore, while the Service Action alone constituted a sincere pronouncement by Chrysler, there was no legally-enforceable agreement, order of NHTSA, or judgment.  However, this will certainly not be the case if this Court approves the Agreement and enters its judgment.  . . . As a result, through the Agreement, all class members can receive a legally-enforceable contractual commitment that Chrysler will provide NHTSA-approved replacement latches free of charge.  This precludes any delay of the Service Action  [resulting from disputes between Chrysler and NHTSA] and precludes Chrysler from litigating the issue of the design of the replacement latch.

(Joint Decl., Ex. M, p. 13-14) (emphasis in original).

Chrysler's argument lucidly demonstrates the advantage of having a settlement agreement or Court order enforcing relief, over mere-NHTSA supervised, voluntarily provided relief.  The District Court approved the <u>Hanlon</u> settlement, and the Ninth Circuit affirmed, observing that the settlement permitted Plaintiffs to return to court if Chrysler failed to meet its service action obligations. <u>See Hanlon</u>, 150 F.3d at 1027.  Chrysler's protest that <u>Hanlon</u> is inapposite because it agreed to pay attorneys' fees in that case is beside the point.  Chrysler's argument in <u>Hanlon</u> reinforces the Court's conclusion that Plaintiffs' attorneys' hours spent litigating the merits after the Bendix 10 and 9 recall announcements were reasonably spent because the announcements provided Plaintiffs no assurance

20

that they would receive their relief in a timely manner, or at all.  In the event Chrysler did renege on its promised recall campaigns, any rational litigant would prefer to be able to move before the Court to enforce a settlement or court order, as opposed to hoping NHTSA would take enforcement action under 49 U.S.C. § 30120(e).

Plaintiffs' efforts may not have led to a settlement, court-ordered relief, or class certification, but Plaintiffs did achieve their ultimate litigation objective: the actual receipt of relief.  Chrysler's quarterly reports to NHTSA reflect that as of September 30, 1998, just over two weeks after the denial of class certification, Chrysler had notified the owners of 375,199 defective vehicles nationwide, and that the owners of 234,858 of those vehicles took advantage of the free inspection, and 72,133 of those vehicles had their defective ABS repaired at no charge.  Supp. Reply Decl. of D. Brian Hufford ("Hufford Supp. Reply Decl."), at para 2, & Exs. A, B.  As mentioned above, California courts have explained that "[w]here plaintiffs are entirely successful on all their claims for relief, it is not important that some of the legal theories used to support those claims were not found meritorious, so long as the plaintiffs did prevail."  Sokolow, 261 Cal. Rptr. at 531.  The Court finds that in continuing to prosecute the merits of the action after the announcement of the Bendix recall campaigns, Plaintiffs' attorneys provided a

tangible benefit to their clients and thus, the hours spent were reasonable and will be included in the lodestar figure.

**(c)   Plaintiffs' Pursuit of Fees Under Federal Law**

In California, hours spent on post-merits fee litigation are includable in a lodestar figure, because otherwise "'the [private attorney general] doctrine will often be frustrated, sometimes nullified, if awards are diluted or dissipated by lengthy, uncompensated proceedings to fix or defend a rightful fee claim.'" Graham I, 34 Cal. 4th at 580 (alteration in original) (quoting Serrano IV, 652 P.2d at 992).  While Chrysler does not contest the hours Plaintiffs spent seeking fees under California law, it does claim that the 1,489.38 hours Plaintiffs spent over the course of almost two-years unsuccessfully seeking fees under federal law should be excluded because they were allegedly "unnecessary and benefited no one." (Def.'s Br. 18; Trunko Decl. ¶ 11 & Ex. E-3.)

On January 29, 1999, Plaintiffs moved for attorneys' fees under the fee-shifting provisions of the Magnuson-Moss Act, 15 U.S.C. § 2310(d)(2).  On December 14, 1999, the Court held that Plaintiffs could utilize the catalyst theory under the Act's fee-shifting provision.  Chin v. Chrysler, No. 95-5569, slip op. at 17, 20 (D.N.J. Dec. 14, 1999).  Soon after completion of discovery on the issue, the United States Supreme Court ruled that the catalyst theory was not applicable to a

22

similar federal fee-shifting provision, see Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health and Human Res., 532 U.S. 598, 610 (2001), and as a result, this Court granted Chrysler's motion to reconsider its December 14, 1999 decision, Chin v. DaimlerChrysler Corp., No. 95-5569, slip op. at 8 (D.N.J. Aug 14, 2003). In opposing Chrysler's motion to reconsider, Plaintiffs filed a cross-motion seeking attorneys' fees under section 1021.5 utilizing the catalyst theory. That cross-motion, of course, was ultimately successful.

The Court finds that the hours Plaintiffs spent pursuing fees under federal law were reasonably spent and are includable in the lodestar. The Court reiterates that it need not reduce lodestar hours spent advancing unsuccessful legal *theories* in pursuit of successfully achieved litigation *objectives*. See, e.g., Olson, 44 Cal. Rptr. 3d at 7-8; Sokolow, 261 Cal Rptr. at 530-31; Sundance, 237 Cal. Rptr. at 272-73. On November 8, 2006, Plaintiffs achieved their objective of being found entitled to attorneys' fees. Thus, the hours spent in pursuit of this goal on an unsuccessful federal law theory were reasonably spent, just the same as the hours spent on the successful California law theory were reasonably spent. As aptly stated in Sokolow, 261 Cal. Rptr. at 531, "[a]ttorneys generally must pursue all available legal avenues and theories in pursuit of their clients' objectives; it is

23

impossible, as a practical matter, for an attorney to know in advance whether or not his or her work on a potentially meritorious legal theory will ultimately prevail."

When Plaintiffs first asserted their entitlement to fees under the Magnuson-Moss Act on January 29, 1999, the catalyst theory was still viable under federal law.  Indeed, nine United States Courts of Appeals had endorsed the theory pre-Buckhannon.  See Buckhannon, 532 U.S. at 602 n.3.  It was not unreasonable for Plaintiffs to spend time pursuing that theory.  It was not until May 29, 2001, just months after Plaintiffs completed discovery on the issue of whether it was a catalyst, that Buckhannon was decided, effectively foreclosing the federal avenue of relief.  Moreover, to the extent that the hours Plaintiffs spent on discovery relating to the catalyst issue under federal law were utilized in their successful pursuit of fees under California law, they were reasonable.

### (2)   Allegedly Inefficient or Duplicative Hours

Chrysler claims that Plaintiffs' billing documentation reveals many inefficient, duplicative, or inadequately documented hours that should be excluded from the lodestar.

### (a)   Alleged Excessive Conferencing

First, Chrysler contends that Plaintiffs' attorneys billed an unreasonable number of hours for intra- and inter-firm conferencing.  Such frequent

conferencing, Chrysler argues, is indicative of excessive staffing and duplication of effort.  Chrysler has submitted the declaration of John L. Trunko, an expert legal auditor, who examined Plaintiffs' billing records.  Trunko concludes that $645,657.77 of Plaintiffs' $3,225,431.00 lodestar, that is, about 20 percent, was billed for intra- and inter-firm conferencing, an amount he characterizes as "significant."  (Trunko Decl. ¶ 18, & Ex. J.)  Chrysler asserts that under Thayer, 112 Cal. Rptr. 2d at 300, this amount is excessive and should be reduced.

Thayer does not require this result.  Unlike here, that case involved five coordinated consumer fraud class actions brought against a bank.  Id. at 285.  On appeal, the California Court of Appeal evaluated the fee award to counsel for the successful plaintiffs in the fifth of those class actions to be filed.  Id.  The court observed that the second through fifth class actions filed were duplicative of the first, and thus added nothing of value to the plaintiffs' case, while "substantially increas[ing] the Bank's exposure to large attorney fee awards."  Id. at 299-300.  To illustrate this point, the court noted that 20 percent of the total hours billed in all five class actions "was spent in correspondence and phone calls between and among the nine law firms representing the various plaintiffs."  Id. at 300.  Chrysler misleadingly compares this to the situation here.  The Thayer court's analysis demonstrated the duplicative nature of the *multiple actions*, but did not involve

25

communications between members of the same firm working on one action, or between different firms working on one action – the situations present here.  Thus, the comparison Chrysler makes involves apples and oranges.  Surely, if the time billed for inter-firm and intra-firm communication in the context of one of the five class actions at issue in Thayer were factored into the Thayer court's example, the resulting percentage of billed time would have far exceeded 20 percent.  In any event, the Thayer court did not reduce the lodestar at issue there based on this example alone; its analysis was far more concerned with the counsel's practice of unnecessarily sending two attorneys to conferences in which their views had been already stated by attorneys in the other class actions.  Id. at 301-03.

Chrysler does not explain why it contends that any particular conferences were duplicative, unnecessary, overly frequent, or excessively attended.  Instead, it points to Trunko's affidavit, which suggests reducing the lodestar by $166,435.16, i.e., 25 percent of the total fees billed for all conferencing between Plaintiffs' attorneys.  Trunko arrives at this number by arbitrarily subtracting all hours billed by conference participants  "other than the participant in the conference with the highest total fees billed for the conference."  (Trunko Decl., ¶ 18.)  A conference with only one participant is no longer a conference.  The upshot of accepting Chrysler's view would be to hold that all conferencing by Plaintiffs' attorneys was

excessive and duplicative.  The Court will not so hold.  There is nothing inherently excessive or duplicative in intra- or inter-firm attorney conferencing. Communication among counsel is of course vital to mounting a successful case, whether representing a plaintiff or defendant.  This is even more true in a complex case such as this, which has spanned 11 years and involved over 100 plaintiffs. The Court sees no evidence that Plaintiffs' conferencing was unnecessary, fabricated, duplicative, or excessive, and thus will not subtract hours from the lodestar for such activities.

### (b)    Alleged Multiple Attendance of Attorneys

Chrysler requests a $66,706.53 reduction in the lodestar for Plaintiffs' attorneys' alleged excessive attendance at hearings, depositions, and conferences. In particular, Trunko points to four status conferences, a conference call, and a hearing, where either four or five of Plaintiffs' attorneys attended, and claims that this number is excessive.  (Trunko Decl. ¶ 19.)  Chrysler again relies on Thayer in arguing that California courts reduce the lodestar in such situations.  However, the Thayer court did not rely upon simple numerical attendance in determining those efforts were duplicative.  The court rightly considered whether the *substance* of what additional attorneys contributed to the work of others was duplicative.  The court observed that the two attorneys at issue "were largely content to follow the

crowd" during conferences and hearings they attended, and often did nothing but concur in presentations made largely by the attorneys leading the other four class actions.  112 Cal. Rptr. 2d at 301-03.  For this reason, the work was duplicative, and the lodestar was reduced by the Thayer court.  Id. at 302-03.

In contrast, Chrysler here offers nothing more than the simple fact that multiple attorneys attended certain events for Plaintiffs during the course of this case.  While the Court does believe that four or five is a rather high number of attorneys to be representing one side at a conference or hearing, there is nothing inherently duplicative about this, especially in complex class-action litigation.  See, e.g., Probe v. State Teachers' Ret. Sys., 780 F.2d 776, 785 (9th Cir. 1986) ("In an important class action litigation such as this, the participation of more than one attorney does not constitute an unnecessary duplication of effort."); United States v. Pa. Blue Shield, 54 F. Supp. 2d 410, 415 (M.D. Pa. 1999) ("[T]he complicated nature of the case makes employment of multiple attorneys proper for such a task. . . . We disagree with defendant's general proposition that it is inherently unreasonable to have more than one attorney involved in such matters as meetings and telephone conferences.").  Multiple attorneys representing Chrysler also attended certain events during this case.  (See Hufford Reply Decl. ¶¶ 9-16.)  It may very well be, as Chrysler claims, that it was excessive and duplicative for

Plaintiffs to have four or five attorneys present for certain hearings and conferences. But without any kind of substantive allegation as to why, the Court cannot determine whether this was the case.

### (c)    Alleged Duplicative Research, Document Review and Drafting

Chrysler argues that Plaintiffs' attorneys should not be compensated for 132.08 hours allegedly billed for researching the same topic, reviewing the same document or drafting the same pleading. While the Court would be troubled by multiple hours billed for researching the same topic, or drafting the same pleading, no such hours appear in the billing entries Chrysler has highlighted. (See Trunko Decl., Ex. M.) Instead, the entries only show that on many occasions more than one of Plaintiffs' attorneys read or reviewed the same document, letter, brief, pleading, or other correspondence. The Court does not find these hours unreasonable. While two attorneys drafting the same document, or performing the same research may be wasteful, it is reasonable for multiple attorneys to review the same document so that different opinions may be heard on how to respond, or determine what course of action to take next, in order to best represent the client.

### (d)    Alleged Vague Billing Entries

Chrysler contends that 659.31 hours should be deducted from the lodestar for billing entries allegedly so vague that it is impossible to determine the nature

29

and scope of the activity billed.  (See Trunko Decl. ¶ 16, & Ex. H.)  The Court has

reviewed the entries Trunko has identified and does not find them to be

unreasonably vague.  Plaintiffs' submissions comply with the requirements of

D.N.J. Civ. R. 54.2.  It is not uncommon for attorneys to use abbreviations in their

billing descriptions, such as "tro," "m/d," and "T/C" (which Trunko identifies as

vague) that have understood meanings such as temporary restraining order, motion

to dismiss, and telephone call.  The Court rejects Chrysler's proposed subtraction

from the lodestar for allegedly vague billing entries.

### (e) Alleged "Transient Billers" and Time Spent "Getting Up to Speed"

Chrysler makes two other objections to Plaintiffs' lodestar.  First, it objects

to hours billed by what Trunko calls "transient billers," that is, "time keepers who

bill a small amount of time and then disappear from the case." (Trunko Decl. ¶ 20,

& ex. L.)  Chrysler claims such hours should be subtracted because "[u]der

generally accepted principles, law firms are expected to absorb the additional

expense created when there are disruptions in the staffing on the cases they are

handling."  (Id.)  However, Chrysler points to no evidence of any "disruptions"

that created "additional expense" as a result of Plaintiffs using certain attorneys on

the case for only a small amount of time.  Furthermore, the Court finds it difficult

to understand Chrysler's objection to so-called "transient billers," given its

30

objection (to be addressed below) that too high a percentage of hours were billed by partners, which Chrysler and Trunko allege "almost certainly indicates the use of partners to perform tasks that could have been performed by lower level personnel billing at a lower hourly rate." (Trunko Decl. ¶ 13; Def.'s Br. 19-20.) The vast majority of the "transient billers" to which Chrysler objects are associates, law clerks, and of counsel (i.e., "lower level personnel") performing discrete tasks and billing at lower rates than partners. (Compare Trunko Decl., Ex. L, with Lite Aff. Ex. A, and Hufford Decl. Ex. A.) Chrysler cannot fault Plaintiffs for failing to delegate enough, and for delegating too much.

Second, Chrysler objects to hours allegedly billed by attorneys who are familiarizing themselves with the litigation. Such hours spent "getting-up-to-speed" are duplicative, Chrysler claims. The Court rejects this objection as well. Not one billing entry highlighted by Chrysler reflects that it was wastefully spent by an attorney "getting-up-to-speed" on the <u>Chin</u> litigation. (<u>See</u> Trunko Decl. Ex. L.)

### (f)      Inclusion of Administrative and Clerical Hours

Chrysler objects to 124.58 hours billed for what it describes as administrative and clerical activities. Chrysler argues that because such activities do not require legal acumen, they should be considered overhead costs that are

31

already reflected in the attorneys' hourly rates.  The Court might agree had these activities been performed by unnamed staff working for Plaintiffs' firms; however, all administrative activities described in Plaintiffs' billing records reflect the work of either attorneys or paralegals performing, perhaps routine, but necessary tasks that are a part of any legal representation.  A de minimis number of these hours were performed by senior attorneys.  The Court finds that these hours were reasonably spent.

### (3)      Conclusion as to Reasonable Hours Spent

The Court has found no grounds for subtracting hours from Plaintiffs' proposed lodestar.  Thus, the Court concludes that Plaintiffs' counsel reasonably spent 6,352.40 hours on the litigation, and that number will be used as the basis for the lodestar.  See Ketchum, 17 P.3d at 742.

### b.      Hourly Prevailing Rate

The Court must now determine the "hourly prevailing rate for private attorneys in the community conducting *noncontingent* litigation of the same type" as performed by Plaintiffs' attorneys.  See Ketchum, 17 P.3d at 742.  "A reasonable hourly rate reflects the skill and experience of the lawyer, including any relevant areas of particular expertise and the nature of the work performed." Crommie v. California, 840 F. Supp. 719, 725 (N.D. Ca. 1994) (applying section

1021.5) (citing <u>Serrano III</u>, 20 Cal. 3d at 48-49).  "The court may consider the applicants' customary billing rates and the prevailing rate charged by attorneys of similar skill and experience for comparable legal services in the community."  <u>Id.</u> (citing <u>Mandel v. Lackner</u>, 92 Cal. App. 3d 747, 761-62 (Cal. Ct. App. 1979)); <u>see also</u> <u>Serrano IV</u>, 652 P.2d at 1000 ("Services compensable under section 1021.5 are computed from their reasonable market value.  The trial court was entitled to use the prevailing billing rates of comparable private attorneys as the 'touchstone' for determination of that value.").

The following chart shows the range of rates charged by Plaintiffs' four firms, the average rate charged by each firm, and the overall average rate charged by all four firms.[6]

---

[6] The hourly rate ranges charged come from the Plaintiffs' billing documentation.  (<u>See</u> Hufford Decl. Ex. A; Lite Aff. Ex. A; Bashian Aff., Ex. 1, 3; (Linker Aff. ¶ 14.) These are the billing rates currently used at these firms, except for the rates used for attorneys, law clerks or paralegals who are no longer employed by Lite DePalma or Pomerantz.  For those employees, the hourly rate in use at the time of their departure is the rate utilized.  (<u>See</u> Lite Aff. ¶ 5; Hufford Decl. ¶ 6).  The firms' average hourly rates were attained by dividing each firm's individual lodestar request by the number of hours billed by that firm.  The overall average hourly rate was attained by dividing the total lodestar request by the total number of hours billed by all four firms.

**Plaintiffs' Attorneys' Hourly Rate Ranges**

Pomerantz
- Partners                                  $495.00 to $725.00
- Of Counsel                           $430.00
- Associates                          $290.00 to $425.00
- Paralegals                          $150.00 to $210.00
- Legal Assistant                     $90.00

Lite DePalma
- Partners                                  $330.00 to $525.00
- Of Counsel                           $330.00 to $350.00
- Associates                          $150.00 to $375.00
- Paralegals                          $125.00 to $200.00
- Law Clerks                         $125.00 to $150.00

Bashian
- Partner                                   $450.00
- Of Counsel                           $425.00

Gruhin
- Partner                                   $375.00

**Average Hourly Rates**

| | | | |
|---|---|---|---|
| Pomerantz: | $541.17 | Lite DePalma: | $455.87 |
| Bashian: | $438.68 | Gruhin: | $375.00 |

**Overall Average Hourly Rate:**       **$507.74**

      Plaintiffs claim these rates are appropriate because they are on par with those charged in the Newark, New Jersey, and New York City legal markets for similar services. Plaintiffs first point to a December 2006 *National Law Journal* survey of the hourly billing rates for the nation's 250 biggest law firms. (See Hufford Supp. Reply Aff.., Ex. J.) Plaintiffs' attorneys' rates are clearly comparable to those

charged by the eight New York area firms, and the four northern New Jersey firms participating in the survey.  Of note is that according to the survey, the rates of Chrysler's national counsel in this case, St. Louis-based Bryan Cave, are comparable to those of the New York-based Pomerantz firm.  As reported in the survey, Bryan Cave bills $315.00 to $665.00 an hour for the services of its partners, and $150.00 to $460.00 an hour for associates.   (Id.)  Moreover, Newark-based Lite DePalma's rates are comparable to those of Chrysler's local counsel, Graham Curtin, P.A. of Morristown, New Jersey.  Thomas Curtin, a partner of Graham Curtin, declared to the Court that his current non-discounted hourly billing rate is $500.00.  (Decl. Of Thomas R. Curtin, at ¶ 4.)  Finally, Plaintiffs' have put forward evidence showing that other district courts have approved such hourly rates in similar fee requests.  (See Hufford Decl. ¶¶ 8-9; Lite Aff. ¶ 6.)

Chrysler calls the hourly rates sought by Plaintiffs' attorneys "astronomical."  To support this allegation, Chrysler first claims that it paid only $235.00, and later $375.00, an hour for Mr. Curtin's services during the course of this litigation.  However, these numbers do not provide an accurate indicator of the prevailing hourly rate in the community since, as Mr. Curtin concedes, the $235.00 and $375.00 rates are reduced from his normal $500.00 hourly rate, based on Graham Curtin's negotiations with Chrysler and "on the fact that [Graham Curtin]

35

was representing DaimlerChrysler in a number of cases."  (Curtin Decl. ¶ 3.)

Additionally, Chrysler cites the report of its auditor, who claims that based on his

experience, Plaintiffs' rates are "excessive."  (Trunko Decl. ¶ 14.)  This conclusory

statement is insufficient to overcome Plaintiffs' evidence.

The Court also rejects Chrysler's claim that too high a percentage of

Plaintiffs' attorneys' time was billed by partners rather than associates or other

personnel.  It is true that partners working for Plaintiffs billed over 80 percent of

the hours and 89 percent of the fees requested, but Chrysler does not point to any

facts showing what a reasonable percentage of partners' hours or fees in a case of

this nature would be.  Nor does it point to any particular work that was performed

by a partner that should have been performed by an associate.  In the absence of

such evidence, the Court will not merely assume that the high proportion of hours

billed by partners on behalf of Plaintiffs was per se unreasonable, duplicative, or

wasteful.  See, e.g., Boston & Maine Corp. v. Moore, 776 F.2d 2, 9 (1st Cir. 1985)

("Associates . . . are not invariably more cost-effective than partners.  In some

circumstances, and assuming of course that the partner is not performing merely

routine work, the use of a more experienced attorney may save time because of his

ability to size-up and do only what needs to be done most effectively.").

Plaintiffs' attorneys demonstrated skill in a long, hard-fought, and difficult litigation. The Court finds that the hourly rates requested are reasonable, reflecting the skill and experience of counsel, and the nature of the work performed. See Serrano III, 20 Cal. 3d at 48-49.

><b>c.    Whether the Lodestar Should Be Discounted for Work Performed on Behalf of Non-California Resident Plaintiffs</b>

Chrysler contends that once the Court determines the appropriate amount of Plaintiffs' lodestar under section 1021.5, it should reduce that figure by 83 percent to reflect that only approximately 17 percent of the named plaintiffs are California citizens. Chrysler points out that "California law cannot support a fee award to persons to whom California law does not apply." (Def.'s Br. at p. 29.)

The Court agrees that a fee award under section 1021.5 may only be granted to the California-citizen Plaintiffs. As explained in the Court's previous opinion in this matter, New Jersey choice-of-law rules require section 1021.5 to be applied here "in determining *whether the 25 California Plaintiffs* are entitled to attorneys' fees." See Chin v. DaimlerChrysler, No. 95-5569, slip op. at 7 (D.N.J. Nov. 8, 2006) (emphasis added). However, there is no basis for Chrysler's attempt here to add an additional requirement to California's lodestar test. Because section 1021.5 only applies to the 25 California Plaintiffs in the first place, the first prong of the

lodestar test necessarily seeks only to ascertain "the reasonable hours spent" *representing California plaintiffs*. Accordingly, the issue here is whether the lodestar hours claimed by Plaintiffs should be reduced because some of those hours were not spent representing California plaintiffs. This issue is not, as Chrysler poses it, whether a properly determined lodestar should then be further reduced on the basis of the percentage of California citizen Plaintiffs.

As support for its argument, Chrysler cites the California Court of Appeal's opinion in Graham III. While reviewing a separate issue, that court noted that the Graham trial court "disallow[ed] fees for work done solely for Trekell (and Hawkins) [the two non-California-citizen Plaintiffs in the case]," and implied that this was done because section 1021.5 did not apply to them as non-citizens. See 2007 Cal. App. Unpub. LEXIS 906, at *21. However, Chrysler overlooks the key word in the Graham III Court's statement: "solely." In contrast to Graham, Chrysler does not contend here that any of the hours in Plaintiffs' lodestar were spent solely representing non-California-citizen Plaintiffs. There is no dispute that all lodestar hours were spent representing *both* the California-citizen and non-California-citizen Plaintiffs.

Chrysler argues that instead of granting fees for time spent representing both California- and non-California-citizen Plaintiffs, "it would be more appropriate to

deny fees altogether, as the same work would have been done regardless of whether there was a Plaintiff who happened to be a citizen of California." (Def.'s Br. 26.)  But the fact is that there are 25 Plaintiff citizens of California, and the Court fails to see why an hour spent representing a California plaintiff is no longer compensable, simply because that hour was also spent representing a plaintiff who is not a citizen of California.   Indeed, Chrysler offers no reason why, and instead its argument boils down to an assertion that California Plaintiffs should be denied fees for all hours reasonably spent on their behalf simply because they happened to have non-California-citizen co-Plaintiffs.  The Court rejects this proposition as illogical and fundamentally unfair, and the Court believes the California courts would agree.  Although there appears to be no California case law that expressly addresses the issue, there is strong analogous authority.  California courts have held that where a party is entitled to recover fees for hours spent on one cause of action, those hours are not to be in any way diluted or reduced simply because those hours were also spent asserting a factually or legally related cause of action not eligible for fees.  See, e.g., Akins v. Enter. Rent-A-Car Co., 94 Cal. Rptr. 2d 448, 452 (Cal. Ct. App. 1987); Drouin v. Fleetwood Enterprises, 209 Cal. Rptr. 623, 625 (Cal. Ct. App. 1985); see also Reynolds Metals Co. v. Alperson, 599 P.2d 83, 86 (Cal. 1979) ("Attorney's fees need not be apportioned when incurred for

representation on an issue common to both a cause of action in which fees are proper and on in which they are not allowed.")  The <u>Akins</u> court explained that "[w]hen the liability issues are so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not, then allocation is not required."  94 Cal. Rptr. 2d at 452; <u>see also</u> <u>Bell v. Vista Unified Sch. Dist.</u>, 98 Cal. Rptr. 2d 263, 273 (Cal. Ct. App. 2000) ("Apportionment is not required when the claims for relief are so intertwined that it would be impracticable, if not impossible, to separate the attorney's time into compensable and noncompensable units.")

While the issue here is different because Chrysler alleges non-entitlement to fees for hours spent on certain *plaintiffs*, as opposed to hours spent on certain *claims*, the cases are identical in that it is impossible in both situations to separate compensable hours from non-compensable hours because of their overlap.  In <u>Akins</u>, <u>Bell</u>, and similar California cases, the hours overlap because they were spent on multiple causes of action (some compensable, some not) involving the same legal or factual issues; here, the hours overlap because they were spent on multiple Plaintiffs (some compensable, some not) involving the same legal and factual issues.  Thus, the Court finds that the same result should apply, and holds

that the California Plaintiffs' lodestar hours will not be reduced because those hours were also spent representing plaintiffs who are not citizens of California.

### d.    Lodestar Conclusion

The number of hours reasonably spent representing the California-citizen Plaintiffs is 6,352.40.  These hours, multiplied by the prevailing hourly rates utilized by Plaintiffs' attorneys, results in a lodestar of $3,225,431.00.  Of this amount, $2,026,347.25 is attributable to the merits litigation; $1,199,083.75 is attributable to the fees litigation.[7]

### 2.    Multiplier

Once the lodestar is set, it may, if appropriate, be adjusted either upwards or downwards by the Court based on several factors, which seek "'to fix a fee at the fair market value for the particular action.  In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order

---

[7] This division of the lodestar figure between the merits and fee phases of the litigation comes from Trunko's report.  (See Trunko Decl., ¶ 11.)  Plaintiffs did not provide their own division, and did not dispute Trunko's calculations.  However, upon its own calculations, the Court has found that Trunko's figures fail to account for 4.6 hours, and $1,725 of Plaintiffs' total proposed lodestar.  (See id.)  The Court has added this missing $1,725 to the fee litigation portion of the lodestar, thus increasing Trunko's original computation of that amount from $1,197,358.75 to $1,199,083.75.  (See id.)

to approximate the fair market value for such services.'"  Graham I, 34 Cal. 4th at

579 (quoting Ketchum, 17 P.3d at 741).

The California Supreme Court has "recognize[d] that the enhancement

justified for fees in the underlying [merits] litigation may differ from the

enhancement warranted in the fee litigation, and that a lower enhancement, or no

enhancement, may be appropriate in the latter litigation."  Id. at 582.  Thus, the

Court will determine the proper multiplier, if any, for the lodestar attributable to

the merits and fee portions of the litigation separately.

### a.  Multiplier for Merits Litigation

The lodestar attributable to merits litigation in this case is $2,026,347.25.

That amount may be adjusted based on, *inter alia*, "(1) the novelty and difficulty of

the questions involved, (2) the skill displayed in presenting them, (3) the extent to

which the nature of the litigation precluded other employment by the attorneys,

[and] (4) the contingent nature of the fee award."  Ketchum, 17 P.3d at 741.  These

factors are not to be considered "to the extent they are already encompassed within

the lodestar," in order to avoid "unfair double counting."  Id. at 746.

Plaintiffs claim that the above factors justify a 3.5 multiplier.  Chrysler asks

the Court to reduce Plaintiffs' lodestar with a negative multiplier.

### (1)  Novelty and Difficulty of the Questions Involved

Plaintiffs argue that their case was novel and difficult because it involved a claim under the Magnuson-Moss Act, 15 U.S.C. § 2301, et seq., which must be asserted as a class action with at least 100 named plaintiffs in order to be heard in federal court, id. § 2310(d)(3)(C).  While amassing and coordinating 100 plaintiffs is surely no simple task, that difficulty speaks more to logistics, rather than the novelty or difficulty of any particular legal question.  There is nothing inherently more novel or difficult about the legal questions involved in a Magnuson-Moss Act claim; certainly, breach of warranty claims are not uncommon.  Furthermore, there were no particular issues on the merits in this case that were so inordinately novel or difficult that enhancing the lodestar on this basis would be warranted.  As the Supreme Court of California has noted, "for the most part, the difficulty of a legal question . . . [is] already encompassed in the lodestar.  A more difficult legal question typically requires more attorney hours . . . ."  Ketchum, 17 P.3d at 746.  The Court finds that any novelty or difficulty involved here is already encompassed by the number of hours included in the lodestar, and therefore, the lodestar will not be enhanced on this basis.

### (2)    Quality of the Work and the Results Obtained

Under California law, the lodestar may be enhanced "where an exceptional effort produced an exceptional benefit. . . . [H]igh-quality work may produce

greater results in less time than would work of average quality, thus justifying a multiplier." Thayer, 112 Cal. Rptr. 2d at 298 (internal quotations omitted). Because two factors are really involved here, the Court will address each in turn.

First, just as with the novelty and difficulty factor, the quality of the representation is for the most part already encompassed in the lodestar, since "a more skillful and experienced attorney will command a higher hourly rate." Ketchum, 17 P.3d at 746. Therefore, the California Supreme Court has cautioned, in order to avoid double counting, "a trial court should award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation." Id.

Plaintiffs' attorneys generally claim that their work on the merits of the case was "extensive" and demonstrated "substantial skill."  The Court has no reason to doubt these statements.  However, there is no evidence that their efforts rose to the level required by Ketchum in order to justify an enhancement over and above the hourly rates already reflected in the lodestar.  While Plaintiffs did achieve their major litigation goals, this does not automatically mean that this resulted from "exceptional" efforts.  Plaintiffs fail to specify why their efforts on the merits "far

44

exceed[]" those provided by other attorneys billing at similar rates. Thus, the Court will not award an enhancement on this basis.

The second factor is the results obtained. An enhancement is warranted on this basis where a court finds that "the underlying litigation . . . produced an *exceptional* benefit for consumers." Graham I, 34 Cal. 4th at 582 (emphasis added). A mere "significant benefit" to a large group of people is insufficient, since such a benefit "is under . . . section 1021.5 relevant only to the entitlement to fees in the first instance, not to the amount of those fees." Thayer, 112 Cal. Rptr. 2d at 297-98.

Plaintiffs' suit helped obtain the following results: the two Bendix repair campaigns, which included a total of 362,627 vehicles, 45,911 of which were owned by residents of California. (Decl. of Lawrence J. Sak ("Sak Decl."), ¶ 6.) The repair campaigns included free vehicle inspection and repair, reimbursement to owners for previous repairs, and a warranty extension on the Bendix ABSs. See Chin, No. 95-5569, slip op. at 15, 33 (D.N.J. Nov. 8, 2006). By September 30, 1998, Chrysler inspected 234,858 vehicles, and repaired 72,133 of those vehicles. (See Hufford Reply. Decl., Exs. A, B.) The number of reimbursements distributed is not known. Using Chrysler's cost projections, Plaintiffs estimate that the value

of the repairs and reimbursements made is upwards of $54 million, not counting the value of the warranty extensions.  Id. ¶ 8.

Despite these benefits, Chrysler argues that a negative multiplier is in order because the NHTSA investigation and the existence of other class action suits against Chrysler also contributed to the results obtained.  Chrysler first cites Californians for Responsible Toxics Mgmt. v. Kizer, 259 Cal. Rptr. 599 (Cal. Ct. App. 1989).  There, a plaintiff non-profit conservation group was awarded fees under section 1021.5 because its suit "acted as a catalyst in speeding up issuance" of a consent order between the defendant landfill-owner and state defendant that required the landfill-owner to comply with state environmental laws.  Id. at 601-02.  Despite being found a successful party, the trial court applied a negative multiplier of .35 to the plaintiff's lodestar, in part because the "[p]laintiff did not succeed on any of its motions," and because "the result achieved was contributed to by 'many other agencies, political entities and individuals.'"  Id. at 607-08.  The California Court of Appeal affirmed.  Id. at 608.

Moreover, Chrysler points out that in Thayer, the California Court of Appeal declined to apply a multiplier to the plaintiffs' lodestar under section 1021.5 because it was one of five identical actions which duplicated each others' efforts in achieving the results obtained.  112 Cal. Rptr. 2d at 299-303.

46

Plaintiffs counter with Graham, where the trial court applied a 2.25 multiplier to plaintiffs' merits-related lodestar,[8] even though only one of the plaintiffs was from California, only 7,000 vehicles in total were recalled, fewer than 1,000 of those vehicles were sold in California, Graham I, 34 Cal. 4th at 561, and where allegedly, "the government was far more involved than in this case," (Pls.' Reply Br. at 21.)

The Court finds that, on balance, the "results achieved" factor weighs slightly in favor of a positive enhancement to Plaintiffs' lodestar.  On the positive side of the ledger is the fact that the Graham court applied a 2.25 merits lodestar multiplier in a substantially similar case, where less relief was obtained by Plaintiffs' suit both in terms of the number of vehicles affected, and in terms of financial impact.  Even if Plaintiffs' $54 million estimate of the value of the relief obtained in this case is an overestimate, the mere $15 million value of the relief obtained in Graham surely pales in comparison.  See Graham I, 34 Cal. 4th at 563.

---

[8] On appeal, the California Supreme Court in Graham I vacated the multiplier applied to the *fee litigation* portion of the lodestar, not the 2.25 multiplier applied to the merits portion.  34 Cal. 4th at 579-84.  Accordingly, on remand, the trial court only revisited the portion of its fee award attributable to the fee litigation.  See Joint Decl. Ex. J, p. 14 (Graham II).  As a result, the trial court's original application of a 2.25 multiplier to the merits portion of the lodestar remained intact.

Three facts temper the positive impact of Graham.  First, the 2.25 multiplier applied in Graham did not completely result from the application of the "results obtained" factor.  "The trial court [also] based the enhancement on 'the contingency nature [of the litigation], [and] the delay in payment." Id. at 579 (first and third alterations in original).

Second, despite being "successful parties" under section 1021.5, Plaintiffs here were not successful in all of their motions, like the plaintiffs in Kizer.  While Plaintiffs successfully defended a motion to dismiss, they failed to achieve class certification, effectively ending the merits of their action.

Third, also like Kizer, other factors helped the Plaintiffs here achieve their "results obtained."  While Plaintiffs can claim 100 percent responsibility for obtaining the reimbursement and warranty extensions, the Court found in its November 8, 2006 opinion that Chrysler was partially motivated by a desire to end NHTSA's investigation when it agreed to offer free inspection and repair aspects of the Bendix recalls.  Furthermore, at least one other lawsuit was pending against Chrysler at the time of both recall announcements, and Chrysler's notes leading up to the announcements show that it was clearly concerned about multiple "class action lawsuits."  Chin, No. 95-5569, slip op. at 20-27, 39-40, 42 (D.N.J. Nov. 8, 2006).  While Plaintiffs' suit was enough of a causal factor to qualify as a

48

"catalyst" under section 1021.5 and <u>Graham I</u>, NHTSA and at least one other suit were surely on Chrysler's radar screen, and thus Plaintiffs cannot lay claim to *complete* responsibility for the results obtained.  Under <u>Kizer</u>, this suggests a negative multiplier.  <u>Graham</u> does not change this result.  As Plaintiffs point out, the <u>Graham</u> trial court applied a positive multiplier despite the fact that the California governmental agencies were indeed "involved"; however, those government agencies "were only concerned with DaimlerChrysler's false advertising materials and never sought any remedies on behalf of the consumers who acquired these vehicles while they were being misrepresented."  <u>Graham I</u>, 34 Cal. 4th at 564.  Thus, unlike here, there was no causal connection at all in <u>Graham</u> between the government's investigation and the relief the <u>Graham</u> plaintiffs catalyzed from Chrysler.

The extent to which <u>Kizer</u> suggests a negative multiplier in this case is lessened somewhat by the apparent existence of an additional factor in that court's decision to apply a negative multiplier.  One of the two defendants in <u>Kizer</u> had already settled with the plaintiffs, agreeing to pay a certain amount of attorneys' fees before the <u>Kizer</u> court's decision.  In setting the multiplier for the other defendant's fees, the trial court noted that "it would be unconscionable to assess [the second defendant] over 16 times the amount of fees paid by" the first

defendant who already settled, <u>Kizer</u>, 259 Cal. Rptr. at 606 (internal quotations omitted), and thus, was seemingly influenced by that figure in determining the second defendant's multiplier.  Of course, that influence does not exist here.

Finally, the Court rejects Chrysler's comparison between this case and <u>Thayer</u>, where the plaintiff's suit was found to be nearly completely superfluous to four other identical, contemporaneous, class actions.  <u>See</u> 112 Cal. Rptr. 2d at 840-45.  Plaintiffs suit here was a much stronger causal factor vis-à-vis NHTSA's investigation and the other actions then pending against Chrysler.

In sum, the Court finds that the large amount of relief obtained, discounted by aspects of that relief not solely attributable to Plaintiffs and certain unsuccessful aspects of the merits of their case, weighs in favor of a slight enhancement of Plaintiffs' lodestar under the "results obtained" factor.

### (3)   <u>Extent to Which the Nature of the Litigation Precluded Other Employment</u>

Next, Plaintiffs' attorneys claim their work on the Chin litigation forced them to forego other work.  As evidence, Plaintiffs offer the declarations of the lead attorneys from Lite DePalma and Pomerantz to this effect.  Chrysler argues that these general declarations, without any supporting facts, are insufficient to support a positive enhancement.  The Court agrees, and will not enhance the lodestar on this basis.  <u>See</u> <u>Robbins v. Alibrandi</u>, 25 Cal. Rptr. 3d 387, 399 (Cal Ct.

App. 2005) (rejecting trial court's conclusion that "it is axiomatic that time spent by individual attorneys on one case prevents them from spending time on another" where "[t]here is no showing that the firm employed by plaintiffs in fact was forced to turn away other work because of this case").

### (4)    Contingent Nature of the Fee Award

California courts commonly enhance lodestars on the basis of contingency risk.  As explained in Graham and Ketchum, "'[a] contingent fee must be higher than a fee for the same legal services paid as they are performed'" because the former must also compensate the attorney for loaning his legal services while bearing the high risk of non-payment in the event the case is lost.  Graham I, 34 Cal. 4th at 580 (quoting Ketchum, 17 P.3d at 742 (quoting Posner, Economic Analysis of Law (4th ed. 1992) pp. 534, 567.)).  During the merits phase of litigation, the risk of non-payment results from "the risk of not being a 'successful party,' i.e., of not prevailing on the merits."  Graham I, 34 Cal 4th at 583.

Plaintiffs' attorneys accepted the case on a contingency fee basis, and accordingly argue they are entitled to the contingency enhancement.  Chrysler counterargues that Ketchum requires Plaintiffs' attorneys to show that the individual Plaintiffs were unable to pay hourly fees, thus making the contingency arrangement necessary, in order to be found entitled to the enhancement.  Ketchum

51

requires no such thing.  The court did suggest that "difficult policy issues" may arise where attorneys accept a case on a contingency basis despite their clients' ability to pay; however immediately afterward it stated: "We need not, and do not, decide the point here."  <u>Ketchum</u>, 17 P.3d at 1139 n.4.  From this Chrysler seeks to create an evidentiary requirement that does not exist.  The Court rejects this effort.

It is not uncommon for nationwide product liability class-actions to be accepted on a contingency basis, and the Court finds nothing out of the ordinary here suggesting that Plaintiffs' attorneys unnecessarily did so just so they could ask for a contingency fee multiplier if they emerged victorious.  The merits lodestar will be enhanced for contingency risk.

### (5)    <u>Conclusion: Merits Litigation Multiplier</u>

The Court will enhance the merits lodestar on the basis of the results achieved and the contingent nature of the fee.   Because Plaintiffs failed to show entitlement to an enhancement on the difficulty, quality, and preclusion-of-other-work factors, the Court denies their request for a multiplier on these bases.

Looking to California case law,[9] the most factually analogous case is Graham.  The Graham trial court applied a 2.25 multiplier on the lodestar on the basis of three factors: (1) the contingency nature of the litigation; (2) the delay in payment; and (3) the quality of the result.  Graham I, 34 Cal. 4th at 579.  While the Graham I court overturned this multiplier as applied to the fee litigation portion of the lodestar, the merits portion remained untouched.

The contingency factor also exists in this case.  Delay in payment is not a factor here; Plaintiffs do not assert this factor as a basis for enhancement because they base their lodestar on present hourly billing rates.  (Pls.' Br. at 28 fn.13; See Graham I, 34 Cal. 4th at 583-84 ("[The delay in payment] enhancement . . . may be reduced or eliminated if the lodestar rate is based on the present hourly rate rather than the lesser rate applicable when the services were rendered.").

Third, while a more impressive result was achieved here than in Graham, the result achieved here was also partly attributable to the efforts of NHTSA and the existence of other class actions.

---

[9] Plaintiffs invite the Court to follow the case law of the United States Court of Appeals for the Third Circuit in determining what multiplier is appropriate; however, the Court declines this invitation.  The method of calculating fees is a matter of state substantive law.  See, e.g., Mangold v. California Pub. Utils. Comm'n, 67 F.3d 1470, 1478 (9th Cir. 1995).

Accordingly, a lesser lodestar multiplier is warranted here than was awarded in Graham.  The Court concludes that a multiplier of 1.5 will be applied to the $2,026,347.25 merits portion of Plaintiffs' lodestar, resulting in a total merits litigation fee award of $3,039,520.88.[10]  This result is supported by other California case law.  See Beasley v. Wells Fargo Bank, 1 Cal. Rptr. 2d 459, 465-66 (Cal. Ct. App. 1991) (affirming 1.5 multiplier on basis of result obtained and contingency risk factors).

### b.    Multiplier for Fee Litigation

"[I]t is well established that plaintiffs and their attorneys may recover attorney fees for fee-related matters."  Graham I, 34 Cal. 4th at 580.  However, "in most cases, the enhancement for the fee litigation should be lower than the enhancement for the underlying litigation if one is applied at all" because certain factors applicable to the merits litigation do not apply with the same force, or at all, to fee litigation.  Id. at 582.  For instance, the Graham I Court explained that a fee litigation lodestar should not be enhanced on the basis of the "results obtained" factor, because while the merits litigation may produce an exceptional benefit for consumers, "the same cannot be said of the fee litigation itself, which simply produced fees to compensate plaintiffs' attorneys for their efforts."  Id.

------

[10] This figure was rounded up to the nearest whole cent.

### (1)  Quality of the Work

The Graham I Court stated that an enhancement for the exceptional skill exhibited by the attorney "is rarely justified for fee-related litigation," which "is for the most part simpler than litigation on the merits."  Id.  The Court finds that this is not one of those "rarely justified" occasions justifying an enhancement, even though the fee-related litigation lasted much longer, and was legally more complicated than the merits litigation in this case.

The lodestar award adequately reflects the facts that Plaintiffs initially won a ruling that they could pursue attorneys' fees using a catalyst theory under the Magnuson-Moss Act.  Chin v. Chrysler, No. 95-5569, slip op. at 17 (D.N.J. Dec. 14, 1999).  After discovery on the catalyst issue, the U.S. Supreme Court decided Buckhannon, and on the basis of that case, this Court granted Chrysler's motion to reconsider its December 14, 1999 decision.  Chin v. DaimlerChrysler Corp., No. 95-5569, slip op. at 8 (D.N.J. Aug. 14, 2003).  Undeterred, Plaintiffs cross-moved for an order finding them entitled to fees under California law, and were ultimately successful in light of the California Supreme Court's decision in Graham I.

### (2)  Contingent Nature of the Fee Award

In contrast to the risk of not prevailing on the merits, contingency risk during fee litigation is a function of "the risk of not establishing eligibility for an

attorney fee award." <u>Graham I</u>, 34 Cal. 4th at 583.  This risk "is generally less than

the risk of litigation on the merits," and thus, "justifies a lower attorney-fee

multiplier . . . if one is given at all." <u>Id.</u>  Nevertheless, the <u>Graham I</u> Court did also

note that in catalyst theory cases, because the plaintiffs have "not established

themselves as the successful party at the beginning of the fee litigation," the more

substantial risk of failure on the merits still exists during the fee litigation, and

therefore "some enhancement for that risk may be justified." <u>Id.</u>  But the court

also stated that "the achievement of [the plaintiffs'] litigation objective before fee

litigation would reduce somewhat the uncertainty over their 'successful party'

status." <u>Id.</u>

      Here, because Plaintiffs' eligibility for fees was only established upon a

finding that they were a "successful party" under section 1021.5, the first "risk of

not establishing eligibility," and the second, "more substantial," risk of not being a

successful party co-existed throughout the entirety of the fee litigation--although

that uncertainty was reduced somewhat by Chrysler's announcements that they

would initiate the Bendix recall campaigns.  Nevertheless, the amount of

contingency risk existing during the fee litigation did not differ significantly from

that which existed during the merits phase.  Despite Chrysler's recall

announcements, there was great uncertainty as to whether Plaintiffs could qualify

56

as successful parties due to the <u>Buckhannon</u> decision, and later, the <u>Graham I</u> decision.  Perhaps in the usual case, where the legal landscape is clear, "the risk of fee litigation is generally less than the risk of litigation on the merits."  <u>See</u> <u>Graham I</u>, 34 Cal. 4th at 583.  However, this case did not involve the usual fee litigation. The Court will award a multiplier for contingency risk during fee litigation on par with that which it awarded for the merits phase.

### (3)   <u>Where Defendant's Opposition to the Fee Motion Creates Extraordinary Difficulties</u>

A multiplier is permitted for the fee litigation lodestar where "a defendant's opposition to the fee motion creates extraordinary difficulties," although "attorney fees may not be used to punish defendants."  <u>Graham I</u>, 34 Cal. 4th at 582-83.  The <u>Graham I</u> court cited two cases to illustrate the application of this factor.  First, it cited <u>Edgerton v. State Personnel Board</u>, where the court affirmed a multiplier for defendant's "intransigent opposition," in particular, pointing out that the defendant continued to oppose the litigation after turning down a reasonable settlement offer from the plaintiff.  100 Cal. Rptr. 2d 491, 500 (Cal. Ct. App. 2000).  The <u>Graham I</u> court also cited <u>Crommie v. California</u>, where the district court applied a multiplier "in light of defense counsel's excessively vexatious and often unreasonable opposition to plaintiffs' counsel."  840 F. Supp. at 726.

Plaintiffs list numerous objections to Chrysler's litigation tactics.  Of these objections, the Court will first disregard those related to Chrysler's actions in the Graham, Buckhannon, Garbie v. DaimlerChrysler Corp., 211 F.3d 407 (7th Cir. 2000), and Weaver v. Chrysler Corp., 1998 WL 477725 (S.D.N.Y. Aug. 14, 1998) litigations, as they simply are not relevant to whether Chrysler created "extraordinary difficulties" in this case.

Second, the Court rejects Plaintiffs' appeals to apply a multiplier because Chrysler allegedly (1) failed to obey Magistrate Judge Chesler's February 4, 1998 case management order; (2) attempted to block the deposition of former Chrysler Chief Operating Officer Robert Eaton; and (3) failed to designate appropriate deposition witnesses.  These complaints were addressed and rejected by then-Magistrate Judge Chesler in a May 2, 2001 opinion denying Plaintiffs' motion for sanctions against Chrysler under Federal Rules of Civil Procedure 16(f), 37(b) and (d).  (Docket Entry #180.)

As to the first allegation, the Magistrate Judge did find that Chrysler's counsel "frustrated" the case management order's purpose, and in doing so "behaved deplorably,"and engaged in "conduct [that] should not . . . be applauded."  (Id. at 1-7.)  However, the Magistrate Judge ultimately found that Chrysler did not violate the terms of the case management order.  (Id. at 3.)

58

Additionally, the Magistrate Judge explained that Plaintiffs evidently suffered no prejudice from Chrysler's actions, since, instead of filing timely objections that would have permitted the Court to correct the behavior, Plaintiffs opted to move for post-discovery sanctions in hopes of winning a monetary award. (Id. at 5-7.) While a defendant's opposition does not necessarily have to be sanctionable in order to "create[] extraordinary difficulties," the Magistrate Judge's finding of no prejudice indicates that the difficulties Plaintiffs incurred did not rise to the level of "extraordinary."  To the extent Chrysler's actions created difficulties, the additional hours spent dealing with those difficulties are already reflected in the lodestar.

As to the second and third allegations, the Magistrate Judge explicitly found that Chrysler did not improperly block Eaton's deposition, or fail to designate appropriate deposition witnesses.  (Id. at 7-8.)  Plaintiffs' reassertion of these rejected allegations six years later as alleged bases for a lodestar multiplier is frivolous.

Third, Plaintiffs argue that Chrysler's alleged assertion of "plainly groundless arguments" constituted "extraordinary difficulties."  The Court rejects this contention.  Chrysler's argument that other class actions were the true catalysts for its recalls was ultimately rejected by the Court; however, the argument was not

*plainly groundless*, especially since those other suits were generally contemporaneous to the time of the recalls.  Finally, the only difficulties created by Chrysler's repeated assertions that this Court could not apply section 1021.5 were borne by the Court itself, in that it had to repeatedly reject Chrysler's argument.

All that remains of Plaintiffs' objections is (1) their claim that Chrysler submitted false declarations from Chrysler executives, and (2) the Court's July 12, 2006 order admonishing Chrysler's repeated deposition requests as a delay tactic intended "perhaps to cause further expense to plaintiffs or their counsel."  See <u>Chin v. Chrysler</u>, No. 95-5569, slip op. at 7 (D.N.J. July 12, 2006).   As to this conduct, the Court reiterates then-Magistrate Judge Chesler's reprimand that "Chrysler's conduct should not . . . be applauded," and the Court regrets that this rebuke apparently fell upon deaf ears.  However, these two instances alone fail to rise to the level of "extraordinary difficulties" that justify a multiplier increasing Plaintiffs' attorneys fees above and beyond that already reflected in the lodestar. The Court declines to apply a multiplier under this factor.

### (4)    Conclusion: Fee Litigation Multiplier

The Court will enhance the $1,199,083.75 fee litigation lodestar with a 1.2 multiplier on the basis of the contingent nature of the fee.  This enhancement increases the fee litigation attorneys' fee award to $1,438,900.50.

### 3.   Total Attorneys' Fee Award

The Court will grant Plaintiffs a total attorneys' fee award of $4,478,421.38 under section 1021.5.  This figure is the sum of the $3,039,520.88. merits litigation fee award, and the $1,438,900.50 fee litigation fee award.

### B.   Expenses

Under California law, "nonrecoverable expenses incurred by counsel may be awarded under section 1021.5 if . . . they represent expenses ordinarily billed to a client and are not included in the overhead component of counsel's hourly rates." Beasley, 1 Cal. Rptr. 2d at 468.  The Court is satisfied that Plaintiffs' claimed expenses satisfy this standard, as demonstrated by their submitted affidavits.  (Lite Aff., Ex. B; Hufford Decl., Ex. E; Bashian Aff., Ex. 2.)  The Court has considered and rejects Chrysler's unsupported contentions that Plaintiffs' request is improperly documented and unrecoverable as a matter of law.  Accordingly, the Court will award Plaintiffs $176,011.76 in expenses under section 1021.5.

## III.   Conclusion

For the foregoing reasons, the Court will award Plaintiffs attorneys' fees in the amount of $4,478,421.38, and expenses in the amount of $176,011.76 for a total of $4,654,433.14.  An appropriate order is filed herewith.

/s/ John C. Lifland, U.S.D.J.

May 14, 2007